## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PERRY SHAPIRO, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:24-cv-00169 |
| | Honorable Franklin U. Valderrama |
| Plaintiff, | |
| | AMENDED CLASS ACTION COMPLAINT |
| v. | |
| | |
| ASSERTIO HOLDINGS, INC., DAN PEISERT, PAUL SCHWICHTENBERG, AJAY PATEL, SPECTRUM PHARMACEUTICALS, INC., THOMAS RIGA, and NORA BRENNAN, | JURY TRIAL DEMANDED |
| | |
| Defendants. | |

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................ 1

II.    JURISDICTION AND VENUE ...................................................................... 6

III.   PARTIES ......................................................................................................... 6

IV.  SUBSTANTIVE ALLEGATIONS .............................................................. 10

     A.     ASSERTIO'S RELIANCE ON INDOCIN AS ITS KEY PRODUCT ............... 10

     B.     ASSERTIO SOUGHT TO ACQUIRE A NEW PRODUCT TO OFFSET THE RISK OF COMPETITION TO INDOCIN ............................................................ 17

     C.     ASSERTIO ACQUIRED SPECTRUM TO COUNTERACT THE RISK OF GENERIC COMPETITION FOR INDOCIN ....................................................... 18

     D.     A SUBSTANTIAL PORTION OF SPECTRUM'S TEAM STAYED ON AT ASSERTIO FOLLOWING THE ACQUISITION ............................................... 22

     E.     DEFENDANTS VALUED SPECTRUM BASED ON UNREALISTIC ROLVEDON SALES FIGURES ........................................................................ 24

     F.     CONFIDENTIAL WITNESSES EXPLAIN THAT SPECTRUM'S REVENUES WERE IMPROPERLY INFLATED ................................................................. 28

            a)     CW 1 ........................................................................................ 28

            b)     CW 2 ........................................................................................ 31

            c)     CW 3 ........................................................................................ 33

            d)     CW 4 ........................................................................................ 35

     G.     ASSERTIO'S EXECUTIVE DEPARTURES .................................................. 36

     H.     THE INDIVIDUAL DEFENDANTS REAPED LARGE PROFITS FROM THEIR FRAUD ................................................................................................ 37

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ....................................................................... 40

     A.     MATERIALLY FALSE AND MISLEADING STATEMENTS PRIOR TO THE ANNOUNCEMENT OF THE SPECTRUM ACQUISITION ............................. 40

     B.     MATERIALLY FALSE AND MISLEADING STATEMENTS ANNOUNCING THE SPECTRUM ACQUISITION ................................................................. 42

     C.     MATERIALLY FALSE AND MISLEADING STATEMENTS ANNOUNCING FIRST QUARTER 2023 FINANCIAL RESULTS ............................................. 47

i

D.    MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE PROXY MATERIALS FOR THE MERGER ................................................................. 53

E.    MATERIALLY FALSE AND MISLEADING STATEMENTS ANNOUNCING COMPLETION OF THE SPECTRUM ACQUISITION AND SECOND QUARTER 2023 FINANCIAL RESULTS ............................................................ 61

F.    MATERIALLY FALSE AND MISLEADING STATEMENTS AMENDING FINANCIAL DISCLOSURES RELATED TO THE MERGER ......................... 65

G.    MATERIALLY FALSE AND MISLEADING STATEMENTS ANNOUNCING THIRD QUARTER 2023 FINANCIAL RESULTS ............................................ 68

VI.    THE TRUTH BEGINS TO EMERGE ............................................................................. 71

VII.    ADDITIONAL SCIENTER ALLEGATIONS ................................................................. 78

A.    THE INDIVIDUAL DEFENDANTS' MOTIVE TO COMMIT FRAUD........... 78

B.    THE INDIVIDUAL DEFENDANTS' KNOWLEDGE OR RECKLESSNESS AS TO THE FRAUD ................................................................................................. 78

VIII.    NO SAFE HARBOR ....................................................................................................... 82

IX.    CLASS ACTION ALLEGATIONS ................................................................................. 83

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS .................................................................. 85

XI.    VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT ............. 86

XII.    VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE EXCHANGE ACT ............. 91

XIII.    PRAYER FOR RELIEF ................................................................................................. 97

XIV.    DEMAND FOR TRIAL BY JURY ................................................................................. 98

Lead Plaintiff Continental General Insurance Company and additional plaintiffs Perry Shapiro, David Cox, and Tihomir Atanasov (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' (defined below) public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by Assertio Holdings, Inc. ("Assertio" or the "Company") and Spectrum Pharmaceuticals, Inc. ("Spectrum"), analysts' reports and advisories about the Company, interviews of confidential witnesses, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I.     **INTRODUCTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Assertio securities between March 9, 2023 and January 3, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, as well as to pursue remedies under Sections 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

2.      Assertio is a commercial pharmaceutical company. Its primary product is Indocin,

---

[1] Emphases herein are added unless noted otherwise below.

a nonsteroidal anti-inflammatory drug marketed in an oral and suppository formulation used to treat rheumatoid arthritis, inflammation, and other painful conditions. Assertio's business is highly dependent on Indocin. In 2022, 64% of the Company's revenue came from Indocin and that figure rose to 70% in the first two quarters of 2023.

3.  Assertio benefited from a de facto monopoly over the suppository form of Indocin. This posed a significant risk to Assertio because Indocin was not patented. A generic competitor could therefore enter the market and substantially cut into Assertio's core business.

4.  The Company was acutely aware of this risk. Before the Class Period, it sued a wholesale compounding pharmacy that was selling an indomethacin suppository formulation that competed with Indocin in what Assertio alleged was a violation of the Food, Drug and Cosmetic Act. Assertio also appears to have hired a pharmaceutical consulting organization in 2021 to challenge a petition that Zydus Lifesciences Limited ("Zydus") submitted to the FDA to have an indomethacin suppository declared suitable for submission in an Abbreviated New Drug Application.

5.  Because of the risk that Indocin could face generic competition, Assertio's highest priority was to acquire a patented product that would offset the potential decline in revenue from Indocin if a generic competitor was approved by the FDA.

6.  Assertio followed through on this strategy by announcing on April 25, 2023, that it agreed to acquire Spectrum, for between $248 million and $291 million (sometimes referred to as the "Merger"). Spectrum's sole commercial product was Rolvedon, a patented oncology drug that first launched in the fourth quarter of 2022. Assertio repeatedly promoted the Spectrum acquisition as a means of "diversifying" Assertio's revenue, including by "reduc[ing] Indocin Revenue Concentration."

7.     This risk of generic competition for Indocin came about when, immediately after Assertio's acquisition of Spectrum closed, on August 3, 2023, the Company announced that Zydus received FDA approval to manufacture and market 50mg indomethacin suppositories and the FDA granted Zydus 180-day exclusivity to market the product. On this news, Assertio's stock price fell 45.6% on August 4, 2023. Defendant Peisert, Assertio's CEO, tried to reassure investors that the Spectrum Acquisition would offset the negative effect of competition to Indocin. He stated that the FDA's approval of a generic competitor to Indocin "highlight[s] our strategic need to diversify the business and why the merger of Spectrum was important."

8.     The Spectrum acquisition, however, was not the solution that Defendants promised. Assertio valued Spectrum between $248 million and $291 million based on projections that Rolvedon would have between $130 million and $190 million in sales in 2024 (the first year after the acquisition) and between $157 million and $261 million in sales in 2025. These assumptions were quickly dashed when Rolvedon's sales were only $7.1 million for the two months following the Spectrum acquisition. This put sales far off pace from the $46 million that Assertio projected for the second half of the year and even farther off from the projections for future growth.

9.     Defendant Peisert admitted on November 8, 2023, that these results were "disappointing" and that Assertio was "learning that certain aspects of the acquisition may not be everything we initially expected." Assertio explained that these anemic sales were a result of there having been "high levels of inventory in the channel at the end of second quarter." Assertio's stock price fell dramatically in response, dropping over 43% the following day and continuing to fall over 14% the following two trading days.

10.     Peisert attempted to reassure investors that Rolvedon sales would improve, stating that "we did not buy Spectrum just for the third quarter." But confidential witnesses have explained

that Rolvedon performed so poorly because Spectrum artificially inflated sales leading up to the acquisition, and the projections for Rolvedon that served as the foundation for the transaction had no basis in its actual business performance.

11.     CW 1, a member of Assertio's executive team that reported directly to Defendant Peisert, explained that Spectrum engaged in channel stuffing or otherwise improper sales practices for Rolvedon leading up to the acquisition. Spectrum oversold Rolvedon at the end of prior quarters so that its largest customers "were sitting on a lot of the product." After the acquisition, those customers "weren't ordering because they were sitting on so much" as a result of their "buy and hold" arrangements. Rolvedon was therefore unable to meet its sales projections in the quarters that followed Assertio's acquisition. Spectrum's sales practices thus undercut the rationale for the acquisition and the amount that Assertio valued Spectrum in the deal.

12.     The Individual Defendants reaped substantial profits from their fraud. Spectrum's executives, including Defendants Riga and Brennan, orchestrated this scheme because they received millions of dollars in compensation upon completion of the acquisition. Defendant Riga's Spectrum securities were worth over $9 million after they were inflated by Spectrum's overvaluation in the acquisition, Defendant Brennan's were worth approximately $1.8 million, and both of them also benefited from other "arrangements with Spectrum that provide for certain severance payments or benefits" in connection with the acquisition. As CW 1 stated, "Riga and [the Spectrum] executive team walked away with millions in hand."

13.     On the flipside, Assertio's executives were desperate to buy Spectrum to offset the impending generic competition for Indocin; had access to all of Spectrum's sales data leading up to, and following, the acquisition; and engaged in highly suspicious stock sales in September 2023, unloading Assertio shares for hundreds of thousands of dollars in gains. These stock sales were

particularly suspicious because all three of these Defendants sold on the same day in September 2023, shortly before Assertio was forced to disclose the disappointing Rolvedon results for the third quarter of 2023, and they were all for a substantial portion of each of these Defendants' holdings of Assertio stock.

14.     CW 1 also explained that Assertio's executives were aware of Rolvedon's poor sales because they monitored those figures in weekly sales meetings that CW 1 attended with Defendants Peisert and Schwichtenberg. This group was "getting really anxious" about Rolvedon's sales weakness by the end of August 2023 and was panicked in September.

15.     Rather than disclose these facts, Assertio downplayed the problem by concealing Spectrum's improper sales practices that diminished Spectrum's value, and reassuring investors that results would improve in subsequent quarters. But because the problem was rooted in Spectrum's deceptive sales practices, it could not be fixed so easily. As a result of those improper sales practices, Rolvedon was a fundamentally weaker product than Defendants represented in the acquisition, and its sales continued to disappoint. Defendant Peisert was fired on January 2, 2024, because of these issues, causing Assertio's stock to drop another 22%.

16.     Defendants misrepresented fundamental aspects of Assertio's business throughout the Class Period. First, Assertio improperly promoted the strength of Indocin to its business and downplayed the risk of a generic competitor to its key product, despite knowing that multiple companies were already trying to compete with Indocin.

17.     Then, because both Assertio and Spectrum were desperate to do a deal, they misrepresented the acquisition as highly beneficial to Assertio shareholders based on the addition of Rolvedon to Assertio's portfolio, despite knowing that past Rolvedon sales were inflated by

improper sales practices and that the projections that formed the basis for the transaction were completely unrealistic.

18.     Finally, after Assertio's acquisition of Spectrum closed, Assertio downplayed Rolvedon's poor performance and reassured investors that it would improve, rather than disclose the truth that Spectrum could not live up to what Defendants promised in the acquisition, because that assessment of Spectrum was based on its improper sales practices.

## II.     JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

21.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Assertio is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

22.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

23.     Plaintiff Continental General Insurance Company, as set forth in the Certification included in its motion to be appointed lead plaintiff, acquired the Assertio's securities at artificially

inflated prices during the Class Period and was damaged upon the revelation of the truth described below. (ECF No. 33-3).

24.     Plaintiff Perry Shapiro, as set forth in the attached Certification, acquired Assertio's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the truth described below.

25.     Plaintiff David Cox, as set forth in the attached Certification, acquired Assertio's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the truth described below.

26.     Plaintiff Tihomir Atanasov, as set forth in the attached Certification, acquired Assertio's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the truth described below.

27.     Defendant Assertio is a Delaware corporation with principal executive offices located at 100 S. Saunders Road, Suite 300, Lake Forest, Illinois, 60045.  Assertio's common stock trades in an efficient market, the Nasdaq Capital Market ("NASDAQ"), under the ticker symbol "ASRT".  As of March 1, 2022, Assertio had 19 full-time employees. As of March 6, 2023, Assertio had 30 full-time employees.

28.     Defendant Daniel A. Peisert ("Peisert") served as Assertio's President, CEO, and a Director from December 14, 2020, until his departure on January 2, 2024. Before that time, he served in other senior positions at the Company since he joined it in September 2017, including as its Chief Financial Officer ("CFO") from December 2018 to December 2020.

29.     Defendant Paul Schwichtenberg ("Schwichtenberg") has served as Assertio's Senior Vice President and Chief Commercial Officer since February 2024, prior to which he served as Senior Vice President, Commercial Pricing, Analytics and Distribution from November 2023.

7

Schwichtenberg served as the Company's Senior Vice President and CFO from March 2021 until November 2023. Prior to that, he served as the Company's Vice President, Finance from when he joined the Company in April 2018.

30.     Defendant Ajay Patel ("Patel") has served as Assertio's Senior Vice President and CFO since November 2023, prior to which he served as Senior Vice President and Chief Accounting Officer from March 2021 and as Vice President, Controller from when he joined the Company in July 2019.

31.     Defendant Spectrum was a Delaware corporation with principal executive offices located at Pilot House - Lewis Wharf, 2 Atlantic Ave, 6th Floor, Boston, Massachusetts, 02110, until it was acquired by Assertio in July 2023.

32.     Defendant Thomas Riga ("Riga") was Spectrum's President, CEO, and Director from December 2021 until the acquisition by Assertio, at which time he remained on in a consulting capacity for Assertio following the transaction. Riga served as Spectrum's Chief Operating Officer from December 2017 to December 2021, as Executive Vice President from May 2017 to December 2021, and as Chief Commercial Officer from August 2014 to December 2021. From June 2017 to December 2017, he served as Spectrum's Head of Business Developments, and was employed at Spectrum in other roles since July 2013.

33.     Defendant Nora Brennan ("Brennan") was Spectrum's CFO from May 2022 until it was acquired by Assertio. Brennan was the CFO of other biotechnology companies from 2017 until she joined Spectrum in May 2022 (other than from April 2018 until January 2019, when she performed consulting service).

34.     Defendants Peisert, Schwichtenberg, Patel, Riga, and Brennan are sometimes referred to herein as the "Individual Defendants."

35.     Defendants Peisert, Schwichtenberg, and Patel are sometimes referred to herein as the "Assertio Individual Defendants."

36.     Defendants Riga and Brennan are sometimes referred to herein as the "Spectrum Individual Defendants."

37.     Assertio, Spectrum, and the Individual Defendants are collectively referred to herein as "Defendants."

38.     The Assertio Individual Defendants possessed the power and authority to control the contents of Assertio's SEC filings, press releases, and other market communications (including statements therein about Spectrum). The Assertio Individual Defendants were provided with copies of Assertio's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Assertio, and their access to material information available to them but not to the public, the Assertio Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Assertio Individual Defendants are liable for the false statements and omissions pleaded herein.

39.     The Spectrum Individual Defendants possessed the power and authority to control the contents of Spectrum's SEC filings, press releases, and other market communications, as well as those made with Assertio in connection with the Company's acquisition of Spectrum. The Spectrum Individual Defendants were provided with copies of these SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their position

with Spectrum, and their access to material information available to them but not to the public about Spectrum and its acquisition by Assertio, the Spectrum Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Spectrum Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.  SUBSTANTIVE ALLEGATIONS

### A.  Assertio's Reliance on Indocin as its Key Product

40.    Assertio is a commercial pharmaceutical company that purportedly offers differentiated products to patients utilizing a non-personal promotional model.

41.    One of the Company's primary pharmaceutical products is Indocin, a nonsteroidal anti-inflammatory drug composed of indomethacin and marketed in an oral and suppository formulation used to treat arthritis, rheumatoid arthritis, inflammation, and other painful conditions.

42.    Assertio acquired Indocin pursuant to a merger that it conducted on May 20, 2020 with Zyla Life Sciences, the prior owner of Indocin.

43.    Indocin was Assertio's most important product at the start of the Class Period. It accounted for 55% of Assertio's revenue in 2021 (or $60.56 million out of $111.01 million total), 64% of Assertio's revenue in 2022 (or $100.34 million out of $156.23 million total), and 70% of Assertio's revenue in the first two quarters of 2023 (or $58.42 million out of $83.46 million total).

44.    While Indocin no longer had patent protection, Assertio benefited from a de facto monopoly over the suppository form of Indocin because its market was "relatively small," thus "potential profits from the sale of rectal indomethacin have been insufficient to encourage additional companies to manufacture and distribute rectal indomethacin." The main use of the

suppository form of Indocin was "for post-[endoscopic retrograde cholangiopancreatography (ERCP)] pancreatitis," which was demonstrated in 2012.[2]

45.     Assertio and its predecessors that  previously owned Indocin massively raised the drug's price, so that a box of 30 anti-inflammatory rectal suppositories that cost $198 in 2008 rose to $10,350 as of October 2021. Assertio's price increases of this drug is one of the prime examples "of how nothing prevents drug companies from hiking prices at will."[3]

46.     In addition to being unethical, this practice increased the risk of generic competition because of the higher price for the drug.

47.     The risk of competition was further increased because the "FDA Reauthorization Act of 2017 created a pathway for the designation of drugs with inadequate competition as 'Competitive Generic Therapies,' meaning there are no generic medications or only one generic version available, as is the case for indomethacin suppositories. This designation provides for expedited approval of new generic drugs and additional incentives for market entry."[4]

48.     Assertio knew that others were applying for approval of a competitor to Indocin. The FDA's records show that Zydus, which manufactures generic drugs, submitted a suitability petition to the FDA by March 9, 2021, requesting that the FDA declare a 100 mg indomethacin suppository formulation would be suitable for submission in an Abbreviated New Drug

---

[2] B.J. Elmunzer, I. Hernandez, & W.F. Gellad, *The Skyrocketing Cost of Rectal Indomethacin*, 180 J. Am. Med. Ass'n Internal Med., 631-32 (2020) ("The Skyrocketing Cost of Rectal Indomethacin") (available through the National Library of Medicine: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7483935/).

[3] Bob Herman, *This Arthritis Drug Cost $198 in 2008. Now It's More Than $10,000*, Axios (Oct. 18, 2021) (https://www.axios.com/2021/10/18/indocinsuppository-drug-prices-assertio-zyla-egalet).

[4] The Skyrocketing Cost of Rectal Indomethacin.

Application ("ANDA").[5] Zydus withdrew this petition on September 29, 2023, after the FDA granted final approval to Zydus on August 3, 2023, for a Competitive Generic Therapy designation with respect to the 50 mg suppository formulation of indomethacin.[6]

49.     The FDA docket for Zydus' suitability petition also shows that, on September 3, 2021, while the petition was pending, ProPharma Group ("ProPharma") (a pharmaceutical industry research consulting organization) submitted comments to the FDA on Zydus's suitability petition "on behalf of a client," requesting that the petition be denied.[7]

50.     ProPharma's comment did not identify the "client" on whose behalf it was submitted, but the most logical conclusion is that it was submitted on behalf of Assertio (or Assertio subsidiary Zyla), because Assertio maintained a de facto monopoly over the Indocin suppository formulation. Assertio was thus the only company that had an economic incentive to oppose a generic version of an indomethacin suppository in order to prevent competition with the Company's drug currently on the market.

51.     At least one other company was also trying to receive an ANDA for a 100 mg indomethacin suppository. On or about March 3, 2023, Hopewell Pharma Ventures, Inc. ("Hopewell Pharma") submitted a suitability petition to the FDA that similarly sought FDA

---

[5] While ANDAs are not public, suitability petitions to submit an ANDA are. The purpose of a suitability petition is to get approval to be able to submit an ANDA for the review of a generic product that has certain differences from the reference drug, such as the petitions here in reference to a 100 mg rather than 50 mg suppository formulation of indomethacin.

[6] The Zydus suitability petition was assigned Docket No. FDA-2021-P-0344. See https://www.regulations.gov/docket/FDA-2021-P-0344/; https://downloads.regulations.gov/FDA-2021-P-0344-0001/attachment_1.pdf; https://downloads.regulations.gov/FDA-2021-P-0344-0015/attachment_1.pdf.

[7] *See* https://www.regulations.gov/comment/FDA-2021-P-0344-0005.

approval of a 100 mg suppository formulation of indomethacin.[8]

52.     Furthermore, Assertio faced competition against Indocin from yet another source, because hospitals could purchase indomethacin from wholesale compounding pharmacies.

53.     The Food, Drug and Cosmetic Act ("FDCA") authorizes a "Section 503B" designation under which certain wholesale compounding pharmacies may manufacture large batches of medications (with or without existing prescriptions for particular patients), and sell and directly distribute ready and reliable sterile medications to healthcare facilities.

54.     By September 16, 2022, Assertio knew that a 503B compounding pharmacy called Wells Pharma of Houston LLC ("Wells Pharma") had begun marketing an indomethacin suppository formulation that competed with Indocin. On that date, Assertio sent Wells Pharma a cease-and-desist letter, claiming that Wells Pharma's drug was prohibited by the FDCA because it was "essentially a copy" of Assertio's FDA-approved Indocin suppositories.

55.     Wells Pharma then filed a case against Assertio (and its subsidiary Zyla) in the United States District Court for the Central District of California, seeking a judicial declaration that Assertio's threatened claims against Wells Pharma are prohibited by the FDCA and the doctrine of implied preemption.[9] Then, on December 20, 2022, Assertio (through Zyla) filed an action in the United States District Court for the Southern District of Texas seeking to enjoin Wells Pharma from competing on the grounds that Wells Pharma had not received clearance from the FDA, purportedly in violation of certain state consumer protection laws.[10] Assertio's complaint

---

[8] Hopewell Pharma's suitability petition was assigned Docket No. FDA-2023-P-0806-0001. *See* https://www.regulations.gov/docket/FDA-2023-P-0806.

[9] *Wells Pharma of Houston, LLC v. Assertio Holdings, Inc.*, No. 2:22-cv-06921-SVW-JPR (C.D. Cal.) (the "Wells Pharma California Action").

[10] Complaint, *Zyla Life Scis., LLC v. Wells Pharma of Houston, LLC*, No. 4:22-cv-04400, (S.D. Tex. Dec. 20, 2022), ECF No. 1 (the "Wells Pharma Texas Action").

against Wells Pharma alleged, in part, that the Company had "lost customers and market share for its Indocin® Suppositories as a direct result of Defendant's unlawful and unfair competition," "refrained from raising its prices and in certain instances has reduced its prices in an effort to dissuade its customers from switching to [Wells Pharma's] unlawful indomethacin suppositories," and "been deprived of money or property and has suffered injury in the form of price erosion, as well as the lost sales, lost customers and lost market share that have been diverted from [Zyla] to [Wells Pharma]."[11]

56.    Assertio stated in its annual report for 2022, filed with the SEC on Form 10-K on March 8, 2023:

> ***INDOCIN suppositories recently began facing competition from a 503B outsourcing facility (commonly referred to as a 503B compounder) which adversely affects our business. Approval of generic versions of our other products, including the INDOCIN products which are not patent protected and may face generic competition at any time, would have an adverse effect on our business.***
>
> Under the FDCA, the FDA can approve an ANDA for a generic version of a branded drug without the ANDA applicant undertaking the clinical testing necessary to obtain approval to market a new drug. In place of such clinical studies, an ANDA applicant usually needs only to submit data demonstrating that its product has the same active ingredient(s) and is bioequivalent to the branded product, in addition to any data necessary to establish that any difference in strength, dosage, form, inactive ingredients or delivery mechanism does not result in different safety or efficacy profiles, as compared to the reference drug.
>
> There are no patents covering the INDOCIN products (which accounted for 64% of our revenue in 2022), which means that a generic drug company could introduce a generic for these drugs at any time. In addition, we are aware of other drug companies that have had interactions with regulatory agencies including FDA relating to indomethacin, which could indicate the development of one or more INDOCIN product generics or other formulations of indomethacin. Furthermore, a 503B outsourcing facility (commonly referred to as a 503B compounder) recently began

---

[11] *See, e.g.*, Amended Complaint ¶¶ 46-48, *Zyla Life Scis. LLC v. Wells Pharma of Houston, LLC*, No. 4:22-cv-04400 (S.D. Tex. Jan. 3, 2023), ECF No. 9.

compounding 100 mg indomethacin suppositories in what we believe to be violation of certain provisions of the FDCA, including, among others, Section 505 approval requirements for new drugs and labeling requirements related to adequate directions for use. For a 503B compounder to qualify for exemptions from these requirements, the 503B compounder must meet certain conditions set forth in Section 503B of the FDCA, including (1) using only bulk drug substances (i.e., indomethacin) that appear on a list identifying the bulk substances for which the FDA has determined that there is clinical need to use in compounding or that the drug product compounded from a bulk drug substance appears on FDA's drug shortage list; and (2) compounding a drug product that is not "essentially a copy" of an FDA-approved product. We believe that the 503B compounder compounding 100 mg indomethacin suppositories does not meet these conditions as indomethacin is not on FDA's list of bulk substances for which there is a clinical need and INDOCIN suppositories are not on the FDA's drug shortage list; and we believe that the 100 mg indomethacin suppositories being compounded are "essentially a copy" of Zyla's FDA-approved INDOCIN suppositories. As a result, Zyla currently faces competition for INDOCIN suppositories from what we believe is an unlawful compounder and could face generic competition at any time for the INDOCIN products. Although Zyla is vigorously pursuing remedies against this compounder, we cannot guarantee that Zyla will be successful in causing it to discontinue sales of its unapproved indomethacin suppository product. . . .

The introduction of one or more generic versions of our products, as well as sales of indomethacin suppositories by compounders, or disclosure of ANDA filings and/or similar applications in respect to any of our products, have and in the future could adversely impact our business, financial condition, results of operations and stock price.

57.    Then, after Zydus received approval for its 50 mg indomethacin suppository,

Assertio updated this disclosure to state in its Form 10-Q filed on August 9, 2023:

*Cambia, Zipsor and INDOCIN suppositories recently began facing competition from generics, which adversely affects our business. Approval of additional generic versions of our products would have an adverse effect on our business. . . .*

There are no patents covering the INDOCIN products (which accounted for 64% of our revenue in 2022 and 70% of our revenue during the first half of 2023), which means that a generic drug company could introduce a generic for these drugs at any time. In August 2023, a generic pharmaceutical company received approval from the FDA, and has started to manufacture and market 50mg indomethacin suppositories, the generic version of INDOCIN Suppositories. As a result, INDOCIN Suppositories now face

competition from generic indomethacin suppositories. We are assessing the financial impact of this generic competition on our future results of operations, financial condition, and cash flows. In addition, we are aware of other drug companies that have had interactions with regulatory agencies including FDA relating to indomethacin, which could indicate the development of one or more additional INDOCIN product generics or other formulations of indomethacin. Accordingly, we could face competition from other generic versions of the INDOCIN products at any time after the 180-day Competitive Generic Therapy ("CGT") exclusivity expires. In addition, we also face competition for INDOCIN suppositories from hospitals and other institutions, including a 503B outsourcing facility (commonly referred to as a 503B compounder), which began compounding 100 mg indomethacin suppositories in the second half of 2022 in what we believe to be violation of certain provisions of the FDCA. Although we are vigorously pursuing remedies against this compounder, we cannot guarantee that we will be successful in causing it to discontinue sales of its unapproved indomethacin suppository product. . . .

The introduction of known and potential additional generic versions of our products, as well as sales of indomethacin suppositories by compounders, or disclosure of ANDA filings and/or similar applications in respect to any of our products, have and in the future could adversely impact our business, financial condition, results of operations and stock price.

58.     These statements did not fully disclose the extent to which Indocin faced the risk of competition from generic manufacturers and compounding pharmacies. For example, Assertio did not disclose that it opposed Zydus's suitability petition to the FDA for a 100 mg indomethacin suppository.

59.     Assertio also did not disclose its extensive legal battle over Wells Pharma's compounding activities or the strength of its claims therein. In particular, Assertio did not disclose that while it has taken the position that Wells Pharma's drug was prohibited by the FDCA because it was "essentially a copy" of Indocin, Assertio is preempted from bringing that claim because it is "a task reserved to the FDA." *Nexus Pharms., Inc. v. Cent. Admixture Pharmacy Servs., Inc.*, 48 F.4th 1040, 1050 (9th Cir. 2022). Indeed, the court dismissed Assertio's claims against Wells Pharma because it found that "all of Plaintiff's claims are preempted by federal law." Wells Pharma Texas Action, ECF No. 51 at 10 (S.D. Tex. Sept. 27, 2023).

16

60.     These disclosures, however, make clear that Assertio knew that the risk of generic competition for Indocin posed an existential risk to its business.

**B.**     **Assertio Sought to Acquire a New Product to Offset the Risk of Competition to Indocin**

61.     Assertio sought to acquire a new product to mitigate the loss that it would face from a generic competitor for Indocin being approved by the FDA or increased compounding activities that would detract from Indocin sales.

62.     In an August 31, 2022 investor presentation titled "At the Forefront of Reinventing Specialty Pharmaceuticals," Assertio included a slide on "Our Strategy," stating that its "External Growth and Diversification objectives" included "Reduce Indocin Revenue Concentration" and "Acquire New Assets." This presentation also described Indocin as part of "Our Core Products" and "the Only Indomethacin Suppository Available in the U.S." The Company's "2022 Priorities" included "Reduce our Concentration in Indocin Primarily Through Business Development Activities."

63.     An updated version of this presentation, dated February 22, 2023, included substantially similar statements, adding that "2023 Priorities" included "Deliver business development acquisitions to diversify and expand the business model."

64.     Similarly, when Assertio announced its results for the fourth quarter and full year 2022, on March 8, 2023, its press release quoted Defendant Peisert as stating, "[o]ur balance sheet is well positioned to support our growth plans, in particular our business development initiatives. . . . We are actively engaged in evaluating multiple prospective opportunities to expand and diversify our business, while remaining focused on identifying the right assets that best advance our strategic growth objectives." On the earnings call for that quarter, held on March 8, 2023, Peisert stated that the Company's priorities were to "to maintain Indocin and execute on the

17

Indocin life cycle management initiatives" and "business development to execute on our M&A plans to diversify our portfolio and create future growth opportunities for the business."

65.     This risk materialized on August 3, 2023, when Assertio announced that Zydus received approval from the FDA to manufacture and market 50mg indomethacin suppositories, the generic version of the Company's Indocin Suppositories. Specifically, the FDA granted Zydus 180-day CGT exclusivity to market the product.

66.     That same day, Assertio issued a press release announcing the Company's Q2 2023 financial results. The press release stated, in relevant part, that "Assertio is withdrawing its 2023 financial outlook to assess the recent news of a generic indomethacin suppository approved by the [FDA]." On this news, Assertio's stock price fell $2.44 per share, or 45.6%, to close at $2.91 per share on August 4, 2023.

## C.    **Assertio Acquired Spectrum to Counteract the Risk of Generic Competition for Indocin**

67.     On April 25, 2023, Assertio announced that it was acquiring Spectrum to advance its strategy of offsetting the risk of losing revenue from generic competition for Indocin.

68.     The joint proxy and prospectus for the transaction that Assertio and Spectrum filed on June 2, 2023, disclosed that Assertio's financial advisor first "introduced members of the Assertio senior management team to members of the Spectrum senior management team" on November 28, 2022. Spectrum and Assertio then "entered into a non-disclosure agreement effective November 30, 2022," and proceeded to conduct negotiations and due diligence that led to the transaction.

69.     After the companies agreed to the Merger, both Assertio and Spectrum discussed Spectrum's financial results and prospects in terms of how they would impact Assertio after the companies combined following completion of the Merger. For example,

18

Assertio and Spectrum issued joint press releases and the Joint Proxy Statement discussing the transaction. Defendants Riga and Peisert also conducted multiple joint conference calls to discuss how the acquisition of Spectrum would benefit Assertio.

70. Similarly, when Spectrum issued its financial disclosures after the two companies had signed the Merger Agreement and announced the transaction, Spectrum's Form 10-Q for the first quarter of 2023 (issued on May 11, 2023, the "Spectrum 1Q2023 10-Q"), focused on how Spectrum's results related to the Merger. The Spectrum 1Q2023 10-Q stated that the two companies entered into the Merger Agreement on April 24, 2023 and that "[u]pon the closing of the Merger, the Company's stockholders will own approximately 35% and Assertio stockholders will own approximately 65% of the combined company." The Spectrum 1Q2023 10-Q also stated that "[t]he respective boards of directors of Assertio (the 'Assertio Board') and the Company (the 'Company Board') have approved the Merger, and the Company Board has agreed to recommend that the Company's stockholders adopt the Merger Agreement. Assertio and the Company each have agreed not to directly or indirectly solicit alternative proposals and to terminate all existing discussions, negotiations and communications with any persons with respect to any alternative proposal."

71. The Spectrum 1Q2023 10-Q also made clear the extent to which both companies were already preparing for the post-Merger combined company, including that both companies would use their "efforts . . .to cause the Merger to be completed," that "prior to the effective time of the Merger, the [Spectrum] Board will nominate one member of the Company Board to be appointed to the Assertio Board," and that each company would owe an $8.3 million termination fee and up to $1 million in expenses if it was responsible for the Merger not being completed.

72.     The Registration Statement, including the Joint Proxy Statement and Prospectus for the Merger, also made clear that Spectrum's performance related to the combined company following the Merger.  For example, the Registration Statement included a letter signed by both Defendants Peisert and Riga, to Assertio and Spectrum shareholders, explaining that the purpose of "[t]his joint proxy statement/prospectus" was to "provide[] you with important information about the . . . the merger" so that shareholders could decide how to vote on the Merger.

73.     When discussing the acquisition on a conference call on April 25, 2023, Peisert stated that the "transaction accelerates our strategy to diversify and extend the duration of our portfolio" and "is expected to accelerate and diversify Assertio's growing revenues . . . . In summary, we expect this transaction to enable us to exceed our near-term business development objectives. The addition of ROLVEDON to our portfolio will immediately diversify and accelerate the revenue growth trajectory of Assertio."

74.     The press release announcing the transaction described Spectrum as "a commercial stage biopharmaceutical company focused on novel and targeted oncology." Spectrum's only commercial product was ROLVEDON ("Rolvedon"), which the release described as "launched into a blockbuster market in October 2022." Rolvedon "(eflapegrastim-xnst) injection is a long-acting granulocyte colony-stimulating factor (G-CSF) with a novel formulation." Defendant Riga stated on the conference call announcing the transaction that Rolvedon is used in "the treatment of chemotherapy-induced neutropenia," to decrease the incidence of infection.

75.     Peisert stated on the conference call announcing the transaction that "ROLVEDON is a biologic product competing in a blockbuster market with patent protection extending to 2036."

76.     Defendant Thomas Riga, Spectrum's CEO, stated that "ROLVEDON was the first novel product to enter the long acting G-CSF space in over 20 years that is not a biosimilar. Our

20

early launch trajectory of ROLVEDON with net sales of $10.1 million in the fourth quarter, provided a very positive end to 2022, and that momentum has continued to build throughout the first quarter of 2023."[12]

77.     The transaction was an all-stock deal for Assertio stock, valuing Spectrum between $248 million and $291 million, depending on Rolvedon's performance. The release announced that "[u]nder the terms of the agreement, at closing":

> Spectrum stockholders will receive a fixed exchange ratio of 0.1783 shares of Assertio common stock for each share of Spectrum common stock they own, implying an upfront value of $1.14 per Spectrum share (approximately $248 million) based on Assertio's stock price on April 24, 2023 and an initial 65% premium to Spectrum's closing price on such date. Additionally, Spectrum stockholders will receive one CVR [contingent value right] per Spectrum share entitling them to receive up to an additional $0.20 per share in total (approximately $43 million), payable in cash or stock at Assertio's election, for $1.34 (approximately $291 million), a total potential premium of 94%. Subject to adjustments, each CVR shall represent the right to receive $0.10 payable upon ROLVEDON net sales (less certain deductions) achieving $175 million during the calendar year ending December 31, 2024, and $0.10 payable upon ROLVEDON net sales (less certain deductions) achieving $225 million during the calendar year ending December 31, 2025.

> Following the close of the transaction, Assertio stockholders will own approximately 65% of the combined company, and Spectrum stockholders will own approximately 35%, on a fully diluted basis.

78.     Assertio then continued to promote the Spectrum acquisition as diversifying Assertio's revenue base, stating in its press release dated July 31, 2023 announcing the closing of the transaction that "[w]e believe this combination will expand and diversify Assertio's revenue

---

[12] A "biosimilar" medication is a biologic medication that "is highly similar to a biologic medication already approved by FDA – the original biologic (also called the reference product)." In addition, biosimilars "have no clinically meaningful differences from the reference product. This means you can expect the same safety and effectiveness from the biosimilar over the course of treatment as you would the reference product. Biosimilars are made from the same types of sources (e.g., living cells or microorganisms) and are just as safe and effective as their reference products."
*See* https://www.fda.gov/drugs/biosimilars/biosimilars-basics-patients.

base," and in its August 3, 2023 press release announcing its results for the second quarter of 2023 that "[o]nce fully integrated, Assertio will benefit from a more diverse revenue base."

79.     Assertio promoted Rolvedon as its most significant product post-acquisition. On the August 3, 2023, earnings call for that quarter, Peisert stated that the "acquisition of Spectrum marks a significant turning point for Assertio, providing immediate diversification of revenues a sustainable near-term growth driver and long-term patent protection." He concluded the call by reassuring investors even more explicitly that the negative news of the FDA's approval of a generic competitor to Indocin "highlight[s] our strategic need to diversify the business and why the merger of Spectrum was important."

80.     On July 27, 2023, Assertio announced that its shareholders and Spectrum's shareholders "each approved the proposed definitive agreement pursuant to which Assertio will acquire Spectrum in an all-stock and contingent value rights (CVR) transaction" and that the transaction would close "in the coming days."

81.     On August 1, 2023, Assertio filed a Form 8-K with the SEC announcing that "[o]n July 31, 2023, the Company completed the previously announced acquisition of Spectrum."

## D.     <u>A Substantial Portion of Spectrum's Team Stayed on at Assertio Following the Acquisition</u>

82.     Assertio promoted the transaction by describing how it would keep Spectrum's existing commercial infrastructure, including its salesforce, and add increased avenues for growth through Assertio's platform. The press release announcing the transaction on April 25, 2023, quoted Peisert as stating that making Assertio's infrastructure available would hasten the growth in Rolvedon's sales, "exemplif[ying] Assertio's attractiveness as an acquirer of new, accretive assets across diverse therapeutic categories, and ability to continue their growth and achieve profitable contributions faster and more efficiently than could be achieved on a standalone basis.

We intend to retain the majority of Spectrum's commercial infrastructure, which we believe is synergistic to our digital non-personal platform, deploying these complementary dual channels to support clinical messaging, reimbursement education and ROLVEDON awareness to further aid and accelerate its launch."

83.     Peisert also stated, on the conference call announcing the transaction, that Assertio "intend[s] to retain the majority of Spectrum's commercial infrastructure, which we believe is synergistic to our digital non-personal platform, deploying these complementary dual channels to support clinical messaging, reimbursement education and ROLVEDON awareness to further aid and accelerate its launch."

84.     Similarly, Riga stated on that conference call that "we have always approached this market with lean infrastructure. So I think just some of the dynamics within the market, we've said there's 113 systems that make up 50% of the business. There's about 660 clinics that we're able to focus on within our existing infrastructure, but there are 2,000 across the United States. So I think augmenting the non-personal promotion platform will certainly open up new reach and frequency that otherwise we weren't able to get to with the current scale. So I think there is a benefit between the two companies' approach as Assertio enters the oncology space."

85.     The confidential witnesses described below also stated that a substantial portion of the Spectrum team stayed on at Assertio following the acquisition. *See infra* ¶¶ 112-15.

86.     In addition, Defendant Riga stated in a letter that he wrote on April 25, 2023, describing the acquisition, "[f]ollowing the closing of the transaction, the combined company will be led by Assertio's President and Chief Executive Officer, Dan Peisert. I will remain in a consulting capacity for Dan and the Assertio team following the transaction. Additionally, one of

our BOD members will remain on the BOD of the combined company. This decision will be finalized prior to closing."

87.     When Assertio announced the closing of the acquisition in a July 31, 2023 press release, it stated that Jeffrey Vacirca, MD, FACP was appointed as a director as part of the closing of the Spectrum transaction. Vacirca previously served on Spectrum's Board of Directors.

88.     Then, when Assertio announced its results for the second quarter, on August 3, 2023, it reiterated that Assertio "intend[s] to maintain [Spectrum's] highly effective commercial team to continue expanding on the success of this exciting new asset."

**E.      Defendants Valued Spectrum Based on Unrealistic Rolvedon Sales Figures**

89.     Immediately after the acquisition, on August 3, 2023, Assertio announced its results for the second quarter, stating "[t]he acquisition of Spectrum Pharmaceuticals and its innovative ROLVEDON™ asset is transformative to our Company. ROLVEDON continues its exceptional launch trajectory as second quarter sales increased to $21.0 million, from $15.6 million in the first quarter."

90.     The Registration Statement, prospectus, and joint proxy statement for the acquisition, which Assertio filed with the SEC on June 2, 2023 and updated on June 14, 2023 (the "Registration Statement"), reported that Rolvedon generated $10.1 million in sales in the fourth quarter of 2022 (the first quarter that it was launched) and $15.6 million in the first quarter of 2023.

91.     The Registration Statement also disclosed that Assertio projected that Rolvedon would generate $46 million in net sales for the second half of 2023, $130 million in 2024, and $157 million in 2025, as follows:

| (in millions) | Year Ending December | | | | | | | | | | | | | |
| --- | 2H:23E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | 2034E | 2035E | 2036E |
| Total Net Sales | $ 46 | $130 | $157 | $152 | $147 | $141 | $138 | $135 | $132 | $128 | $125 | $121 | $117 | $112 |
| Gross Profit[1] | 40 | 115 | 131 | 124 | 123 | 121 | 118 | 114 | 111 | 107 | 103 | 99 | 94 | 90 |
| Operating Income[2] | (0) | 44 | 63 | 63 | 68 | 66 | 72 | 68 | 64 | 60 | 55 | 51 | 46 | 41 |
| Unlevered Free cash flow[3] | (21) | 22 | 43 | 48 | 52 | 50 | 54 | 51 | 48 | 45 | 42 | 39 | 35 | 31 |

92.   Assertio explained these figures by stating that "Spectrum management prepared certain unaudited prospective financial information concerning Spectrum for fiscal years 2023 through 2030, which Assertio management adjusted to reflect its estimate of certain expenses, revenue grow [sic] and peak revenue, and which assume commercialization of ROLVEDON in the United States until patent expiration in 2036."

93.   The figures prepared by Spectrum management were even higher:

| | 2023E | 2024E | 2025E | 2026E | 2027E |
| --- | --- | --- | --- | --- | --- |
| | | | (in millions) | | |
| ROLVEDON Net Sales | $ 97 | $ 190 | $ 261 | $ 244 | $ 214 |
| Cost of Goods Sold[1] | $(17) | $ (30) | $ (55) | $ (42) | $ (35) |
| Gross Profit | $ 79 | $ 160 | $ 206 | $ 202 | $ 179 |
| Operating Expenses | $(80) | $(127) | $(126) | $(124) | $(123) |
| Unlevered Free Cash Flow | $(23) | $ 8 | $ 58 | $ 79 | $ 60 |

| | 2028E | 2029E | 2030E | 2031E |
| --- | --- | --- | --- | --- |
| | | (in millions) | | |
| ROLVEDON Net Sales | $ 183 | $148 | $105 | $ 65 |
| Cost of Goods Sold[1] | $ (33) | $(30) | $(28) | $(25) |
| Gross Profit | $ 150 | $118 | $ 78 | $ 40 |
| Operating Expenses | $(104) | $ (84) | $ (61) | $(39) |
| Unlevered Free Cash Flow | $ 51 | $ 40 | $ 26 | $ 11 |

94.   The fact that Assertio management felt the need to adjust downward the projections prepared by Spectrum management shows that Assertio's management knew that the projections for Rolvedon were flawed. Assertio, however, did not disclose its reason for lowering these figures and did not adjust them sufficiently to account for the true problems with Rolvedon sales. This was because Assertio was desperate to acquire a patented drug to mitigate the loss of Indocin sales

from a generic competitor to Indocin. Assertio thus needed to present figures that justified the exorbitant acquisition price that Spectrum demanded.

95.     Moreover, these projections were inflated even further because the Registration Statement stated that the projections that Spectrum made—and that formed the basis for Assertio's projections—were prepared "on a standalone basis without giving effect to the Merger, they do not reflect any synergies that may be realized as a result of the Merger or any changes to Spectrum's or Assertio's operations or strategy that may be implemented after completion of the Merger." This meant that Rolvedon was expected to generate even greater sales figures after benefiting from the combined company's resources after the acquisition, which both companies described as one of the key benefits of the Merger.

96.     In addition, these projections were even more unrealistic because Defendant Peisert expressly affirmed the ability to meet Rolvedon sales milestones of $175 million and $225 million for 2024 and 2025. *See infra* ¶ 171.

97.     Rolvedon did not come close to meeting these sales projections. On November 8, 2023, Assertio announced its results for the third quarter of 2023, which was the first quarter following the closing of the Spectrum acquisition on July 31, 2023. Peisert stated that "[o]ur third quarter results were disappointing, with the loss of Indocin exclusivity and Rolvedon results below expectations driving significant charges to our net income. While we are learning that certain aspects of the acquisition may not be everything we initially expected, we did not buy Spectrum just for the third quarter."

98.     Rolvedon's net sales were just $7.1 million for the two months following the acquisition. This put sales far off pace from the $46 million that Assertio projected for the second half of the year and the $97 million that Spectrum projected for the full year. Assertio admitted

that "[o]ur initial assessment indicates there were several dynamics that impacted the third quarter. While the early phase of the launch benefited from favorable reimbursement, expectations for an incremental demand increase from a permanent J-code, effective April 1, have not been achieved, and there were **high levels of inventory in the channel at the end of second quarter**."

99.     Assertio also announced for this quarter that "Indocin net products sales in the third quarter were $17.9 million, a $4.0 million decrease from the prior year quarter reflecting competition from a generic entrant and a compounder."

100.     The Company continued on this trajectory in the fourth quarter of 2023. Assertio announced these results on March 11, 2024. Its net product sales were $32.5 million, a decrease from $49.9 million in the prior year fourth quarter. Net product sales for Rolvedon were just $11.0 million in the fourth quarter, which was the first full quarter following the acquisition of Spectrum. Assertio stated when announcing these results for Rolvedon that "[d]uring the quarter, the Company successfully addressed high levels of inventory in the channel and implemented an updated commercial strategy expected to drive sales growth throughout 2024 while maintaining pricing discipline." In addition, "Indocin net product sales in the fourth quarter were $10.8 million, a $23.4 million decrease from the prior year quarter reflecting declining price and volumes due to a generic entrant late in 2023."

101.     Despite these assurances, the weak sales for Rolvedon continued in the first quarter of 2024, when Rolvedon net product sales were just $14.5 million. Rolvedon thus remained far off pace from what Defendants projected in connection with the acquisition.

**F.**   **Confidential Witnesses Explain That Spectrum's Revenues Were Improperly Inflated**

*a)      CW 1*

102.    Confidential Witness 1 ("CW 1") was a member of the Assertio executive team that worked on commercial operations and reported directly to Defendant Peisert, from the spring of 2021 through March 2024. CW 1 was heavily involved in the Spectrum acquisition, the process for which began in the first quarter of 2023.

103.    CW 1 explained that Assertio knew that it had to take action because Indocin was not patented and other companies were trying to create a generic version. The witness stated that one of Assertio's main strategies was to reduce its dependence on Indocin sales by bolstering its portfolio of other products. CW 1 explained that Assertio wanted to acquire Spectrum because "when you have a product that doesn't have patent protection anymore and you're leaning on that for 70 percent of your sales you have to diversify your portfolio. Otherwise it's a death sentence."

104.    In addition, Spectrum had only one product, Rolvedon. CW 1 explained that soon after the acquisition of Spectrum, Assertio learned that Spectrum's sales were less than what was represented in the acquisition process. Assertio projected in the acquisition process that Rolvedon would earn $20 million in revenue in the first quarter following the acquisition, then $30 million the next quarter. But the witness explained that the sales figures following the acquisition were very low.

105.    CW 1 saw Assertio sales figures on a weekly basis, through an email they received that contained the weekly sales report. There was a weekly meeting on Thursdays at which the executive team met at Assertio's headquarters in Chicago and would review these figures. In addition to CW 1, Defendants Peisert and Schwichtenberg, as well as other executives, would

attend this meeting, with approximately eight people attending in total. This Assertio team also received Rolvedon sales figures in July 2023, before the acquisition closed at the end of the month.

106.    The witness stated that by the end of August, "[w]e were probably getting really anxious" and asking questions about Rolvedon's sales weakness. Part of Spectrum's "story was we would see sales in the first month" following the acquisition (*i.e.*, August). "By early September we [Assertio] were saying, 'When are these sales coming in? You guys keep telling us the end of the quarter.' Then that end of the quarter came and that was very tumultuous because sales didn't come in as expected." The witness stated that there were "alarm bells" in September and panic by the end of that month. CW 1 also stated that the sales report email contained quarterly figures and the report for the third quarter through September 25, 2023, described a steep drop off from the last month of the preceding quarter.

107.    The witness explained that Spectrum inflated its sales figures for Rolvedon by "channel stuffing and it was all the lies around where this product was and where it was going and when to expect more." This channel stuffing involved "friends and channel partners that would buy extra at a discount and hold onto it for a few quarters worth. A lot of channel customers will hold two to three months of a product and they had people buying a helluva lot more." CW 1 stated that Spectrum "basically lied to our executive team at Assertio" about how they "shoved products into channels; and hid product into channels to inflate sales." In particular, there were a few big accounts that were expected to "be ordering at the end of the quarter that didn't and we thought it was because they were sitting on a lot of the product." The Spectrum team told Assertio that large orders would come in September, as they had in the last month of prior quarters, but they did not because those orders from prior quarters were under "buy and hold" arrangements and "these customers weren't ordering because they were sitting on so much."

29

108. Overall, CW 1 explained that Spectrum and its senior executives, including Defendant Riga, misrepresented Spectrum's finances and potential in the course of the acquisition by Assertio. This witness also explained that Assertio then discovered soon after the acquisition that Spectrum had lied to them in the acquisition process, but Assertio concealed these facts from the public. CW 1 stated that people lost their jobs on the Spectrum side once the Assertio team figured out there was a lot of funny stuff happening. The witness stated that this conduct went all the way up to former Spectrum CEO Riga.

109. CW 1 described the Spectrum team as "trying to boost the sales numbers for their valuation of Spectrum as we're acquiring it." Assertio purchased Spectrum for $248 million based on inflated sales figures that Spectrum provided, and Spectrum "was only worth a fraction of that – maybe 25 percent of that. Maybe a third." The witness also stated that Spectrum was valued based on "forecasted sales for the three-year time frame" following the acquisition. CW 1 stated that "Riga and [the Spectrum] executive team walked away with millions in hand."

110. CW 1 also explained that while Rolvedon was patented, there "are biosimilars in that competitive market."

111. In addition, CW 1 stated that Defendant Peisert was terminated by the Assertio Board because the Board "blamed him for the failure on the Spectrum acquisition. They let him come back one day to clear out his desk and that was it. He was just gone."

112. This witness also explained that Spectrum's Senior Vice President ("SVP") of Sales and Marketing, as well as the management team under that individual (including Executive Directors for National Accounts, Commercial Operations & Government Pricing, and Marketing and Commercial Training, as well as a Senior Director for Commercial Operations), stayed on at Assertio following the acquisition.

113. CW 1 stated that the Spectrum SVP of Sales and Marketing, who ran the commercial team (including sales, marketing, and anything commercial), was going to be on Assertio's Executive Committee, but was dismissed in the third quarter of 2023 because of the inflated sales figures, and has filed a lawsuit against Assertio. Until that point, this SVP of Sales and Marketing was intended to keep their Spectrum team on at Assertio as its own business unit, alongside CW 1's team that was at Assertio prior to the acquisition.

### b)    CW 2

114. A former employee that worked in Sales at Spectrum, and then Assertio following the acquisition, from November 2022 to April 2024 (CW 2), said that money was tight at Spectrum and that's why the CEO, Defendant Riga, knew he had to sell the company. The witness stated: "We could have run for another six to twelve months. Money was tight. Riga was looking to find a partner. Assertio was a nice fit because they had the cash. They didn't have a salesforce so most people at Spectrum could keep their jobs, which as a CEO you want to see."

115. CW 2 stated that between 75 to 90 percent of Spectrum's staff stayed on after the acquisition. The witness explained that Assertio had only 30 employees and they acquired a 200-person company. "They were basically a snake that had swallowed an elephant and they needed time to digest. It was all pretty amenable." Assertio took some time following the acquisition to determine who from Spectrum they needed and who they didn't.

116. CW 2 was among about a dozen former Spectrum employees who were laid off in April 2024. The layoff did not come as a surprise to CW 2 because, they stated, "I was doing 1,200 units a quarter and I dropped down to 300 units a quarter. With my biggest contract someone came in and undercut me. Sales and growth were slowing and they realized they could cut half the team and still cover the main accounts."

31

117.    In addition, CW 2 stated that although Spectrum projected $200 million a year in revenue for Rolvedon post-acquisition, "Rolvedon is growing but it's not growing to the extent they thought it would. I said, 'If you guys do $100 million, you're lucky.' They were talking $150 million to $200 million potential. I said, 'Sure. Potential.' They were saying that because they wanted to get bought. They needed this drug to be really big."[13]

118.    In particular, CW 2 stated that projecting that Rolvedon sales would be $20 million the first quarter after the Assertio acquisition, when it was currently at about $10 million to $15 million a quarter, was a "ridiculous number" because "nobody doubles like that. This was a crowded market with six or seven biosimilar players that insurance plans preferred because they were cheaper. We were only able to sell to doctors that had patients with insurance plans that would cover whatever the doctor prescribed."

119.    CW 2 described Rolvedon sales following the acquisition as falling short. The witness stated that "the third quarter was a little dry." Sales for the fourth quarter of 2023 were 5000 to 5,500 units," which the witness said was still far short of the projections.

120.    CW 2 questioned if Assertio quashed the news of the generic version of Indocin so the Spectrum acquisition could go through. The exchange ratio of Assertio shares to Spectrum shares in the acquisition was approximately 5 to 1 based on Assertio's share price at the time. *See supra* ¶ 77. CW 2 asked, "[i]f they had known the stock was going to tank, was there any safety net in place to stop the transaction? I don't know. The reality is the deal was struck."

---

[13] Spectrum projected that it would have $190 million in Rolvedon sales in 2024 and $261 million in 2025, even before accounting for the benefits of the Merger. *Supra* ¶¶ 95 and *infra* ¶¶ 202-07.

c) **CW 3**

121. Another witness, CW 3, worked for Spectrum from 2014 to June 2023, most recently (from February 2020 until June 2023) as Executive Director for Sales, and reported to the SVP of Sales and Marketing, who reported to Defendant Riga.

122. CW 3 stated that Spectrum's projection of Rolvedon bringing in $200 million in sales annually was an "impossible" number to reach, and so were the quarterly milestones post-acquisition. This witness said that Assertio "probably should have done their homework before they bought it. All I know is if they hit those milestones then people that own Spectrum stock were to get a 20-cent increase. When I saw those numbers I thought, 'That's impossible.' Literally I was the [person] that was in charge of that so I would have been the [person] tasked with hitting those numbers and those numbers were impossible." CW 3 explained that this should have been clear to Assertio based on Spectrum's past sales figures for Rolvedon that were far below the projections.

123. This witness explained that "there were 2 ½ quarters of sales and then the deal went through so they had information to make an educated decision. I just don't know why they neglected that information." While Spectrum's CEO, Defendant Riga, might have showed Assertio "something that would get to those numbers," CW 3 stated that "it doesn't matter what he showed them. They have to do their homework. How are they going to do $200 million when they haven't done close to that the first two quarters of sales? I don't know what kind of person they had negotiating this but all they had to do was look at what the actual sales were and realize that was hard to get to. Like really hard. Like almost impossible."

124. Even prior to the acquisition, CW 3 stated that Spectrum's internal sales targets for Rolvedon for the first half of 2023 were 12,000 units, which CW 3 told Spectrum's SVP of Sales and Marketing, and Defendant Riga, was unrealistic and made it impossible for salespeople to

33

meet their goals. Spectrum ended up selling only half of that amount for the first half of 2023. CW 3 was saying to the SVP and Riga, "what do you know that can" make Spectrum able to sell multiple times "what everyone else tells us?" The witness therefore thought that "maybe that was the beginning of them telling their story to Assertio." According to CW 3, Assertio "should have realized it was toothpicks and glue."

125.    CW 3 also stated, "I know there's a lot of disgruntled people but I want to speak off the facts and the facts are Assertio probably should have done more homework. The CEO that did the deal [*i.e.*, Peisert] is no longer with the company so that should tell you something."

126.    In addition, CW 3 stated that if customers buying large amounts of Rolvedon at the end of the second quarter of 2023 is "what caused them to have no sales in August and September that's a s*****y thing to do but I don't know if it's illegal."  CW 3 also stated, consistent with CW 1, that if there was channel stuffing, Spectrum's SVP of Sales and Marketing (who CW 1 also discussed, and who reported to Spectrum's CEO Tom Riga while at Spectrum and to Assertio's CEO Defendant Peisert while at Assertio) would know about it. "If there's anybody that knows where the bodies are buried and should be held accountable it's" the Spectrum SVP of Sales and Marketing. CW 3 also stated, consistently with CW 1, that they "don't doubt [the SVP of Sales and Marketing] got fired because of that because the reason I left is because [the SVP of Sales and Marketing] wasn't listening to what I was saying about what the sales should actually be. You have to set the sales numbers reasonably so I died on the sword for that." Additionally, CW 3 stated that if the Spectrum SVP of Sales and Marketing and Defendant Riga did something, they should be held accountable. CW 3 also stated that they "don't doubt for a second" that the Spectrum SVP of Sales and Marketing "knew something."

### d)     CW 4

127.    CW 4 was a Strategic Business Leader for Spectrum, and then Assertio following the Merger, from mid-2020 until April 2024. This witness reported to CW 3. CW 4 was in charge of the Sales team for the central part of the country.

128.    CW 4 confirmed that Spectrum's SVP of Sales and Marketing discussed above reported to Defendant Riga at Spectrum and then to Defendant Peisert at Assertio.

129.    This witness stated that Assertio was "completely unprepared" to purchase Spectrum. CW 4 also said that Assertio "didn't do their due diligence" and "the stockholders are 100 percent accurate that these guys screwed up this acquisition."

130.    CW 4 described Spectrum's sales projections for Rolvedon post-acquisition as "a total and complete joke." The witness stated that it's on Assertio for believing the inflated sales projections because "if I'm selling you a car or a house, I'm going to tell you my house is worth a million dollars and it's your job to say it's not worth that." The witness explained that "the due diligence is where they screwed the deal up."

131.    When CW 4 saw the sales forecasts for Rolvedon, the witness thought that "anyone in the field," from a sales rep to CW 3, "will tell you that the projection we got for the first quarter after integration was ridiculous, not even close. And that's what they used to drive the value of the acquisition."

132.    CW 4 described Assertio as "a bunch of bankers who bought a couple of pain drugs and call themselves a pharmaceutical company. Our initial meetings with them were a joke" because Assertio did not understand Spectrum's business.

133.    This witness explained that Spectrum sold "buy and bill" drugs whereby "[i]f at the end of the quarter your price is going down and you're running a business and get a deal you might buy" the "inventory for the entire quarter." CW 4 stated that "you purchase it but you don't actually

take the order. You bought the product, the company books the sale, but the product is not in the office so you pull from the inventory throughout the quarter. So there's usage but there's no sales because you already sold it."

134. CW 4 specified that Spectrum "offered EOQ [End of Quarter] spiffs," which the witness stated "goes to the inventory issue and not managing the channel appropriately." The witness stated that Spectrum's "large customers in Q1 and Q2 bought what they needed for all of Q2 and Q3" of 2023.

## G.   **Assertio's Executive Departures**

135. As a result of these events, Assertio fired Defendant Peisert and the Senior Vice President of Sales and Marketing, as described by multiple confidential witnesses, and reshuffled other executive positions.

136. On November 8, 2023, when Assertio disclosed the disastrous results for the third quarter of 2023, it also "announced the appointment of Paul Schwichtenberg, the Company's Senior Vice President and Chief Financial Officer, to a new role as Senior Vice President with responsibility for market access, pricing, trade and distribution and other commercial activities, and the appointment of Ajay Patel as Chief Financial Officer in addition to his current role as Senior Vice President and Chief Accounting Officer . . . effective immediately after the filing of the Company's Quarterly Report on Form 10-Q for the three months ended September 30, 2023 with the SEC."

137. On January 5, 2024, Assertio filed a Form 8-K disclosing that "[e]ffective as of January 2, 2024, Daniel A. Peisert, President and Chief Executive Officer and a director of Assertio . . . separated from service as President and Chief Executive Officer of the Company. Mr. Peisert's separation constitutes an 'Other Involuntary Termination,' as defined in the Management Continuity Agreement between Mr. Peisert and the Company, a form of which was filed as Exhibit

10.2 to the Company's Annual Report on Form 10-K filed on March 10, 2022. As such, contingent upon Mr. Peisert's execution and non-revocation of a waiver and release in substantially the form included with the Management Continuity Agreement, Mr. Peisert will be entitled to the severance compensation and benefits provided for in the Management Continuity Agreement in connection with an 'Other Involuntary Termination.'"

138.     Moreover, in April 2024, Assertio fired a large portion of the legacy Spectrum sales team because that many employees were not needed for the lower demand for Rolvedon. *See supra* ¶ 116.

## H.     <u>The Individual Defendants Reaped Large Profits From Their Fraud</u>

139.     Each of the Individual Defendants were motivated by substantial financial benefits to engage in the fraud here.

140.     The Assertio Individual Defendants engaged in suspicious sales of Assertio stock shortly before the Company announced Rolvedon's disappointing sales for the third quarter of 2023.

141.     On September 11, 2023, Defendant Peisert sold 127,281 shares, at a weighted average price of $3.0403 per share, for proceeds of $386,972. The following day, he sold an additional 31,121 shares, at a weighted average price of $2.9701, for proceeds of $92,432. In total from these transactions, Defendant Peisert thus sold 158,402 shares for total proceeds of $479,404. Peisert owned 324,939 Assertio securities following these sales and 483,341 securities before them. He thus sold approximately 33% of his Assertio securities in these transactions.

142.     On September 11, 2023, Defendant Schwichtenberg sold 104,980 shares, at a weighted average price of $3.0729 per share, for proceeds of $322,593.  Schwichtenberg owned 64,313 Assertio securities following these sales and 169,293 before them. He thus sold approximately 62% of his Assertio securities in these transactions.

143.    On September 11, 2023, Defendant Patel sold 64,313 shares, at a weighted average price of $3.0444 per share, for proceeds of $195,769. Patel owned 93,643 Assertio securities following these sales and 157,956 before them. He thus sold approximately 41% of his Assertio securities in these transactions.

144.    These transactions are highly suspicious in all ways. First, these sales were the only open market transactions in Assertio shares that Defendants Peisert, Schwichtenberg, and Patel conducted during the Class Period.

145.    Second, these sales were conducted directly by these Defendants, not through Rule 10b5-1 trading plans.[14]

146.    Third, these transactions were for a substantial portion of these Defendants' total Assertio shares.

147.    Fourth, the timing of these transactions is highly suspicious because all three Defendants traded on the same day, toward the end of the first quarter following the Spectrum Acquisition, when they knew about Rolvedon's disappointing sales for the quarter but before Assertio disclosed those terrible results.

148.    In addition, the Spectrum Individual Defendants received large windfalls by selling Spectrum to Assertio for more than it was worth. Their holdings of Spectrum securities substantially increased in value as a result of the transaction that grossly overvalued Spectrum.

149.    The Registration Statement for the transaction shows that Defendant Riga beneficially owned 3,448,446 shares of Spectrum common stock. Spectrum shares were valued at $1.14 per share in the transaction (*see supra* ¶ 77), making those shares worth approximately

---

[14] Transactions by other insiders during the Class Period were specifically designated on Form 4s filed with the SEC as "effected pursuant to a Rule 10b5-1 trading plan," but the transactions described above were not.

$3.931 million. Furthermore, the Registration Statement stated that Defendant Riga owned 1,215,313 shares subject to vested Spectrum options and 5,542,627 shares subject to unvested Spectrum options, totaling an estimated upfront value of $3,674,514. Additionally, Defendant Riga had 1,317,694 shares subject to unvested Spectrum RSU's totaling an estimated upfront value of $1,502,171 and 204,471 RSA shares totaling an estimated upfront value of $233,097. These options and equity-based awards were valued based on "a fixed dollar amount that will be paid in the form of Assertio common stock" that overvalued Spectrum shares in the transaction, before accounting for additional value from CVRs.

150.    Defendant Brennan also obtained a large financial windfall as a result of the Spectrum transaction. The Registration Statement revealed that Defendant Brennan had 505,319 shares subject to vested Spectrum options and 1,850,638 shares subject to unvested Spectrum options totaling an estimated upfront value of $1,290,262. Additionally, Defendant Brennan had 463,005 shares subject to unvested Spectrum RSU's totaling an estimated upfront value of $527,826. These awards were also based on "a fixed dollar amount that will be paid in the form of Assertio common stock" that overvalued Spectrum shares in the transaction, before accounting for additional value from CVRs.

151.    Defendants Riga and Brennan thus reaped millions of dollars in unwarranted gains from the Spectrum acquisition by having their securities increase in value based on the overvaluation of Spectrum in the transaction. They also benefited even further because the Registration Statement stated that Riga and Brennan "have arrangements with Spectrum that provide for certain severance payments or benefits, accelerated vesting of certain equity-based awards and other rights and other payments or benefits in the event of a Qualifying Termination (as defined below) of employment following the consummation of the Merger."

152. As CW 1 stated, "Riga and [the Spectrum] executive team walked away with millions in hand."

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A. Materially False and Misleading Statements Prior to the Announcement of the Spectrum Acquisition

153. The Class Period begins on March 9, 2023, the day after Assertio filed an Annual Report on Form 10-K with the SEC after the market closed, reporting the Company's financial and operating results for the year ended December 31, 2022 (the "2022 10-K").[15] Defendant Peisert signed the 2022 10-K and Defendants Peisert and Schwichtenberg signed the certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), as the Principal Executive Officers of the Company, attesting to the accuracy of the statements therein.

154. When describing the nature of its business and the competition it faced, the 2022 10-K stated that Assertio "face[s] competition and potential competition from several sources, including pharmaceutical and biotechnology companies, generic drug companies, and medical devices and drug delivery companies. There are no patents covering the INDOCIN products, which means that a generic drug company could file for and obtain approval of, and launch, a generic form of these drugs at any time. We are aware of other drug companies that have had interactions with regulatory agencies including the U.S. Food and Drug Administration ('FDA') relating to indomethacin, which could indicate the development of one or more INDOCIN product generics or other formulations of indomethacin."

---

[15] Where a paragraph in this section contains **bolded and italicized** language, those statements are alleged to be false and misleading.

155.    Further, the 2022 10-K stated that "[a]pproval of generic versions of our other products, including the INDOCIN products which are not patent protected and may face generic competition at any time, would have an adverse effect on our business." It added, "[t]here are no patents covering the INDOCIN products (which accounted for 64% of our revenue in 2022), which means that a generic drug company could introduce a generic for these drugs at any time. In addition, we are aware of other drug companies that have had interactions with regulatory agencies including FDA relating to indomethacin, which could indicate the development of one or more INDOCIN product generics or other formulations of indomethacin. Furthermore, a 503B outsourcing facility (commonly referred to as a 503B compounder) recently began compounding 100 mg indomethacin suppositories in what we believe to be violation of certain provisions of the FDCA, including, among others, Section 505 approval requirements for new drugs and labeling requirements related to adequate directions for use."

156.    The 2022 10-K also stated that "Zyla currently faces competition for INDOCIN suppositories from what we believe is an unlawful compounder and could face generic competition at any time for the INDOCIN products." Additionally, the 2022 10-K lists "the entry and sales of generics of our products (including the INDOCIN products which are not patent protected and may face generic competition at any time) and/or other products competitive with any of our products (including compounded indomethacin suppositories that a 503B compounder recently began selling in what we believe to be violation of certain provisions of the FDCA and which compete with our INDOCIN suppositories)" as a factor that affects the Company's operating results and that could adversely affect its stock price.

157.    The foregoing statements in ¶¶ 153-56 were materially false and misleading because they downplayed the risk of generic competition to Indocin, including by omitting

information related to pending suitability petitions to the FDA for an ANDA for a 100 mg indomethacin suppository and Assertio's lawsuits with Wells Pharma.

**B.  Materially False and Misleading Statements Announcing the Spectrum Acquisition**

158.   On April 25, 2023, Assertio filed with the SEC a Form 8-K, signed by Defendant Peisert that attached a joint press release issued the same day by both Assertio and Spectrum (the "4/25/2023 Joint Press Release"), announcing Assertio's acquisition of Spectrum. Also on April 25, 2023, Spectrum filed a form 8-K, signed by Defendant Brennan (who was also listed as a Spectrum Investor Contact in the press release), attaching this joint press release.

159.   In the 4/25/2023 Joint Press Release, Defendant Peisert touted the transaction, stating "[t]he addition of Spectrum's commercial capabilities and ROLVEDON, a novel long-acting G-CSF product recently launched into a blockbuster market in October 2022, exemplifies Assertio's attractiveness as an acquirer of new, accretive assets across diverse therapeutic categories, and ability to continue their growth and achieve profitable contributions faster and more efficiently than could be achieved on a standalone basis."

160.   Defendant Riga added in the 4/25/2023 Joint Press Release, to promote the benefit to Assertio of acquiring Spectrum, that Spectrum is "excited to combine with Assertio in a transaction that will deliver significant value to our stockholders and the opportunity to share in the future upside of ROLVEDON." Riga also stated, "[o]ur mission at Spectrum has always been to make a difference in the lives of patients and with Assertio, we have a partner that will enable us to deliver on this promise. Our combined assets and commercial infrastructure will position us to accelerate ROLVEDON's launch for the benefit of patients, maximize its potential and drive further growth. We are proud of the launch trajectory our team has achieved with ROLVEDON and look forward to an exciting new chapter."

42

161.     The foregoing statements in ¶¶ 159-60 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

162.     On the same day, Assertio held a call with analysts and investors to discuss its acquisition of Spectrum (the "4/25/23 Acquisition Call"), on which Defendants Peisert and Riga discussed how Assertio would benefit by acquiring Spectrum.  Both Assertio and Spectrum filed a transcript of this call with the SEC.[16]

163.     During prepared remarks on the 4/25/23 Acquisition Call, Defendant Peisert touted the transaction, stating "[t]hrough this transaction, we combine two of the fastest-growing small-cap companies in the specialty pharmaceutical industry.  One with a new promotional platform targeting broad reach and increased frequency that can be applied across multiple therapy categories, and the other focused on oncology in the midst of what we believe is a highly successful product launch in ROLVEDON. ***Together, we will have two synergistic and light infrastructure commercial platforms in a diversified portfolio of assets.***" Peisert continued, "***[t]his transaction accelerates our strategy to diversify and extend the duration of our portfolio, strengthens our commercial infrastructure with two complementary and scalable platforms, and increases our financial strength and access to the capital markets for future M&A.***"  Peisert added, "[t]his transaction is ***expected to accelerate and diversify Assertio's growing revenues***, while also significantly extending the portfolio's weighted average patent life. Combined, we will have four commercial growth assets in Indocin, ROLVEDON, Sympazan and Otrexup. We believe this combined portfolio of products ***offers a pathway to more than doubling our existing revenue***

---

[16] Assertio  filed this transcript as an exhibit to a Form 8-K that was signed by Defendant Peisert. Spectrum filed it as a Schedule 14A.

base with the **near-term potential to have two products generating greater than $100 million in revenues each**, neither of which we expect to be more than 45% of the pro forma product revenue."

164.    Peisert concluded his opening remarks by stating that "[a]cquiring products and businesses is an integral part of Assertio's growth strategy and recent success. **We have a proven track record of doing it successfully, and I'm confident that we can repeat this success with Spectrum.**"

165.    The foregoing statements in ¶¶ 163-64 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

166.    During prepared remarks on the 4/25/23 Acquisition Call, Defendant Riga also promoted how Assertio would benefit by acquiring Spectrum. Riga stated, "[o]ur mission at Spectrum has always been to acquire, develop, and commercialize products that make a positive difference in the lives of cancer patients. **With Assertio, we have a partner that will enable us to deliver on that promise**. **The combination of financial discipline and maximizing ROLVEDON's launch has allowed us to realize our broader strategic vision.**" Defendant Riga continued, "[w]e believe this combination allows us to execute on that vision as we **continue to commercialize ROLVEDON while extracting operational synergies, which Spectrum shareholders will capitalize on through their shared ownership stake in the combined company.**" Riga added, "[w]e believe the combination allows our business to reach profitability, and positive cash flows faster than doing it alone."

167.    Riga also stated on this call, promoting how Assertio would benefit from the acquisition, that Spectrum's "early launch trajectory of ROLVEDON with net sales of $10.1 million in the fourth quarter provided a very positive end to 2022, and that momentum has

continued to build throughout the first quarter of 2023. It has been a great start, and the reception we have seen affirms our value proposition and market approach. . . . As Assertio enters the cancer space with this transaction, they're in good hands with the team with a proven track record of success in oncology. In meeting with Dan and many members of the management team, I believe there is a good cultural fit and I am impressed by the level of talent and experience at Assertio. They have a clear vision for the company and I am confident they have the passion, the drive, and the resources to maximize the value of ROLVEDON and create long-term shareholder value for both companies."

168.    The foregoing statements in ¶¶ 166-67 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

169.    Additionally, Riga promoted the benefits of the Merger to Assertio by stating that "ROLVEDON was the first novel product to enter the long acting G-CSF space in over 20 years that is not a biosimilar." Then, in response to an analyst question, Riga confirmed that "[i]t is not a biosimilar."

170.    The foregoing statements in ¶ 169 were materially false and misleading because Rolvedon was in fact a biosimilar (as explained by CWs 1 and 2), and therefore faced more competition than this statement represented. Indeed, as Defendant Peisert later admitted, Rolvedon existed in a "competitive and dynamic market."

171.    On the 4/25/23 Acquisition Call, an analyst from Jeffries raised the Rolvedon sales milestones in the transaction of $175 million and $225 million for 2024 and 2025, respectively, asking "what has to be done to achieve those sales milestones?" Defendant Peisert responded that "I'm not prepared to give comments about the specific assumptions, but as you probably know

better than I, this is a very large market that can easily support that level of sales. As Tom mentioned, they're starting to focus in the community clinics, which is 35% of that market, which is still well above those numbers. So we're going to continue with the strategy that the Spectrum team has launched this product with, and it's been a very successful launch to that to date. And as long as things go as planned, we should be able to achieve those targets and reward shareholders of both Assertio and Spectrum."

172.    Defendant Riga added that "some of the attractiveness that we saw in the combination with Assertio and working directly with Dan, is the intent and the recognition of the commercial infrastructure, the commercial team and know-how that exists here within Spectrum, and *we are confident in our ability to execute on those numbers*."

173.    An analyst then asked whether there was "enough capacity as far as just manufacturing and working capital to sustain the growth that is expected in 2024 and 2025?" Defendant Riga responded, "Yes, I think the short answer is yes."

174.    Defendant Peisert concluded the call by saying, "if I can speak collectively for Assertio, are very excited about the potential combination with Spectrum. In summary, *we expect this transaction to enable us to exceed our near term business development objectives*."

175.    The foregoing statements in ¶¶ 171-74 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented or support the projections disclosed in these statements.

176.    On April 26, 2023, Spectrum filed with the SEC information that it disclosed as a Schedule 14A (the "4/26/2023 Schedule 14A"), containing a letter written and signed by Defendant Riga, discussing the Assertio acquisition. In the 4/26/2023 Schedule 14A, Riga touted

the transaction and how it would benefit Assertio, stating "[t]his marks a major milestone for Spectrum and **will create an improved strategic profile for the combined company and deliver significant stockholder value**." Riga added, "[a] great deal of thought and consideration went into this decision. As discussions with Assertio and our various advisors evolved, it became clear that **Spectrum is an ideal partner for Assertio**. We are united with a shared focus on patients and a strategy to diversify and expand a **strong product portfolio**. Additionally, **the opportunity to capitalize on our combined commercial capabilities with the two complementary platforms will maximize the potential of ROLVEDON**." Riga also explained that "**Assertio was attracted by the commercial success of ROLVEDON and the team that we have at Spectrum**." Additionally, Riga touted Spectrum's success to date stating, "[t]hanks to your tremendous efforts, we made significant progress in our commitment when we received FDA approval for ROLVEDON$^{TM}$ in September 2022. **We delivered strong sales of $10.1 million in the fourth quarter of 2022, and that momentum has continued throughout Q1 of 2023**."

177.    The foregoing statements in ¶ 176 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

## C.    Materially False and Misleading Statements Announcing First Quarter 2023 Financial Results

178.    On May 9, 2023, Assertio filed with the SEC a Form 8-K (the "5/9/2023 Form 8-K"), signed by Defendant Peisert that attached a press release issued the same day (the "5/9/2023 Press Release"), announcing the Company's 1Q2023 financial results and raising its full year 2023 outlook. In the 5/9/2023 Press Release, Defendant Peisert is quoted as saying "[a]s part of Assertio's ongoing transformation over the past two years, we also laid out a goal to build and diversify our portfolio through accretive acquisitions that fit our unique go-to-market model."

"***Our recent announcement to acquire Spectrum Pharmaceuticals exemplifies that goal and significantly diversifies our asset base with its exciting new G-CSF asset ROLVEDON. We believe that Assertio's platform can increase the market accessible to ROLVEDON in a time and cost efficient manner not available to it under Spectrum's traditional sales model***." When discussing Assertio's agreement to acquire Spectrum, the press release stated the transaction "[d]iversifies Assertio's net product sales with the addition of ROLVEDON™, a novel long-acting G-CSF product recently launched into a blockbuster market in October 2022" and "is ***expected to accelerate and enhance the profit opportunities for the combined company*** and generate double-digit accretion to adjusted EPS and increased operating cash flow in 2024."

179.    The foregoing statements in ¶ 178 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

180.    The 5/9/2023 Press Release also stated that "[f]irst quarter net product sales performed above internal expectations" which was "***driven by continued growth of Indocin*** and the first full quarter of sales for Sympazan."

181.    The foregoing statements in ¶ 180 were materially false and misleading because they downplayed the risk of generic competition to Indocin, including by omitting information related to pending suitability petitions to the FDA for an ANDA for a 100 mg indomethacin suppository and Assertio's lawsuits with Wells Pharma.

182.    Also on May 9, 2023, Assertio filed its Form 10-Q with the SEC for the quarter ended March 31, 2023 ("1Q2023 10-Q"). Defendants Peisert, Schwichtenberg and Patel signed the 1Q2023 10-Q and Defendants Peisert and Schwichtenberg signed the certifications pursuant

to the Sarbanes-Oxley Act of 2002 ("SOX"), as the Principal Executive Officers of the Company, attesting to the accuracy of the statements therein.

183.     When describing purportedly forward-looking information, the 1Q2023 10-Q listed "the entry and sales of generics of our products (including the INDOCIN products which are not patent protected and may face generic competition at any time) and/or other products competitive with any of our products (including compounded indomethacin suppositories that a 503B compounder recently began selling in what we believe to be violation of certain provisions of the Food, Drug and Cosmetic Act and which compete with our INDOCIN suppositories)."

184.     The foregoing statements in ¶ 183 were materially false and misleading because they downplayed the risk of generic competition to Indocin, including by omitting information related to pending suitability petitions to the FDA for an ANDA for a 100 mg indomethacin suppository and Assertio's lawsuits with Wells Pharma.

185.     The 1Q2023 10-Q also stated the following regarding the Spectrum merger:

This document also contains statements about our agreement and plan of merger with Spectrum Pharmaceuticals, Inc. ("Spectrum"), whereby we agreed to acquire Spectrum (the "Proposed Merger"). Many factors could cause actual results to differ materially from these forward-looking statements with respect to the Proposed Merger, including (1) the completion of the Proposed Merger on anticipated terms and timing, including obtaining shareholder approvals, anticipated tax treatment, unforeseen liabilities, future capital expenditures, revenues, expenses, earnings, synergies, economic performance, indebtedness, financial condition, losses, future prospects, business and management strategies for the management, expansion and growth of the new combined company's operations and other conditions to the completion of the Proposed Merger; (2) the risk that the conditions to the closing of the Proposed Merger are not satisfied, including the risk that required approvals for the Proposed Merger from our or Spectrum's stockholders are not obtained; (3) the occurrence of any event, change or other circumstances that either could give rise to the right of one or both of us or Spectrum to terminate the merger agreement; (4) the risk of litigation relating to the Proposed Merger; (5) uncertainties as to the timing of the consummation of the Proposed Merger and the ability of each party to consummate the Proposed Merger; (6) risks related to disruption of management time from ongoing business operations due to the Proposed Merger; (7) unexpected costs, charges or expenses

49

resulting from the Proposed Merger; (8) our and Spectrum's ability to retain and hire key personnel; (9) competitive responses to the Proposed Merger and the impact of competitive services; (10) certain restrictions during the pendency of the Proposed Merger that may impact our or Spectrum's ability to pursue certain business opportunities or strategic transactions; (11) potential adverse changes to business relationships resulting from the announcement or completion of the Proposed Merger; (12) the combined company's ability to achieve the growth prospects and synergies expected from the Proposed Merger, as well as delays, challenges and expenses associated with integrating the combined company's existing businesses; (13) negative effects of this announcement or the consummation of the Proposed Merger on the market price of our or Spectrum's common stock, credit ratings and operating results; and (14) legislative, regulatory and economic developments, including changing business conditions in the industries in which we and Spectrum operate.

186.    The foregoing statements in ¶ 185 were materially false and misleading because they disclosed all of the items described therein, thus giving shareholders the impression that those were the main "factors [that] could cause actual results to differ materially" from descriptions of the Merger, while omitting that Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

187.    On May 9, 2023, Assertio held an earnings call with analysts and investors in conjunction with its 1Q2023 financial results (the "5/9/2023 Earnings Call"), on which Defendants Peisert and Schwichtenberg spoke.  As part of his opening remarks, Defendant Peisert said "[w]e needed to develop a sustainable business model that reposition[s] the business to compete more effectively in a changing environment, improve our profitability and cash flow generation, improve our balance sheet and reduce our cost of capital, **protect INDOCIN**, add new products to diversify our business and extend the portfolio's duration, ***create internal opportunities for growth and mitigate our legacy legal uncertainties***." Peisert continued, "***[t]he recent announcement of the acquisition of Spectrum Pharmaceuticals and their key asset ROLVEDON, was just one of the many tactics that we have completed in the aim of achieving that strategy***. I'm proud to say

that by the time we close the acquisition, currently expected to be sometime this third quarter, *we will have largely checked the box on everything we set out to do.*"

188.    When discussing the acquisition of Spectrum on this call, Peisert said "*[t]hat team is clearly doing a tremendous job with the launch of ROLVEDON*" and that Assertio's "number one priority is a meticulously planned integration of Spectrum into Assertio after closing to ensure the *continued successful launch of ROLVEDON.*"  Peisert concluded his remarks on the acquisition by stating that "[t]he combination of these two companies increases the business development opportunities we can pursue and effectively commercialize" and that "*[c]ombined, we're stronger than apart now with both digital and personal promotional execution.*"

189.    The foregoing statements in ¶¶ 187-88 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

190.    Peisert also emphasized on the 5/9/2023 Earnings Call that "[g]rowth in INDOCIN and the addition of Sympazan more than made up for" losses caused by losing exclusivity of two other drugs.

191.    The foregoing statements in ¶ 190 were materially false and misleading because they downplayed the risk of generic competition to Indocin, including by omitting information related to pending suitability petitions to the FDA for an ANDA for a 100 mg indomethacin suppository and Assertio's lawsuits with Wells Pharma.

192.    On May 9, 2023, Spectrum filed with the SEC a Form 8-K signed by Defendant Brennan that attached a press release issued the same day (the "5/9/2023 Press Release") announcing Spectrum's 1Q2023 financial results and providing a corporate update. In it, Defendant Riga is quoted as saying, "Spectrum delivered a strong start to 2023 with outstanding

execution in the launch of ROLVEDON. This success is demonstrated through significant quarter-over-quarter sales growth, account expansion, and continued customer receptivity to ROLVEDON's value proposition."

193. Riga made clear in the 5/9/2023 Press Release that these benefits would accrue to Assertio following the acquisition, stating that "[f]ollowing the acquisition, we believe the combination of Spectrum's commercial infrastructure and Assertio's digital non-personnel resources will set the brand up for long-term success and accelerate the profitability of the combined company."

194. The foregoing statements in ¶¶ 192-93 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

195. On May 11, 2023, Spectrum filed its Form 10-Q with the SEC for the quarter ended March 31, 2023 ("Spectrum 1Q2023 10-Q"). Defendant Brennan signed the Spectrum 1Q2023 10-Q and Defendants Riga and Brennan signed the certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), as the Principal Executive Officers of the Company, attesting to the accuracy of the statements therein. The Spectrum 1Q2023 10-Q discussed the Merger in detail, making clear that its disclosures were also about Assertio and the future combined company, as explained above. *See supra* ¶¶ 70-71.

196. The Spectrum 1Q2023 10-Q stated that the CVRs for the transaction were dependent on Rolvedon achieving certain milestones, including "Rolvedon exceed[ing] $175 million during the 2024 calendar year" and "Rolvedon exceed[ing] $225 million during the 2025 calendar year."

197.    The Spectrum 1Q2023 10-Q also stated that "During the three months ended March 31, 2023, net sales were $15.6 million," which were attributed to Spectrum's "sole commercial product, ROLVEDON."

198.    The foregoing statements in ¶¶ 195-96 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented or support the projections disclosed in these statements.

**D.    Materially False and Misleading Statements in the Proxy Materials for the Merger**

199.    On June 2, 2023, Assertio filed with the SEC the Registration Statement for the Spectrum acquisition on Form S-4, which included the initial Joint Proxy Statement and Prospectus for the Spectrum acquisition (collectively, the "Registration Statement"). The Joint Proxy Statement and Prospectus was signed by Defendants Peisert, Schwichtenberg, and Patel, with a cover letter signed by Defendants Peisert and Riga. Defendants Peisert and Riga also signed the Merger Agreement that was included with these materials and their names were on the cover of the Registration Statement. The rest of Assertio's Board (Chairman Peter Staple, and William McKee, Heather Mason, and James Tyree) also signed the Joint Proxy Statement and Prospectus.

200.    When describing the benefits of the Spectrum acquisition to Assertio, the Registration Statement stated that "[t]he Assertio board of directors believe that ***the acquisition of Spectrum enhances Assertio's leadership position in the pharmaceutical industry and expands Assertio's branded prescription portfolio***." In particular, the Board of Directors noted, among other things, that "the incorporation of ROLVEDON into Assertio's product portfolio represents ***meaningful further asset and revenue diversification and extends the portfolio's weighted average duration of exclusivity***;" "Assertio's innovative digital non-personal sales model complements Spectrum's in-person commercial infrastructure, ***providing***

53

*greater market access and resources than either company as a standalone entity*;" "the expectation that the combined company's enhanced scale and greater diversification of revenue generating commercial assets is expected to result in a *more attractive profile to investors* and benefit from greater access to the capital markets;" "the transaction enables the combined company to have *a more scalable and competitive infrastructure* for continuing the commercialization and acquisition of existing products suited to Assertio's unique omni-channel sales strategy or Spectrum's in-person oncology-focused commercial infrastructure;" and "*the Merger is expected to better position Assertio to benefit from specialty pharmaceutical market conditions*, including opportunities for additional company and product acquisitions."

201.    The foregoing statements in ¶ 200 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

202.    The Registration Statement gave the following "*Summary of the Assertio Adjusted Spectrum Projections*" (emphasis in original), which it described as "Spectrum management [having] prepared certain unaudited prospective financial information concerning Spectrum for fiscal years 2023 through 2030,[17] which Assertio management adjusted to reflect its estimate of

---

[17] The Registration Statement stated that those projections prepared by Spectrum's management were described in the document under "Spectrum Unaudited Financial Projections," which in turn, described the "Spectrum standalone projections." The Registration Statement made clear that these "Spectrum standalone projections" were prepared specifically "in connection with the Merger," because Spectrum "Spectrum does not as a matter of course make public long-term projections or forecasts." The "revenues associated with a portion of these projections" were shared "with Assertio," so that Assertio could evaluate Spectrum's finances for purposes of the Merger. Moreover, the entirety of the "Spectrum standalone projections" were shared with Assertio because Assertio used them to create the "*Assertio Adjusted Spectrum Projections*" (emphasis in original) described above.

certain expenses, revenue grow and peak revenue, and which assume commercialization of ROLVEDON in the United States until patent expiration in 2036":

| | | | | | | | Year Ending December | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2H:23E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | 2034E | 2035E | 2036E |
| (in millions) | | | | | | | | | | | | | | |
| Total Net Sales | $ 46 | $130 | $157 | $152 | $147 | $141 | $138 | $135 | $132 | $128 | $125 | $121 | $117 | $112 |
| Gross Profit[1] | 40 | 115 | 131 | 124 | 123 | 121 | 118 | 114 | 111 | 107 | 103 | 99 | 94 | 90 |
| Operating Income[2] | (0) | 44 | 63 | 63 | 68 | 66 | 72 | 68 | 64 | 60 | 55 | 51 | 46 | 41 |
| Unlevered Free cash flow[3] | (21) | 22 | 43 | 48 | 52 | 50 | 54 | 51 | 48 | 45 | 42 | 39 | 35 | 31 |

203. The foregoing statements in ¶ 202 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented or support the projections disclosed in these statements. These figures were particularly misleading because they were based on the "Spectrum standalone projections" that "do not reflect any synergies that may be realized as a result of the Merger or any changes to Spectrum's or Assertio's operations or strategy that may be implemented after completion of the Merger." These statements thus indicated that Rolvedon's sales figures following the acquisition would be even higher than these numbers after accounting for the purported synergies and other operational and strategic benefits of the acquisition.

204. Under the heading "Spectrum Unaudited Financial Projections," the Registration Statement provided the "Spectrum standalone projections" that "were prepared treating Spectrum . . . on a standalone basis, without giving effect to the Merger, including . . . the potential synergies that may be achieved by the combined company as a result of the Merger, [or] the effect of any business or strategic decision or action that has been or will be taken as a result of the Merger Agreement having been executed or in anticipation of the Merger." Similarly, the Registration Statement stated that these projections were prepared "on a standalone basis without giving effect

to the Merger, they do not reflect any synergies that may be realized as a result of the Merger or any changes to Spectrum's or Assertio's operations or strategy that may be implemented after completion of the Merger."

205.     The Registration Statement also stated that these projections "in the view of Spectrum management were prepared on a reasonable basis, reflecting the best available estimates and judgments at the time of preparation and presented as of the time of preparation, to the best of management's knowledge and belief, the expected course of action and the expected respective future financial performance of Spectrum and Assertio." These projections were "prepared by, and [are] the responsibility of, Spectrum management," and are "considered reasonable by Spectrum's management."

206.     The Registration Statement provided the following "***Summary of the Spectrum Financial Projections***" (emphasis in origin):

### Summary of the Spectrum Financial Projections

The following table presents certain unaudited prospective financial information of Spectrum prepared by Spectrum management for the years 2023 through 2031.

| | 2023E | 2024E | 2025E | 2026E | 2027E |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| ROLVEDON Net Sales | $ 97 | $ 190 | $ 261 | $ 244 | $ 214 |
| Cost of Goods Sold[(1)] | $(17) | $ (30) | $ (55) | $ (42) | $ (35) |
| Gross Profit | $ 79 | $ 160 | $ 206 | $ 202 | $ 179 |
| Operating Expenses | $(80) | $(127) | $(126) | $(124) | $(123) |
| Unlevered Free Cash Flow | $(23) | $ 8 | $ 58 | $ 79 | $ 60 |

| | 2028E | 2029E | 2030E | 2031E |
|---|---|---|---|---|
| | | (in millions) | | |
| ROLVEDON Net Sales | $ 183 | $148 | $105 | $ 65 |
| Cost of Goods Sold[(1)] | $ (33) | $(30) | $(28) | $(25) |
| Gross Profit | $ 150 | $118 | $ 78 | $ 40 |
| Operating Expenses | $(104) | $ (84) | $(61) | $(39) |
| Unlevered Free Cash Flow | $ 51 | $ 40 | $ 26 | $ 11 |

207.     The foregoing statements in ¶¶ 205-06 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug

did not provide the benefit to Assertio that these statements represented or support the projections disclosed in these statements. These figures were particularly misleading because they "do not reflect any synergies that may be realized as a result of the Merger or any changes to Spectrum's or Assertio's operations or strategy that may be implemented after completion of the Merger." These statements thus indicated that Rolvedon's sales figures following the acquisition would be even higher than these numbers after accounting for the purported synergies and other operational and strategic benefits of the acquisition.

208. The Registration Statement also disclosed Spectrum's past net sales from Rolvedon as follows:

**Year Ended December 31, 2022**

| (in thousands) | | Spectrum Before Reclassification | | Reclassification | | Spectrum After Reclassification |
|---|---|---|---|---|---|---|
| Net sales | $ | 10,114 | $ | (10,114) | $ | — |
| Product sales, net | | — | | 10,114 | | 10,114 |
| Selling, general and administrative | | 38,816 | | (38,816) | | — |
| Selling, general and administrative expenses | | — | | 38,816 | | 38,816 |
| Research and development | | 42,203 | | (42,203) | | — |
| Research and development expenses | | — | | 42,203 | | 42,203 |
| Interest income | | 968 | | (968) | | — |
| Other (loss) gain | | — | | 968 | | 968 |
| Other expense, net | | (5,331) | | 5,331 | | — |
| Other (loss) gain | | — | | (5,331) | | (5,331) |

57

**Three Months Ended March 31, 2023**

| (in thousands) | Spectrum Before Reclassification | | Reclassification | | Spectrum After Reclassification |
|---|---|---|---|---|---|
| Net sales | $ | 15,615 | $ | (15,615) | $ — |
| Product sales, net | | — | | 15,615 | 15,615 |
| Selling, general and administrative | | 13,998 | | (13,998) | — |
| Selling, general and administrative expenses | | — | | 13,998 | 13,998 |
| Research and development | | 5,424 | | (5,424) | — |
| Research and development expenses | | — | | 5,424 | 5,424 |
| Interest income | | 559 | | (559) | — |
| Other gain | | — | | 559 | 559 |
| Other income (expense), net | | 248 | | (248) | — |
| Other gain | | — | | 248 | 248 |

209.    The foregoing statements in ¶ 208 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

210.    The Registration Statement also confirmed that Assertio determined that the acquisition was fair to Assertio's shareholders, as follows:

> After careful consideration, the Assertio board of directors unanimously: (i) determined that the terms of the Merger Agreement and the Merger are fair to and in the best interests of Assertio and its stockholders; (ii) approved and declared advisable the Merger Agreement and the transactions contemplated thereby, including the Merger and the share issuance, each on the terms and subject to the conditions set forth in the Merger Agreement; and (iii) recommended that Assertio stockholders approve of the Assertio share issuance proposal.

211.    The foregoing statements in ¶ 210 were materially false and misleading because the acquisition grossly overvalued Spectrum and thus was not "fair to and in the best interests of Assertio and its stockholders."

212.    The Registration Statement included the following factor as supporting the Assertio board of directors' conclusion that the Spectrum acquisition was fair to Assertio shareholders:

the expectation that the combined company's enhanced scale and greater diversification of revenue generating commercial assets is expected to result in a more attractive profile to investors and benefit from greater access to the capital markets.

213. The foregoing statements in ¶ 212 were materially false and misleading because the acquisition grossly overvalued Spectrum and thus was not fair to Assertio shareholders.

214. The Registration Statement also stated that the Assertio board of directors considered the exchange ratio and merger consideration to be favorable to Assertio shareholders "relative to the current assessment of the valuation of each company" and based on the opinions of its financial advisors (SVB Securities LLC and H.C. Wainwright & Co.) that the Merger consideration "was fair from a financial point of view to Assertio."

215. Those opinions of Assertio's financial advisors were, in turn, based on Spectrum's false and misleading historical net sales figures for Rolvedon and Spectrum's projections for future net sales from Rolvedon that Assertio provided to its financial advisors. *See, e.g.*, *supra* ¶¶ 167, 171-72, 176, 196-97, 202-08.

216. The foregoing statements in ¶¶ 214-15 were materially false and misleading because the acquisition grossly overvalued Spectrum and thus the merger consideration was not "fair from a financial point of view to Assertio."

217. The Registration Statement also stated that the Assertio Board of Directors considered the following factor to "weigh[] in favor of the Merger: historical information concerning Assertio's and Spectrum's respective businesses, financial condition, results of operations, earnings, trading prices, managements, competitive positions and prospects on stand-alone and forecasted combined bases."

218. The foregoing statements in ¶ 217 were materially false and misleading because these factors did not "weigh[] in favor of the Merger," since Rolvedon's past sales were inflated

by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

219. The Registration Statement included a copy of the Merger Agreement between Assertio and Spectrum, signed by Defendants Peisert and Riga, which confirmed that none of Spectrum's financial reports filed with the SEC since January 1, 2021 "contained any untrue statement of a material fact or omitted to state a material fact required to be stated or incorporated by reference therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading."

220. The Merger Agreement also represented that all of Spectrum's audited consolidated financial statements in its financial reports filed with the SEC since January 1, 2021 "(i) complied as to form in all material respects with the published rules and regulations of the SEC applicable thereto; (ii) have been prepared in accordance with United States generally accepted accounting principles ('GAAP') applied on a consistent basis throughout the periods involved . . . ; [and] (iii) fairly present in all material respects the consolidated financial position of the Company and its Subsidiaries at the respective dates thereof and the results of their operations and cash flows for the periods indicated subject, with respect to unaudited interim statements, to normal and recurring year-end adjustments."

221. The foregoing statements in ¶¶ 219-20 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices.

222. On June 14, 2023, Assertio filed an Amended Registration Statement for the Spectrum acquisition on Form S-4, which included the final Joint Proxy Statement and Prospectus for the Spectrum acquisition (the "Amended Registration Statement"), signed by Defendants Peisert, Schwichtenberg, and Patel, with a cover letter signed by Defendants Peisert and Riga.

223.    On June 15, 2023, Assertio filed with the SEC a Prospectus pursuant to Rule 424(b)(3) (the "6/15/2023 Prospectus") containing the Spectrum transaction merger proposal, including the final Joint Proxy Statement and Prospectus.

224.    The Amended Registration Statement and the 6/15/2023 Prospectus contained the same materially false and misleading statements as in the original Registration Statement described in ¶¶ 199-221 above.

**E.    Materially False and Misleading Statements Announcing Completion of the Spectrum Acquisition and Second Quarter 2023 Financial Results**

225.    On August 1, 2023, Assertio filed with the SEC a Form 8-K (the "8/1/2023 Form 8-K"), signed by Defendant Peisert that attached a joint press release issued on July 27, 2023, by both Assertio and Spectrum (the "7/27/2023 Press Release"), announcing a favorable vote on the proposed Spectrum acquisition.  Defendant Peisert is quoted in the release as saying "[w]e believe *this transaction provides extensive new growth opportunities and will be accretive to our stockholders in 2024.*"

226.    The 8/1/2023 Form 8-K also attached a press release issued on July 31, 2023 (the "7/31/2023 Press Release"), announcing the closing of the Spectrum transaction. In the release, Defendant Peisert stated that "[w]e look forward to *building on the successful early results in the ROLVEDON®* (eflapegrastim-xnst) Injection launch for the remainder of 2023, driving the business toward our goal of accretive contribution to our Adjusted EPS and operating cash flow in 2024."

227.    The foregoing statements in ¶¶ 225-26 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

228.    On August 3, 2023, Assertio filed with the SEC a Form 8-K (the "8/3/2023 Form 8-K"), signed by Defendant Peisert that attached a press release issued the same day (the "8/3/2023 Press Release"), announcing the Company's 2Q2023 financial results and discussing the completion of the Spectrum acquisition.

229.    Defendant Peisert is quoted in the release as stating "*[t]he acquisition of Spectrum Pharmaceuticals and its innovative ROLVEDON^TM asset is transformative to our Company*. *ROLVEDON continues its exceptional launch trajectory* as second quarter sales increased to $21.0 million, from $15.6 million in the first quarter. . . . *Once fully integrated, Assertio will benefit from a more diverse revenue base, greater intellectual property protection and an enhanced commercial capability in support of our long-term growth strategy.*"

230.    The foregoing statements in ¶ 229 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

231.    On August 3, 2023, Assertio held an earnings call with analysts and investors in conjunction with its 2Q2023 financial results, on which Defendants Peisert, Schwichtenberg and Riga discussed those results for the combined Company and the completion of the Spectrum acquisition (the "8/3/2023 Call").

232.    In prepared opening remarks on the 8/3/2023 Call, Defendant Peisert stated "[t]he acquisition of Spectrum marks a significant turning point for Assertio, providing immediate diversification of revenues, a sustainable near-term growth driver, and long-term patent protection." He added, "[w]e've proven we can manage through the ups and downs of loss of exclusivity, and we've built and now acquired a first-class commercial team from Spectrum. That can only enhance our capabilities to grow assets and scale."

233.    In his prepared opening remarks on the 8/3/2023 Call, Defendant Riga touted Rolvedon by stating that "[t]he launch trajectory of Rolvedon continues to be extremely positive and that momentum has continued in the second quarter of 2023. Net sales for the second quarter were $21 million versus $15.6 million in Q1, an increase of 34%" and that "[t]his is the third consecutive quarter of exceptional performance."

234.    In addition, Riga promoted Rolvedon's performance, stating that "beyond the strong Q2 revenue number, we made important progress on customer growth in terms of breadth, meeting the absolute number of customers using ROLVEDON and depth meeting same-store sales."

235.    When concluding his opening remarks, Riga stated "*[a]s Spectrum transitions to be a part of Assertio and take the next steps in ROLVEDON growth trajectory, every one of our employees should take great pride in the excellent ROLVEDON performance to date*. As I sign off and turn the reins over to Dan, I must say I am extremely confident in the team he has acquired and have come to have respect for his leadership and the capabilities at Assertio."

236.    The foregoing statements in ¶¶ 232-35 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

237.    Also on the 8/3/2023 Call, Riga also stated that "[i]t is a credit to the execution of our experienced team ensuring ROLVEDON continues to be clearly differentiated as the first novel product to enter the long-acting GCSF space in over 20 years that is not a biosimilar."

238.    The foregoing statements in ¶ 237 were materially false and misleading because Rolvedon was in fact a biosimilar (as explained by CWs 1 and 2), and therefore faced more

63

competition than this statement represented. Indeed, as Defendant Peisert later admitted, Rolvedon

existed in a "competitive and dynamic market."

239.    In his concluding remarks on the 8/3/2023 Call, Peisert said the entrant of an

Indocin generic competitor "***does highlight our strategic need to diversify the business and why***

***the merger of spectrum was important.*** We will have some short-term obstacles to overcome, but

we are a strong and committed team, and ***we will overcome them***. ***We are a far stronger company***

***now than we were a few years ago. And I believe that we are well positioned to come through***

***this even stronger and create value for all shareholders.***"

240.    The foregoing statements in ¶ 239 were materially false and misleading because

Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not

provide the benefit to Assertio that these statements represented.

241.    On August 9, 2023, Assertio filed its Form 10-Q with the SEC for the quarter ended

June 30, 2023 ("2Q2023 10-Q"). Defendants Peisert, Schwichtenberg and Patel signed the 2Q2023

10-Q and Defendants Peisert and Schwichtenberg signed the certifications pursuant to the

Sarbanes-Oxley Act of 2002 ("SOX"), as the Principal Executive Officers of the Company,

attesting to the accuracy of the statements therein.

242.    When describing purportedly forward-looking information, the 2Q2023 10-Q

stated the following regarding the Merger:

> This document also contains statements about the Spectrum Merger. Many factors
> could cause actual results to differ materially from these forward-looking
> statements with respect to the Spectrum Merger, including (1) the completion of
> the Spectrum Merger on anticipated terms, including anticipated tax treatment,
> unforeseen liabilities, future capital expenditures, revenues, expenses, earnings,
> synergies, economic performance, indebtedness, financial condition, losses, future
> prospects, business and management strategies for the management, expansion and
> growth of the new combined company's operations and other conditions to the
> completion of the Spectrum Merger; (2) the risk of litigation relating to
> the Spectrum Merger; (3) risks related to disruption of management time from

ongoing business operations due to the Spectrum Merger; (4) unexpected costs, charges or expenses resulting from the Spectrum Merger; (5) our and Spectrum's ability to retain and hire key personnel; (6) competitive responses to the Spectrum Merger and the impact of competitive services; (7) potential adverse changes to business relationships resulting from the announcement or completion of the Spectrum Merger; (8) the combined company's ability to achieve the growth prospects and synergies expected from the Spectrum Merger, as well as delays, challenges and expenses associated with integrating the combined company's existing businesses; (9) negative effects of the announcement or the consummation of the Spectrum Merger on the market price of our common stock, credit ratings and operating results; and (10) legislative, regulatory and economic developments, including changing business conditions in the industries in which the new combined company operates.

243.     The foregoing statements in ¶ 241-42 were materially false and misleading because they disclosed all of the items described therein, thus giving shareholders the impression that those were the main "factors [that] could cause actual results to differ materially" from descriptions of the Merger, while omitting that Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

**F.     Materially False and Misleading Statements Amending Financial Disclosures Related to the Merger**

244.     On October 10, 2023, Assertio filed with the SEC a Form 8-K/A (the "Amended 8-K"), signed by Defendant Peisert, amending its prior Form 8-K that was filed on August 1, 2023. That prior Form 8-K  disclosed the completion of the Spectrum acquisition (the "Original Form 8-K"). The Original Form 8-K stated, under Item 9.01 Financial Statements and Exhibits, that "As permitted by Item 9.01(a)(3) of Form 8-K, the [financial statements and pro forma financial information of Spectrum] required by this Item will be filed by amendment to this Current Report on Form 8-K within 71 days following the date on which this Current Report on Form 8-K is required to be filed."[18] However, when it came time to disclose that information, the Amended 8-

---

[18] The Amended 8-K stated: "On July 31, 2023, Assertio . . . filed a Current Report on Form 8-K (the 'Original Form 8-K') disclosing the Company's acquisition of Spectrum . . . . The Original

K filed on October 10, 2023, stated that "*[u]pon further analysis subsequent to the completion of the Acquisition, the Company determined that the financial statements and pro forma financial information are not required to be filed pursuant to Item 9.01 of Form 8-K. Accordingly, the Company hereby amends the Original Form 8-K to eliminate the references to the subsequent filing of financial statements and pro forma financial information relating to the Acquisition*." The Amended 8-K thus stated that "[t]he disclosure contained in Items 9.01(a) and (b) of the Original Form 8-K is hereby deleted in its entirety."

245.    The foregoing statements in ¶ 244 were materially false and misleading because Assertio did not decline to disclose Spectrum's financial statements and pro forma financial information for the reason provided, but rather, to avoid making any disclosures about Spectrum's financial information for as long as possible given its improper sales practices and disappointing results.

246.    In particular, Spectrum's financial statements and pro forma financial information *were* required to be filed pursuant to Item 9.01 of Form 8-K. A company must disclose financials under Item 9.01 if the transaction qualifies as a "significant acquisition/transaction" under Item 2.01 of Form 8-K. An acquisition is significant if, among other bases, either of the following metrics exceeds 20%: (i) the amount of the acquiror's investment in the target compared to the acquiror's total assets *or* (ii) the total assets of the target compared to the acquiror's total assets. Spectrum satisfied both of these measure because the transaction valued Spectrum between $248 million and $291 million and "[f]ollowing the close of the transaction, Assertio stockholders will own approximately 65% of the combined company, and Spectrum stockholders will own

---

Form 8-K stated that the Company intended to file the financial statements and pro forma financial information required by Item 9.01 of Form 8-K related to the Acquisition not later than 71 days after the required filing date of the Original Form 8-K."

approximately 35%, on a fully diluted basis." *Supra* ¶¶ 70, 77. In addition, Spectrum's total assets as of March 31, 2023, as disclosed in its Form 10-Q for the first quarter of 2023, were purportedly $107.675 million. Assertio's assets as of that time were purportedly $414.274 million, as disclosed in Assertio's Form 10-Q for the first quarter of 2023.

247.    Indeed, Assertio disclosed financials under Item 9.01 for prior acquisitions that were substantially smaller than the Spectrum acquisition. For example, on December 16, 2021, Assertio filed a Form 8-K announcing its acquisition of Otrexup® (methotrexate) a Drug Device Combination from Antares Pharma, Inc. for $18 million upfront and an additional $26 million in deferred payments—a fraction of the price that Assertio paid to acquire Spectrum. The initial Otrexup Form 8-K, like the one here, stated that the financial statements and pro forma financial information "required by this Item 9.01(a) are not included in this Current Report on Form 8-K. The Company intends to file such [financial statements and pro forma financial information] by amendment to this Current Report on Form 8-K not later than 71 calendar days after the date this Current Report on Form 8-K is required to be filed." After the market closed that day, Assertio filed an amended Form 8-K that "amends Item 9.01 of the Original Report to include carveout financial information," attaching Otrexup's audited special purpose financial statements for 2019 and 2020, as well as its unaudited special purpose financial statements and unaudited pro forma condensed combined financial statements for the nine months ended September 30, 2021 and for the year ended December 21, 2020 (and unaudited special purpose financial statements for the nine months ended September 30, 2020). The fact that Assertio disclosed financials under Item 9.01 for the much smaller Otrexup acquisition shows that its purported reason for failing to do so for its acquisition of Spectrum was false and misleading.

248.     Moreover, even if Assertio was not required to file Spectrum's financial information under Item 9.01, it was false and misleading to represent that its reason for failing to disclose it—and amending its prior Form 8-K—was that it "determined" that the information was "not required to be filed pursuant to Item 9.01 of Form 8-K." That information was equally available to Assertio when it filed the Original Form 8-K on August 1, 2023. In addition, Assertio's conduct here was inconsistent with its practice in prior, less significant acquisitions. Assertio's true reason for changing course and refraining from filing Spectrum's financial information was that it was not accurate because of Spectrum's sales practices. Moreover, because this deadline fell after the end of the third quarter of 2023, Assertio knew by this time that Rolvedon sales in the full third quarter were extremely disappointing and fell far below expectations. Assertio thus wanted to avoid making any disclosures about Spectrum's financial information for as long as possible.

**G.     Materially False and Misleading Statements Announcing Third Quarter 2023 Financial Results**

249.     On November 8, 2023, Assertio filed with the SEC a Form 8-K (the "11/8/2023 Form 8-K"), signed by Defendant Peisert that attached a press release issued the same day (the "11/8/2023 Press Release"), announcing the Company's 3Q2023 financial results. Defendant Peisert is quoted in this press release as stating, in response to Rolvedon's disappointing results, that "[w]hile we are learning that certain aspects of the acquisition may not be everything we initially expected, ***we did not buy Spectrum just for the third quarter***. The addition of Rolvedon diversifies and extends our portfolio's duration, plus ***brings improved commercial access and business-to-business contracting teams that are important to our strategic direction***." "***We have taken immediate steps to improve the business and remain committed to building a strategic path for Rolvedon's long-term sustainable growth***."

68

250.    The foregoing statements in ¶ 249 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented. In particular, Rolvedon's poor performance was not limited to "just . . . the third quarter," as Peisert stated, but rather, was rooted in its past improper practices that would continue to impact its results going forward.

251.    On November 8, 2023, Assertio filed its Form 10-Q with the SEC for the quarter ended September 30, 2023 ("3Q2023 10-Q"). Defendants Peisert, Schwichtenberg and Patel signed the 3Q2023 10-Q and Defendants Peisert and Schwichtenberg signed the certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), as the Principal Executive Officers of the Company, attesting to the accuracy of the statements therein.

252.    When describing forward-looking information, the 3Q2023 10-Q stated the following regarding the Spectrum merger:

> This document also contains statements about the Spectrum Merger. Many factors could cause actual results to differ materially from these forward-looking statements with respect to the Spectrum Merger, including (1) the tax treatment, unforeseen liabilities, future capital expenditures, revenues, expenses, earnings, synergies, economic performance, indebtedness, financial condition, losses, future prospects, business and management strategies for the management, expansion and growth of the new combined company's operations resulting from the Spectrum Merger; (2) the impact of pending Spectrum litigation and potential litigation relating to the Spectrum Merger; (3) the impact of disruption of management time from ongoing business operations due to the Spectrum Merger; (4) unexpected costs, charges or expenses resulting from the Spectrum Merger; (5) our and Spectrum's ability to retain and hire key personnel; (6) competitive responses to the Spectrum Merger and the impact of competitive services; (7) potential adverse changes to business relationships resulting from the announcement or completion of the Spectrum Merger; (8) the combined company's ability to achieve the growth prospects and synergies expected from the Spectrum Merger, as well as delays, challenges and expenses associated with integrating the combined company's existing businesses; (9) negative effects of the announcement or the consummation of the Spectrum Merger on the market price of our common stock, credit ratings and operating results; and (10) legislative, regulatory and economic developments, including changing business conditions in the industries in which the new combined company operates.

253.    The foregoing statements in ¶¶ 251-52 were materially false and misleading because they disclosed all of the items described therein, thus giving the impression that those were the main "factors [that] could cause actual results to differ materially" from descriptions of the Merger, while omitting that Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented.

254.    On November 8, 2023, Assertio held an earnings call with analysts and investors in conjunction with its 3Q2023 financial results (the "11/8/2023 Earnings Call"), on which Defendants Peisert, Schwichtenberg and Patel spoke. In prepared remarks, Defendant Peisert touted the benefits of the Spectrum merger, stating that "[e]ven though the reported sales for Rolvedon were significantly below our internal expectations in the quarter, when viewed with the launch of a generic competitor for Indocin, ***the rationale for the merger and our commitment to diversification are evident***." "***In addition, the Rolvedon team brings enhanced competencies in market access and field reimbursement support that are part of our broader strategic vision for the future***." He added, "[w]hile this is a competitive and dynamic market, it is still ***very attractive, and we're committed to maximizing ROLVEDON potential***."

255.    The foregoing statements in ¶ 254 were materially false and misleading because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented. In particular, Rolvedon's poor performance was not limited to just the third quarter, as Peisert stated, but rather, was rooted in its past improper practices that would continue to impact its results going forward. These problems also undermined "the rationale for the merger" and Assertio's ability "to maximiz[e] ROLVEDON potential."

## VI.  THE TRUTH BEGINS TO EMERGE

256.  Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

257.  Throughout the Class Period, the price of Assertio securities were artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein.

258.  The price of Assertio securities significantly declined when the misrepresentations made to the market, and/or the information and risks alleged herein to have been concealed from the market, and/or the effects thereof, materialized and/or were revealed, causing investors' losses. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Assertio securities, Plaintiffs and other Class members have suffered significant losses and damages.

259.  In particular, on August 3, 2023, Zydus received approval from the FDA to manufacture and market 50mg indomethacin suppositories, the generic version of the Company's Indocin Suppositories. Specifically, the FDA granted Zydus 180-day CGT exclusivity to market the product.

260.  That same day, Assertio issued a press release after the market closed, announcing the Company's Q2 2023 financial results. The press release stated, in relevant part, that "Assertio is withdrawing its 2023 financial outlook to assess the recent news of a generic indomethacin suppository approved by the [FDA]."

261.  On this news, Assertio's stock price fell $2.44 per share, or 45.6%, to close at $2.91 per share on August 4, 2023, on unusually heavy trading volume that was over seven times the 20-day moving average volume.

262.    This dramatic fall in Assertio's stock price resulted directly from Defendants' misrepresentations of the risk that Indocin would face a generic competitor.

263.    In its August 4, 2023 analyst report, Lake Street Capital Markets explained that "[w]hat was likely to be a triumphant post-close earnings call did not happen, ruined by news of FDA approval of a generic indomethacin suppository." It also "acknowledge[d] the generic indomethacin news was unwelcome" and that "[t]he uncertainty surrounding this potential generic launch will create uneasiness." Based on this news, Lake Street Capital Markets reduced its revenue assumptions for Assertio by just over 50% and its price target from $9 to $7.

264.    On the same day, Roth MKM issued an analyst report explaining that Assertio's reported 2Q23 results were "overshadowed by the entrance of an Indocin generic." As a result, it "lowered forecasts to reflect generic competition to Indocin" and reduced its Assertio price target from $10 to $7 "to reflect the entrance of an Indocin generic competitor." The report also explained Assertio "[s]hares traded down as much as ~50% in after hours" based on the news that a generic challenger for Indocin was approved.

265.    Despite this news, investors understood that Defendants continued to tout the Spectrum Acquisition, including as a way to counteract the FDA's decision to grant Zydus approval to manufacture and market the generic version of the Company's Indocin Suppositories, as explained above. *See supra* Sections V.E-G. Defendants thus continued to perpetuate the fraud by misrepresenting the strength of Spectrum.

266.    For example, in its August 4, 2023 analyst report, Roth MKM exclaimed that "Rolvedon [was] tracking well" through the second quarter of 2023 and "Rolvedon (white blood cell stimulant) sales (recently acquired with SPPI; closed 3Q23) were ~$21M, which was ahead of our expectations."

267.     Additionally, on August 7, 2023, Sidoti & Company, LLC ("Sidoti") issued an analyst report touting the Spectrum transaction's impact, stating that "[w]e expect growing sales of Spectrum's Rolvedon cancer treatment to more than offset the decline in Indocin resulting from increased competition" and "[w]e expect Spectrum Pharmaceuticals to fuel top-line growth the next several years and counter a falloff in Indocin sales." The report continued by stating that the Spectrum addition "fits two of Assertio's key objective: diversify the product portfolio and extend duration of patents." Further, the report asserted that "Friday's selloff after pulled 2023 guidance and FDA approval of a generic rival to Assertio's Indocin pain medication overshadows an acquisition that we contend will more than make up for lost Indocin sales and was an overreaction" and "[o]ur sights were more on the company's simultaneously announced completion of its Spectrum Pharmaceuticals acquisition."

268.     Similarly, Lake Street Capital Markets' description above of "[w]hat was likely to be a triumphant post-close earnings call" shows that they were unaware of the true nature of the Spectrum acquisition.

269.     On November 8, 2023, Assertio issued a press release after the market closed announcing the Company's Q3 2023 financial results. Among other results, Assertio reported Q3 non-GAAP earnings per share of $0.01, missing consensus estimates by $0.09, and revenue of $35.63 million, missing consensus estimates by $14.8 million. The press release called these results "disappointing," with "Rolvedon results below expectations."

270.     Rolvedon's net product sales were just "$7.1 million for the two months following the acquisition of Spectrum," including because "there were high levels of inventory in the channel at the end of second quarter." This admission confirms the explanation by confidential witnesses

described above that Spectrum was overselling Rolvedon leading up to the Merger in order to artificially boost sales and inflate the value of Spectrum.

271. Defendant Peisert also admitted with these results that "we are learning that certain aspects of the acquisition may not be everything we initially expected" and that Rolvedon existed in "a competitive and dynamic market."

272. Moreover, Assertio announced, with these results, "the appointment of Paul Schwichtenberg, the Company's Senior Vice President and Chief Financial Officer, to a new role as Senior Vice President with responsibility for market access, pricing, trade and distribution and other commercial activities, and the appointment of Ajay Patel as Chief Financial Officer in addition to his current role as Senior Vice President and Chief Accounting Officer. These appointments are effective immediately after the filing of the Company's Quarterly Report on Form 10-Q for the three months ended September 30, 2023 with the SEC." Schwichtenberg was also appointed, "on an interim basis," to "oversee the oncology commercial team while Assertio recruits a new team leader."

273. On this news, Assertio's stock price fell $0.92 per share, or 43.19%, on November 9, 2023, to close at $1.21 per share that day, on unusually heavy trading volume that was over seven times the 20-day moving average volume.

274. Assertio's stock price continued to fall the following two trading days, as the market continued to react to the significance of the news that the Spectrum acquisition did not provide the benefit that Defendants had represented.

275. On November 10, 2023, Assertio's stock price fell $0.09 per share, or 7.44%, to close at $1.12 per share, on unusually heavy trading volume that was over twice the 20-day moving average volume.

276. On November 13, 2023, the following trading day, Assertio's stock price fell $0.08 per share, or 7.14%, to close at $1.04 per share, on unusually heavy trading volume that was over twice the 20-day moving average volume.

277. This dramatic fall in Assertio's stock price resulted directly from Defendants' misrepresentations of the true nature of the Spectrum acquisition.

278. On November 9, 2023, Roth MKM issued a report emphasizing that Assertio "reported 3Q23 results that were fundamentally below expectations" and "Rolvedon base lower than expected." When discussing the performance of Rolvedon, the report stated, "[Assertio] noted that the acquired Rolvedon (white blood cell stimulant) sales were lower than expected" and "[r]evenues for 3Q23 of $7.1M trailed our target of $16.0M." As a result, "[g]oing forward, [Roth MKM] lowered [its] 2023-25 Rolvedon revenue targets to $17.1M, $65.5M, and $85.0M (from $42.0M, $130.0M, and $170.0M)." Roth MKM "lowered [its] price target to $3.50/share (from $7) to reflect impairment of the fundamental business."

279. In its analyst report issued on the same day, Sidoti explained Assertio "3Q:23 revenue of $35.6 million was well below [its] estimate of $46 million due to lower-than-expected sales of the recently acquired pharmaceutical Rolvedon." It continued by stating, "Rolvedon sales in the quarter were $7.1 million compared to our estimate for sales of $16 million." Further, the report added that "[m]anagement reported it is not seeing the expected increase in demand for Rolvedon" and Assertio "is reevaluating its launch strategy for the product and withdrew guidance for Rolvedon sales to exceed $100 million by 2025." As a result, Sidoti lowered its revenue estimates for Assertio, "assuming a slower ramp in Rolvedon sales," and lowered the company's price target from $7 to $4.

280.    Despite this news, Defendants continued to misrepresent the true nature of the Spectrum acquisition, as explained above. *See supra* Section V.G. For example, Defendant Peisert reassured investors in the press release that "we did not buy Spectrum just for the third quarter. The addition of Rolvedon diversifies and extends our portfolio's duration, plus brings improved commercial access and business-to-business contracting teams that are important to our strategic direction . . . . We have taken immediate steps to improve the business and remain committed to building a strategic path for Rolvedon's long-term sustainable growth." He also touted that "despite these headwinds, Assertio's innovative non-personal platform continues to drive profitable growth on our other assets."

281.    Based on statements like these, in its November 9, 2023 analyst report, Sidoti continued to express optimism about the impact the Spectrum acquisition would have on Assertio going forward. When providing its valuation of Assertio, Sidoti explained that it "still find[s] the Spectrum acquisition diversifies [Assertio's] product portfolio and think[s] the deal will be accretive to earnings by 2025."

282.    Similarly, when announcing Defendant Schwichtenberg's demotion from CFO, Assertio did not admit that it was a result of the problems described above, but rather, quoted Defendant Peisert as stating that "[w]e believe Paul's deep financial acumen, experience with gross to net and leadership in optimizing margins and cash flows will be critical for guiding our commercial team to success. Ajay has been instrumental in the Company's financial transformation over the past three years, as we transitioned the business from a net debt to net cash position, extended the maturity of our debt and significantly improved both Adjusted EBITDA margins and operating cash flows. I am excited to work with both of them in these new roles for the continued transformation of our business."

283.     On January 3, 2024, Assertio issued a press release announcing that Defendant Peisert was "stepping down as the Company's Chief Executive Officer."

284.     Defendant's Peisert's departure from the Company was a direct result of detrimental nature of the Spectrum acquisition that grossly overvalued Spectrum and Rolvedon's revenue potential. Multiple confidential witnesses discussed above stated that Peisert was fired as a result of these events. *See supra* ¶¶ 111, 125. In addition, Assertio explained in its January 5, 2024 Form 8-K, that "[e]ffective as of January 2, 2024," Peisert "separated from service as President and Chief Executive Officer of the Company. Mr. Peisert's separation constitutes an '***Other Involuntary Termination***,' as defined in the Management Continuity Agreement between Mr. Peisert and the Company, a form of which was filed as Exhibit 10.2 to the Company's Annual Report on Form 10-K filed on March 10, 2022."

285.     On January 4, 2024, Sidoti issued an analyst report reacting to Defendant Peisert's departure from Assertio, expressing that "the change was made after the company missed 3Q:23 sales and earnings estimates … and reevaluated the market for the recently acquired drug Rolvedon." The report also expressed the expectation that "high inventory of Rolvedon in the sales channel continues to pressure sales." As a result, Sidoti trimmed their expectations for Rolvedon, lowered their 4Q:23 revenue estimate from $35 million to $31 million, lowered their 2024 and 2025 revenue estimates from $135 million to $118 million and $173 million to $140 million, respectively, and lowered their price target from $4 to $3.

286.     On this news, Assertio's stock price fell $0.13 per share, or 11.4%, to close at $1.01 per share on January 3, 2024, on unusually heavy trading volume that was approximately twice the 20-day moving average volume.

287.     Assertio's stock price continued to fall the following day as the market continued to react to this news, falling $0.12 per share, or 10.89%, to close at $0.90 per share on January 4, 2024, on unusually heavy trading volume that was over twice the 20-day moving average volume.

288.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Assertio securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VII.     ADDITIONAL SCIENTER ALLEGATIONS

### A.     The Individual Defendants' Motive to Commit Fraud

289.     Each of the Individual Defendants had a financial motive to commit fraud. The Assertio Individual Defendants sold significant portions of their holdings of Assertio securities in highly suspicious transactions in September 2023. *See supra* Section IV.H.

290.     The Spectrum Individual Defendants made large profits from the increase in value of their Spectrum securities based on the company's overvaluation in the Merger, as well as from other financial benefits that they received from the transaction. *See supra* Section IV.H. As CW 1 stated, "Riga and [the Spectrum] executive team walked away with millions in hand." *Supra* ¶ 109.

### B.     The Individual Defendants' Knowledge or Recklessness as to the Fraud

291.     Each of the Individual Defendants also had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described above in the Substantive Allegations section.

292.      Defendants Peisert, Schwichtenberg, Riga, and Brennan's actual knowledge of the falsity of the alleged misstatements and omissions is established by their signing of the SOX certifications, that certified that each of Assertio's and Spectrum's SEC filings, among other things, "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements

were made, not misleading with respect to the period covered by this report"; fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act], as amended"; and that "[t]he information contained in [them] fairly presents, in all material respects, the financial condition and results of operations of the Company." Before vouching for the accuracy of the statements made in Assertio's and Spectrum's SEC filings, the certifying Defendants were obligated to familiarize themselves with the contents of the filings and the underlying operations described therein.

293.    Defendants' scienter is further established by Assertio's involvement in efforts to combat competition to Indocin, including in the Company's opposition to Zydus's suitability petition for a 100 mg indomethacin suppository and the Company's lawsuits against Wells Pharma. *See supra* ¶¶ 48-60. Defendant Peisert was particularly aware of Assertio's litigation against Wells Pharma because he filed a declaration in Wells Pharma's case against Assertio in support of Assertio's motion to dismiss.[19]

294.    Defendants' scienter is further established by statements from confidential witnesses. CW 1 made clear that Defendant Riga and Spectrum's executives orchestrated its improper sales practices to inflate its value in the Merger.

295.    In addition, CW 1 explained that Assertio's executive team, including Defendants Peisert and Schwichtenberg, attended a weekly meeting and received weekly reports that showed them Rolvedon's sales figures. By the end of August, they were getting "really anxious" about the low amount of sales, and they were panicking in September. *See supra* ¶ 106.

296.    CW 2 questioned if Assertio quashed the news of the generic version of Indocin so the Spectrum acquisition could go through. *See supra* ¶ 120.

_____

[19] *See* Wells Pharma California Action, ECF No. 17 (C.D. Cal. Oct. 18, 2022).

297.    In addition, CW 3 explained that Assertio "probably should have done their homework before they bought [Spectrum]" because hitting the milestones for the acquisition was "impossible." CW 3 explained that this should have been clear to Assertio and the witness did not know "know why they neglected that information." *See supra* ¶ 122.

298.    CW 3 also described how if there was channel stuffing, Spectrum's SVP of Sales and Marketing (who CW 1 also discussed, and who reported to Spectrum's CEO Tom Riga while at Spectrum and to Assertio's CEO Defendant Peisert while at Assertio) would know about it. "If there's anybody that knows where the bodies are buried and should be held accountable it's" the Spectrum SVP of Sales and Marketing, who CW 3 does not "doubt for a second . . . knew something." *See supra* ¶ 126.

299.    These allegations are corroborated by CW 4, who described Spectrum's sales projections for Rolvedon post-acquisition as "a total and complete joke," including because Spectrum's "large customers in Q1 and Q2 bought what they needed for all of Q2 and Q3" of 2023. *See supra* ¶¶ 130, 134.

300.    In addition, CW 4 described Assertio as "completely unprepared" to purchase Spectrum and "a bunch of bankers who bought a couple of pain drugs and call themselves a pharmaceutical company," with "the stockholders [being] 100 percent accurate that these guys screwed up this acquisition."

301.    Defendant Peisert's scienter is further supported by his admission when discussing the "disappointing" results for the third quarter of 2023 that "there were high levels of inventory in the channel at the end of second quarter" and that Rolvedon existed in a "competitive and dynamic market." *See supra* ¶¶ 98, 271.

302. Departures of senior executives, including Defendant Peisert and Spectrum's SVP of Sales and Marketing, as well as a large portion of the legacy Spectrum sales team, as a result of the events described above also support Defendants' scienter. *See supra* ¶¶ 111, 113, 116, 125-26, 135-38.

303. The Individual Defendants making detailed statements about the topics at issue, including about the risk of generic competition to Indocin and the benefit that Rolvedon sales would provide to Assertio, also demonstrates their scienter as to the underlying factual information related to these topics. *See, e.g.*, *supra* ¶¶ 159-60, 163-74, 176-78, 187-92, 226, 229, 232-39, 249, 254.

304. The Individual Defendants' scienter is also established because the alleged misstatements and omissions at issue here concerned Assertio's and Spectrum's core operations. Indeed, Indocin accounted for 70% of Assertio's revenue before the Merger and acquiring Spectrum was Assertio's strategy to offset the decline in revenue from a generic competitor to Indocin. Following the acquisition, Spectrum's business accounted for 35% of the combined company. [20] Moreover, when Assertio gave financial guidance on May 9, 2023, it projected net product sales (without Rolvedon) with a midpoint of $162 million for the year. Rolvedon sales were projected to surpass that amount in 2024, especially after accounting for the purported operational benefits of the acquisition. In addition, the allegations described above, showing how crucial purchasing Spectrum was to Assertio's strategy to offset the decline in sales from competition to Indocin, shows how core these issues were to Assertio. Rolvedon was also core to

---

[20] Assertio's market capitalization on April 24, 2023, just before the acquisition was announced, was approximately $593 million. The acquisition price that valued Spectrum at between $248 million and $291 million thus valued Spectrum ***at least*** at 42% of Assertion's value prior to the acquisition.

Spectrum since it was the company's **only** commercially available product. The Individual Defendants, by virtue of their roles in senior management and involvement in Assertio's and Spectrum's core operations, would have had knowledge of the true nature of their core businesses during the Class Period. In addition, Defendants had access to reports and communications describing these operations.

305.    Assertio and Spectrum themselves had scienter as to the false and misleading nature of the statements described above based on the scienter of the Individual Defendants. In addition, their scienter can be inferred because these statements about such crucial issues would have been approved by other corporate officials that knew they were false or misleading.

## VIII.    <u>NO SAFE HARBOR</u>

306.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

307.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, the forward-looking statement was authorized or approved by an executive officer

or top management of Assertio who knew that the statements were false when made, and/or the statutory safe harbor does not apply in the context of going private transactions such as the Merger.

## IX.    CLASS ACTION ALLEGATIONS

308.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Assertio securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. The Class includes those who acquired Assertio securities in the Merger. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

309.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Assertio securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Assertio or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

310.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

311.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

312.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the business, operations and management of Assertio and/or Spectrum;

- whether the Individual Defendants caused Assertio and/or Spectrum to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Assertio securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

313.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS

314.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Assertio securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts during the Class Period;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Assertio securities between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

315.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

316.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed herein.

85

## XI.  VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT
## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)

317.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

318.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

319.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC.

320.    Defendants made false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

321.    Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased or acquired Assertio securities.

322.    These Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and the Class; and (ii) cause Plaintiffs and the Class to purchase or acquire Assertio securities.

323.    Defendants also were individually and collectively responsible for making the false and misleading statements and omissions alleged herein by virtue of having made public

86

statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Assertio and Spectrum's financial condition.

324. By virtue of their actions, positions, and associations with Assertio and Spectrum, these Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, these Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

325. During the Class Period, Assertio securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying upon the price of the Assertio securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, purchased or acquired Assertio securities at artificially inflated prices and were damaged thereby. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or acquired said securities at those prices.

326. By purchasing or acquiring their Assertio securities at these artificially inflated prices, Plaintiffs and the Class members suffered economic losses, which losses were a direct and

proximate result of Defendants Assertio, Spectrum, and the Individual Defendants' fraudulent conduct.

327. By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants)

328. This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c), pursuant to Section 10(b). Accordingly, Plaintiffs need not allege or prove in this Count that each of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs prior to Count I above as if fully set forth herein.

329. During the Class Period, Defendants carried out a common plan, scheme, conspiracy, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Assertio securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Assertio securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

330.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases or acquisitions of Assertio securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

331.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included inflating Rolvedon's financial metrics to inflate the value of Spectrum and covering up the decline in revenue from Indocin, including by conducting the Spectrum transaction at an inflated value.

332.    During the Class Period, Assertio securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying upon the price of the Assertio securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, purchased or acquired Assertio securities at artificially inflated prices and were damaged thereby.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or acquired said securities at those prices.

333.    During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiffs and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased or acquired Assertio securities, or if they had, would not have done so at the value at which they did.

334.    As a direct and proximate result of the Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Assertio securities during the Class Period.

335.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of Assertio securities during the Class Period.

## COUNT III

**(Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants)**

336.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

337.    During the Class Period, the Assertio Individual Defendants participated in the operation and management of Assertio and the Spectrum Individual Defendants participated in the operation and management of Spectrum in connection with its acquisition by Assertio, and conducted and participated, directly and indirectly, in the conduct of Assertio's and Spectrum's business affairs. Because of their senior positions, they knew the adverse non-public information about Assertio's and Spectrum's statements described above.

338.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Assertio's and Spectrum's financial condition and results of operations, and to correct promptly any public statements issued by Assertio and Spectrum that had become materially false or misleading.

339.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Assertio and Spectrum disseminated in the marketplace during the Class Period concerning Assertio's and Spectrum's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Assertio and/or Spectrum to engage in the wrongful acts complained of herein. The Assertio Individual Defendants,

therefore, were "controlling persons" of Assertio, and the Spectrum Individual Defendants were "controlling persons" of Spectrum in connection with its acquisition by Assertio, within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Assertio securities.

340. Each of the Individual Defendants, therefore, acted as a controlling person of Assertio and/or Spectrum. By reason of their senior management positions and/or being directors, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Assertio and/or Spectrum to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Assertio and/or Spectrum in connection with its acquisition by Assertio, and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

341. By reason of the above conduct, the Assertio Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Assertio and the Spectrum Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Spectrum.

## XII.  VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE EXCHANGE ACT

342. The claims in Counts IV and V below are brought under Sections 14(a) and 20(a) of the Exchange Act (the "Proxy Claims"). The Proxy Claims are brought on behalf of investors who beneficially owned and/or held Assertio common stock as of the Record Date of June 13, 2023 and were eligible to vote at Assertio's special meeting on July 27, 2023. The Proxy Claims are based solely on negligence. They are not based on any knowing or reckless conduct by or on

behalf of Defendants, and Plaintiffs specifically disclaim any allegations of fraud, scienter or recklessness in these non-fraud claims.

343.    Defendants' proxy solicitations included the statements described Section V.D above that served to color the market's view of the Spectrum acquisition and encourage Assertio common stockholders to vote in favor of the transaction. These statements were made in the following proxy solicitations, including statements that these documents incorporated by reference (collectively, the "Proxy Solicitations"):

(a)    the Form S-4 Registration Statement filed on June 2, 2023, which included the Preliminary Joint Proxy Statement and Prospectus, dated June 1, 2023, as set forth above in ¶¶ 199-221;

(b)    Amendment No. 1 to Form S-4 Registration Statement filed on June 14, 2023, which included the Joint Proxy Statement and Prospectus, as set forth above in ¶¶ 222, 224;

(c)    the Joint Proxy Statement and Prospectus filed on June 15, 2023, as set forth above in ¶¶ 223-24.

344.    All of the Proxy Solicitations were materially false and misleading for the reasons explained in Section V.D above.

345.    The materially false and misleading statements and omissions set forth above directly and proximately caused the economic loss suffered by Plaintiffs and the Class. As discussed in more detail in Section VI, throughout the Class Period, the price of Assertio securities was artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein until the truth was revealed through a series of partial corrective disclosures starting on August 3, 2023, and continuing through the end of the Class Period.

## COUNT IV

**(Violations of Section 14(a) of the Exchange Act and SEC Rule 14a–9 Against Defendants Assertio, Peisert, Schwichtenberg, Patel, Spectrum, and Riga (the "Section 14(a) Defendants"))**

346.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except that this claim does not sound in fraud.

347.    For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

348.    This claim is brought against the Section 14(a) Defendants pursuant to Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a 9 promulgated thereunder (17 C.F.R. § 240.14a 9), on behalf of all former shareholders of Assertio who held common stock as of the Record Date for the Merger and were entitled to vote at the Assertio special meeting on July 27, 2023 with respect to the Merger.

349.    The Section 14(a) Defendants' statements issued to solicit shareholder approval of the Merger, including the Proxy Solicitations, and the documents incorporated therein, and other proxy solicitation materials, contained statements that were false and misleading with respect to material facts, and omitted material facts necessary in order to make the statements not false or misleading.

350.    Moreover, the Section 14(a) Defendants were under a continuing duty to update and/or correct these material misrepresentations and omissions, between dissemination of these documents and the shareholder vote on July 27, 2023, by disclosing the relevant facts, as well as update and/or correct any false or misleading statements. In violation of these duties, the Section 14(a) Defendants never disclosed any of the omitted facts or corrected the misleading statements before the shareholder vote on the Spectrum acquisition that was held on July 27, 2023.

Significantly, these Defendants updated and/or supplemented the Proxy multiple times without correcting their misrepresentations or disclosing any of the material facts originally omitted.

351.    The Section 14(a) Defendants, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy Statement and other proxy solicitation materials.

352.    Spectrum is additionally liable for these statements because following the Merger, Spectrum is the same entity as Assertio or, in the alternative, Assertio is the successor in interest to Spectrum.

353.    By means of the Proxy Solicitations and documents attached thereto or incorporated by reference therein and other proxy solicitation materials, the Section 14(a) Defendants sought to secure Plaintiffs' and other Class members' approval of the Spectrum acquisition and solicited proxies from Plaintiffs and other members of the Class.

354.    Each Defendant named in this Count acted negligently in making inaccurate statements of material facts, and/or omitting material facts required to be stated in order to make those statements not misleading, as well as in failing to update these statements. Defendants were required to ensure that the Proxy Solicitations and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision.

355.    The solicitations described herein were essential links in the accomplishment of the Merger.

356.    In the alternative, Plaintiffs and the Class's reliance may established through the presumptions of reliance established under the fraud-on-the-market doctrine or *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

357.    Plaintiffs, and other members of the Class eligible to vote on the Merger, were

misled by the Section 14(a) Defendants' false and misleading statements and omissions, were denied the opportunity to make a fully informed decision in voting on the transaction, and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

358.     The false and misleading statements and omissions in the Proxy Solicitations and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Solicitations, additional proxy solicitation materials, and in other information reasonably available to stockholders.

359.     The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and other members of the Class.

360.     By reason of the foregoing, the Section 14(a) Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a 9 promulgated thereunder, 17 C.F.R. § 240.14a 9.

## COUNT V

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants in Connection with the Section 14(a) Claims in Count IV)

361.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except that this claim does not sound in fraud.

362.     For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

363.     This Count is asserted against the Individual Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

364.    During the Class Period, the Individual Defendants participated in the operation and management of Assertio, and/or Spectrum in connection with its acquisition by Assertio, and conducted and participated, directly and indirectly, in the conduct of Assertio's and Spectrum's business affairs. Because of their senior positions, they knew the adverse non-public information about Assertio's and Spectrum's statements described above.

365.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Assertio's financial condition and results of operations and Spectrum's financial condition and results of operations in connection with its acquisition by Assertio, and to correct promptly any public statements issued by Assertio and Spectrum that had become materially false or misleading.

366.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Assertio and Spectrum disseminated in the marketplace during the Class Period concerning Assertio's and Spectrum's results of operations. Throughout the Class Period, these Defendants exercised their power and authority to cause Assertio and/or Spectrum to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Assertio, and/or of Spectrum in connection with its acquisition by Assertio, within the meaning of Section 20(a) of the Exchange Act. In this capacity, the Individual Defendants participated in the unlawful conduct alleged which artificially inflated the market price of Assertio securities.

367.    Each of the Individual Defendants, therefore, acted as a controlling person of Assertio and/or Spectrum. By reason of their senior management positions and/or being directors, each of the Individual Defendants had the power to direct the actions of, and exercised the same

to cause, Assertio and/or Spectrum to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Assertio and/or Spectrum in connection with its acquisition by Assertio, and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

368. In particular, the Individual Defendants had direct and supervisory involvement in the day to day operations of Assertio and/or Spectrum in connection with its acquisition by Assertio and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. These Defendants also reviewed the Merger Agreement between Assertio and Spectrum and voted to approve the Merger, signed the Proxy Solicitations, and/or solicited approval of the Merger.

369. As set forth above, the Section 20(a) Defendants each violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9 by their acts and omissions as alleged in this complaint. By virtue of their position as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Assertio's securities during the Class Period.

370. By reason of the foregoing, the Individual Defendants violated Section 20(a).

### XIII. <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## XIV.   DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  June 10, 2024                                  Respectfully submitted,

**POMERANTZ LLP**

*/s/ Michael Grunfeld* _____
Jeremy A. Lieberman
Michael Grunfeld (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mgrunfeld@pomlaw.com

*Lead Counsel for Plaintiffs*

**DJS LAW GROUP LLP**
David J. Schwartz
274 White Plains Road, Suite 1
Eastchester, New York 10709
Telephone: (914) 206-9742
david@djslawllp.com

*Counsel for Lead Plaintiff Continental
General Insurance Company*

# CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, <u>Perry Shapiro                                    </u>, make this declaration

pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private

Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Assertio Holdings, Inc. ("Assertio") and

authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Assertio securities at the direction of plaintiffs'

counsel or in order to participate in any private action arising under the Securities Act or Exchange

Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who

purchased or otherwise acquired Assertio securities during the Class Period as specified in the

Complaint, including providing testimony at deposition and trial, if necessary. I understand that

the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Assertio securities during the Class

Period as specified in the Complaint.

6.      I previously submitted a certification in connection with the original complaint that

was filed in this action on January 5, 2024.

7.      During the three-year period preceding the date on which this Certification is

signed, I have not served or sought to serve as a representative party on behalf of a class under the

federal securities laws, other than in connection with the original complaint that was filed in this

action.

8.      I agree not to accept any payment for serving as a representative party on behalf of

DocuSign Envelope ID: 7B7CC9C5-E18E-42FB-964E-EA8770571868

the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

9.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** ___5/31/2024_____
                **(Date)**



DocuSigned by:

_____
C4D7C3CB6A61416...
**(Signature)**

Perry Shapiro
_____
            **(Type or Print Name)**

**Assertio Holdings, Inc. (ASRT)**                                            **Perry Shapiro**

### List of Purchases and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase | Common Stock | 9/29/2023 | 6,000 | $2.6300 |

## CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.      I, <u>    David Cox                                          </u>, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Assertio Holdings, Inc. ("Assertio") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Assertio securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Assertio securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Assertio securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** _____
6/3/2024
                    **(Date)**


DocuSigned by:

_____
479D434EB90E4F0...
**(Signature)**

David Cox

_____
                    **(Type or Print Name)**

**Assertio Holdings, Inc. (ASRT)**                                                                 **David S. Cox**

### List of Purchases and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase | Common Stock | 1/27/2023 | 1,000 | $4.0100 |
| Purchase | Common Stock | 3/3/2023 | 300 | $5.9900 |
| Purchase | Common Stock | 4/4/2023 | 1,000 | $5.8868 |
| Purchase | Common Stock | 4/21/2023 | 1,500 | $6.0300 |
| Purchase | Common Stock | 4/25/2023 | 437 | $5.1300 |
| Purchase | Common Stock | 4/25/2023 | 5,000 | $5.0900 |
| Purchase | Common Stock | 5/10/2023 | 1,000 | $7.6800 |
| Purchase | Common Stock | 7/11/2023 | 3,000 | $5.1250 |
| Purchase | Common Stock | 7/20/2023 | 1,000 | $6.0000 |
| Purchase | Common Stock | 8/4/2023 | 20,000 | $2.9396 |
| Purchase | Common Stock | 9/14/2023 | 1,000 | $2.7300 |
| Purchase | Common Stock | 9/15/2023 | 1,000 | $2.7586 |
| Purchase | Common Stock | 9/18/2023 | 2,000 | $2.6100 |
| Purchase | Common Stock | 9/27/2023 | 500 | $2.6200 |
| Purchase | Common Stock | 9/29/2023 | 263 | $2.5899 |
| Sale | Common Stock | 10/13/2023 | (2,500) | $2.3428 |
| Sale | Common Stock | 12/12/2023 | (5,000) | $1.0607 |
| | | | | |
| Purchase | P 20230616 6 | 6/2/2023 | 1 | $0.1000 |
| Purchase | C 20230818 6 | 7/11/2023 | 30 | $0.3000 |
| Sale | C 20230616 9 | 5/10/2023 | (27) | $0.2000 |
| Sale | P 20230616 6 | 5/24/2023 | (1) | $0.2000 |
| Sale | C 20230721 7 | 5/31/2023 | (10) | $0.4000 |
| Sale | P 20230721 6 | 5/31/2023 | (10) | $0.4300 |

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, Tihomir Atanasov, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Assertio Holdings, Inc. ("Assertio") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Assertio securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Assertio securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in Assertio securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


**Executed 04.06.2024**
**        (Date)**


_____
     **(Signature)**


Tihomir Atanasov
**(Type or Print Name)**

**Assertio Holdings, Inc. (ASRT)**                                                                 **Tihomir Atanasov**

### List of Purchases and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase | Common Stock | 8/7/2023 | 1,000 | $3.3859 |
| Purchase | Common Stock | 8/7/2023 | 1,000 | $3.3868 |
| Purchase | Common Stock | 8/7/2023 | 1,000 | $3.3880 |
| Purchase | Common Stock | 8/7/2023 | 1,000 | $3.3780 |
| Purchase | Common Stock | 8/7/2023 | 1,000 | $3.3683 |
| Purchase | Common Stock | 8/7/2023 | 1,000 | $3.3600 |
| Purchase | Common Stock | 8/7/2023 | 1,000 | $3.3600 |
| Purchase | Common Stock | 8/7/2023 | 1,000 | $3.3450 |
| Purchase | Common Stock | 8/7/2023 | 1,000 | $3.3400 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.4200 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.3400 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.3100 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.3287 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.3000 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.2300 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.2000 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.2000 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.2100 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.2100 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.1800 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.1600 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.1582 |
| Purchase | Common Stock | 8/8/2023 | 1,000 | $3.1600 |
| Purchase | Common Stock | 8/8/2023 | 500 | $3.1493 |
| Purchase | Common Stock | 8/8/2023 | 500 | $3.1495 |
| Purchase | Common Stock | 8/8/2023 | 500 | $3.1500 |
| Purchase | Common Stock | 8/10/2023 | 2,000 | $3.1380 |
| Purchase | Common Stock | 8/10/2023 | 1,000 | $3.1770 |
| Purchase | Common Stock | 8/10/2023 | 1,000 | $3.1878 |
| Purchase | Common Stock | 8/10/2023 | 1,000 | $3.1800 |
| Purchase | Common Stock | 8/11/2023 | 1,000 | $3.1200 |
| Purchase | Common Stock | 8/14/2023 | 3,000 | $3.2500 |
| Purchase | Common Stock | 8/14/2023 | 2,000 | $3.1180 |
| Purchase | Common Stock | 8/15/2023 | 1,000 | $3.1600 |
| Purchase | Common Stock | 8/29/2023 | 3,000 | $3.3389 |
| Purchase | Common Stock | 8/29/2023 | 1,000 | $3.3379 |
| Purchase | Common Stock | 8/30/2023 | 1,000 | $3.2580 |
| Purchase | Common Stock | 8/30/2023 | 1,000 | $3.2950 |
| Purchase | Common Stock | 8/30/2023 | 1,000 | $3.3088 |
| Purchase | Common Stock | 9/1/2023 | 1,000 | $3.3878 |
| Purchase | Common Stock | 9/1/2023 | 1,000 | $3.3877 |
| Purchase | Common Stock | 9/5/2023 | 1,000 | $3.2780 |
| Purchase | Common Stock | 9/5/2023 | 500 | $3.2600 |
| Purchase | Common Stock | 9/6/2023 | 500 | $3.2190 |
| Purchase | Common Stock | 9/6/2023 | 500 | $3.1950 |
| Purchase | Common Stock | 9/7/2023 | 500 | $3.2580 |
| Purchase | Common Stock | 9/7/2023 | 500 | $3.2350 |
| Purchase | Common Stock | 9/7/2023 | 500 | $3.2300 |
| Purchase | Common Stock | 9/7/2023 | 500 | $3.2200 |
| Purchase | Common Stock | 9/8/2023 | 500 | $3.1980 |
| Purchase | Common Stock | 9/8/2023 | 500 | $3.1700 |
| Purchase | Common Stock | 9/11/2023 | 2,000 | $3.0474 |
| Purchase | Common Stock | 9/11/2023 | 1,000 | $3.1800 |
| Purchase | Common Stock | 9/11/2023 | 1,000 | $3.0361 |
| Purchase | Common Stock | 9/11/2023 | 1,000 | $3.0390 |
| Purchase | Common Stock | 9/11/2023 | 1,000 | $3.0480 |
| Purchase | Common Stock | 9/11/2023 | 1,000 | $3.0350 |
| Purchase | Common Stock | 9/11/2023 | 1,000 | $3.0174 |
| Purchase | Common Stock | 9/11/2023 | 1,000 | $3.0186 |
| Purchase | Common Stock | 9/11/2023 | 1,000 | $3.0260 |

**Assertio Holdings, Inc. (ASRT)**                                    **Tihomir Atanasov**

### List of Purchases and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase | Common Stock | 9/11/2023 | 500 | $3.1800 |
| Purchase | Common Stock | 9/12/2023 | 3,000 | $2.9886 |
| Purchase | Common Stock | 9/12/2023 | 2,000 | $3.0180 |
| Purchase | Common Stock | 9/12/2023 | 2,000 | $2.9763 |
| Purchase | Common Stock | 9/12/2023 | 1,000 | $3.0290 |
| Purchase | Common Stock | 9/12/2023 | 1,000 | $3.0200 |
| Purchase | Common Stock | 9/12/2023 | 1,000 | $3.0100 |
| Purchase | Common Stock | 9/12/2023 | 1,000 | $3.0000 |
| Purchase | Common Stock | 9/12/2023 | 1,000 | $2.9700 |
| Purchase | Common Stock | 9/12/2023 | 500 | $3.0200 |
| Purchase | Common Stock | 9/13/2023 | 500 | $2.9600 |
| Purchase | Common Stock | 9/13/2023 | 500 | $2.9450 |
| Purchase | Common Stock | 9/13/2023 | 500 | $2.9250 |
| Purchase | Common Stock | 9/14/2023 | 3,000 | $2.7688 |
| Purchase | Common Stock | 9/14/2023 | 2,000 | $2.7380 |
| Purchase | Common Stock | 9/14/2023 | 2,000 | $2.7393 |
| Purchase | Common Stock | 9/14/2023 | 2,000 | $2.7283 |
| Purchase | Common Stock | 9/14/2023 | 2,000 | $2.6800 |
| Purchase | Common Stock | 9/14/2023 | 1,000 | $2.7280 |
| Purchase | Common Stock | 9/14/2023 | 1,000 | $2.7290 |
| Purchase | Common Stock | 9/14/2023 | 1,000 | $2.7288 |
| Purchase | Common Stock | 9/14/2023 | 1,000 | $2.6586 |
| Purchase | Common Stock | 9/14/2023 | 1,000 | $2.7466 |
| Purchase | Common Stock | 9/19/2023 | 1,000 | $2.6582 |
| Purchase | Common Stock | 9/19/2023 | 1,000 | $2.6078 |
| Purchase | Common Stock | 9/19/2023 | 1,000 | $2.6150 |
| Purchase | Common Stock | 9/19/2023 | 1,000 | $2.6299 |
| Purchase | Common Stock | 9/19/2023 | 1,000 | $2.6273 |
| Purchase | Common Stock | 9/20/2023 | 1,000 | $2.6890 |
| Purchase | Common Stock | 9/20/2023 | 1,000 | $2.6880 |
| Purchase | Common Stock | 9/20/2023 | 1,000 | $2.6550 |
| Purchase | Common Stock | 9/22/2023 | 1,000 | $2.5500 |
| Purchase | Common Stock | 9/22/2023 | 1,000 | $2.5780 |
| Purchase | Common Stock | 9/22/2023 | 1,000 | $2.5783 |
| Purchase | Common Stock | 9/22/2023 | 1,000 | $2.5788 |
| Purchase | Common Stock | 9/27/2023 | 1,000 | $2.6750 |
| Purchase | Common Stock | 9/27/2023 | 1,000 | $2.6750 |
| Purchase | Common Stock | 9/27/2023 | 100 | $2.6750 |
| Purchase | Common Stock | 10/4/2023 | 2,000 | $2.4472 |
| Purchase | Common Stock | 10/4/2023 | 1,000 | $2.4488 |
| Purchase | Common Stock | 10/4/2023 | 1,000 | $2.4488 |
| Purchase | Common Stock | 10/4/2023 | 1,000 | $2.4800 |
| Purchase | Common Stock | 10/6/2023 | 2,000 | $2.5572 |
| Purchase | Common Stock | 10/6/2023 | 1,000 | $2.5599 |
| Purchase | Common Stock | 10/6/2023 | 1,000 | $2.5599 |
| Purchase | Common Stock | 10/6/2023 | 1,000 | $2.5770 |
| Purchase | Common Stock | 10/6/2023 | 1,000 | $2.5770 |
| Purchase | Common Stock | 10/9/2023 | 1,000 | $2.5700 |
| Purchase | Common Stock | 10/9/2023 | 1,000 | $2.5850 |
| Purchase | Common Stock | 10/9/2023 | 1,000 | $2.5650 |
| Purchase | Common Stock | 10/9/2023 | 1,000 | $2.5550 |
| Purchase | Common Stock | 10/9/2023 | 1,000 | $2.5550 |
| Purchase | Common Stock | 10/9/2023 | 1,000 | $2.5450 |
| Purchase | Common Stock | 10/10/2023 | 3,000 | $2.5099 |
| Purchase | Common Stock | 10/10/2023 | 1,000 | $2.5499 |
| Purchase | Common Stock | 10/10/2023 | 1,000 | $2.5500 |
| Purchase | Common Stock | 10/10/2023 | 1,000 | $2.5050 |
| Purchase | Common Stock | 10/10/2023 | 1,000 | $2.4850 |
| Purchase | Common Stock | 10/10/2023 | 1,000 | $2.4890 |
| Purchase | Common Stock | 10/10/2023 | 1,000 | $2.4880 |

**Assertio Holdings, Inc. (ASRT)**                                                **Tihomir Atanasov**

### List of Purchases and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase | Common Stock | 10/10/2023 | 1,000 | $2.4800 |
| Purchase | Common Stock | 10/11/2023 | 1,000 | $2.3580 |
| Purchase | Common Stock | 10/11/2023 | 1,000 | $2.3950 |
| Purchase | Common Stock | 10/12/2023 | 1,000 | $2.3070 |
| Purchase | Common Stock | 10/12/2023 | 1,000 | $2.3080 |
| Purchase | Common Stock | 10/13/2023 | 1,000 | $2.3370 |
| Purchase | Common Stock | 10/13/2023 | 1,000 | $2.3380 |
| Purchase | Common Stock | 10/16/2023 | 2,000 | $2.3592 |
| Purchase | Common Stock | 10/16/2023 | 1,000 | $2.3987 |
| Purchase | Common Stock | 10/18/2023 | 2,000 | $2.3490 |
| Purchase | Common Stock | 10/18/2023 | 1,000 | $2.3460 |
| Purchase | Common Stock | 10/18/2023 | 1,000 | $2.3450 |
| Purchase | Common Stock | 10/18/2023 | 1,000 | $2.3480 |
| Purchase | Common Stock | 10/18/2023 | 1,000 | $2.3450 |
| Purchase | Common Stock | 10/18/2023 | 1,000 | $2.3250 |
| Purchase | Common Stock | 10/18/2023 | 1,000 | $2.3250 |
| Purchase | Common Stock | 10/18/2023 | 1,000 | $2.3050 |
| Purchase | Common Stock | 10/18/2023 | 1,000 | $2.3090 |
| Purchase | Common Stock | 10/19/2023 | 1,000 | $2.2950 |
| Purchase | Common Stock | 10/19/2023 | 1,000 | $2.2980 |
| Purchase | Common Stock | 10/19/2023 | 1,000 | $2.2900 |
| Purchase | Common Stock | 10/19/2023 | 1,000 | $2.2777 |
| Purchase | Common Stock | 10/19/2023 | 1,000 | $2.2700 |
| Purchase | Common Stock | 10/20/2023 | 5,000 | $2.3087 |
| Purchase | Common Stock | 10/20/2023 | 2,000 | $2.2999 |
| Purchase | Common Stock | 10/20/2023 | 1,000 | $2.2900 |
| Purchase | Common Stock | 10/20/2023 | 1,000 | $2.2880 |
| Purchase | Common Stock | 10/20/2023 | 1,000 | $2.2799 |
| Purchase | Common Stock | 10/20/2023 | 1,000 | $2.2800 |
| Purchase | Common Stock | 10/23/2023 | 5,000 | $2.2590 |
| Purchase | Common Stock | 10/23/2023 | 2,000 | $2.2600 |
| Purchase | Common Stock | 10/23/2023 | 1,000 | $2.2459 |
| Purchase | Common Stock | 10/23/2023 | 1,000 | $2.2350 |
| Purchase | Common Stock | 10/23/2023 | 1,000 | $2.2350 |
| Purchase | Common Stock | 10/24/2023 | 3,000 | $2.2371 |
| Purchase | Common Stock | 10/24/2023 | 3,000 | $2.2300 |
| Purchase | Common Stock | 10/24/2023 | 185 | $2.2200 |
| Purchase | Common Stock | 10/25/2023 | 3,000 | $2.1987 |
| Purchase | Common Stock | 10/27/2023 | 1,000 | $2.1577 |
| Purchase | Common Stock | 10/30/2023 | 2,000 | $2.0953 |
| Purchase | Common Stock | 10/30/2023 | 1,000 | $2.0950 |
| Purchase | Common Stock | 10/30/2023 | 500 | $2.0950 |
| Purchase | Common Stock | 10/31/2023 | 1,000 | $2.1350 |
| Purchase | Common Stock | 11/1/2023 | 3,000 | $2.1300 |
| Purchase | Common Stock | 11/1/2023 | 1,000 | $2.1200 |
| Purchase | Common Stock | 11/1/2023 | 1,000 | $2.1200 |
| Purchase | Common Stock | 11/1/2023 | 1,000 | $2.1100 |
| Purchase | Common Stock | 11/2/2023 | 2,000 | $2.1000 |
| Purchase | Common Stock | 11/2/2023 | 2,000 | $2.0600 |
| Purchase | Common Stock | 11/2/2023 | 1,000 | $2.1360 |
| Purchase | Common Stock | 11/2/2023 | 1,000 | $2.1380 |
| Purchase | Common Stock | 11/2/2023 | 1,000 | $2.1200 |
| Purchase | Common Stock | 11/2/2023 | 1,000 | $2.1200 |
| Purchase | Common Stock | 11/2/2023 | 1,000 | $2.0650 |
| Purchase | Common Stock | 11/3/2023 | 5,000 | $2.3379 |
| Purchase | Common Stock | 11/3/2023 | 2,000 | $2.2480 |
| Purchase | Common Stock | 11/3/2023 | 1,000 | $2.2700 |
| Purchase | Common Stock | 11/6/2023 | 2,000 | $2.2780 |
| Purchase | Common Stock | 11/6/2023 | 1,000 | $2.3000 |
| Purchase | Common Stock | 11/6/2023 | 1,000 | $2.2600 |

**Assertio Holdings, Inc. (ASRT)**                                                                  **Tihomir Atanasov**

**List of Purchases and Sales**

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase | Common Stock | 11/6/2023 | 1,000 | $2.2500 |
| Purchase | Common Stock | 11/6/2023 | 1,000 | $2.2300 |
| Purchase | Common Stock | 11/6/2023 | 500 | $2.2350 |
| Purchase | Common Stock | 11/6/2023 | 500 | $2.2200 |
| Purchase | Common Stock | 11/6/2023 | 500 | $2.2100 |
| Purchase | Common Stock | 11/6/2023 | 500 | $2.2050 |
| Purchase | Common Stock | 11/7/2023 | 2,000 | $2.2100 |
| Purchase | Common Stock | 11/7/2023 | 2,000 | $2.2150 |
| Purchase | Common Stock | 11/7/2023 | 1,000 | $2.1770 |
| Purchase | Common Stock | 11/8/2023 | 2,000 | $2.1680 |
| Purchase | Common Stock | 11/8/2023 | 2,000 | $2.1600 |
| Purchase | Common Stock | 11/8/2023 | 2,000 | $2.1450 |
| Purchase | Common Stock | 11/8/2023 | 1,000 | $2.1850 |
| Purchase | Common Stock | 11/8/2023 | 1,000 | $2.1850 |
| Purchase | Common Stock | 11/8/2023 | 1,000 | $2.1800 |
| Purchase | Common Stock | 11/9/2023 | 2,000 | $1.1384 |
| Purchase | Common Stock | 11/9/2023 | 3,000 | $1.1582 |
| Purchase | Common Stock | 11/9/2023 | 3,000 | $1.1500 |
| Purchase | Common Stock | 11/9/2023 | 3,000 | $1.1477 |
| Purchase | Common Stock | 11/9/2023 | 3,000 | $1.1479 |
| Purchase | Common Stock | 11/9/2023 | 3,000 | $1.1386 |
| Purchase | Common Stock | 11/9/2023 | 3,000 | $1.1157 |
| Purchase | Common Stock | 11/9/2023 | 5,000 | $1.1665 |
| Purchase | Common Stock | 11/9/2023 | 5,000 | $1.1477 |
| Purchase | Common Stock | 11/13/2023 | 2,000 | $1.0200 |
| Purchase | Common Stock | 11/13/2023 | 3,000 | $0.9776 |
| Purchase | Common Stock | 11/15/2023 | 5,000 | $1.1470 |
| Purchase | Common Stock | 11/16/2023 | 1,000 | $1.1050 |
| Purchase | Common Stock | 11/16/2023 | 1,000 | $1.1000 |
| Purchase | Common Stock | 11/17/2023 | 1,000 | $1.1250 |
| Purchase | Common Stock | 11/20/2023 | 2,000 | $1.2190 |
| Purchase | Common Stock | 11/21/2023 | 5,000 | $1.2059 |
| Purchase | Common Stock | 11/21/2023 | 10,000 | $1.2588 |
| Purchase | Common Stock | 11/27/2023 | 2,000 | $1.1800 |
| Purchase | Common Stock | 11/28/2023 | 3,000 | $1.1580 |
| Purchase | Common Stock | 11/30/2023 | 1,000 | $1.0800 |
| Purchase | Common Stock | 11/30/2023 | 2,000 | $1.0800 |
| Purchase | Common Stock | 11/30/2023 | 2,000 | $1.0650 |
| Purchase | Common Stock | 11/30/2023 | 2,000 | $1.0197 |
| Purchase | Common Stock | 11/30/2023 | 3,000 | $1.0200 |
| Purchase | Common Stock | 12/6/2023 | 5,000 | $1.1177 |
| Purchase | Common Stock | 12/6/2023 | 5,000 | $1.1179 |
| Purchase | Common Stock | 12/6/2023 | 5,000 | $1.1174 |
| Purchase | Common Stock | 12/6/2023 | 5,000 | $1.1000 |
| Purchase | Common Stock | 12/6/2023 | 5,000 | $1.0900 |
| Purchase | Common Stock | 12/7/2023 | 2,000 | $1.0800 |
| Purchase | Common Stock | 12/7/2023 | 3,000 | $1.0800 |
| Purchase | Common Stock | 12/8/2023 | 2,000 | $1.0900 |
| Purchase | Common Stock | 12/12/2023 | 5,000 | $1.0550 |
| Purchase | Common Stock | 12/13/2023 | 1,000 | $1.0400 |
| Purchase | Common Stock | 12/13/2023 | 2,000 | $1.0450 |
| Purchase | Common Stock | 12/13/2023 | 3,000 | $1.0581 |
| Purchase | Common Stock | 12/15/2023 | 10,000 | $1.0677 |
| Purchase | Common Stock | 12/18/2023 | 5,000 | $1.0788 |
| Purchase | Common Stock | 12/18/2023 | 5,000 | $1.0480 |
| Sale | Common Stock | 8/7/2023 | (90) | $3.4750 |
| Sale | Common Stock | 8/7/2023 | (900) | $3.4701 |
| Sale | Common Stock | 8/7/2023 | (1,000) | $3.6438 |
| Sale | Common Stock | 8/7/2023 | (1,000) | $3.5420 |
| Sale | Common Stock | 8/7/2023 | (1,000) | $3.3950 |

**Assertio Holdings, Inc. (ASRT)**                                                    **Tihomir Atanasov**

### List of Purchases and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Sale | Common Stock | 8/7/2023 | (1,000) | $3.4000 |
| Sale | Common Stock | 8/7/2023 | (1,000) | $3.4110 |
| Sale | Common Stock | 8/7/2023 | (1,000) | $3.4150 |
| Sale | Common Stock | 8/7/2023 | (1,000) | $3.4120 |
| Sale | Common Stock | 8/7/2023 | (1,000) | $3.4138 |
| Sale | Common Stock | 8/8/2023 | (1,000) | $3.1900 |
| Sale | Common Stock | 8/8/2023 | (1,000) | $3.2000 |
| Sale | Common Stock | 8/8/2023 | (1,000) | $3.2022 |
| Sale | Common Stock | 8/8/2023 | (1,000) | $3.2021 |
| Sale | Common Stock | 8/8/2023 | (1,000) | $3.2019 |
| Sale | Common Stock | 8/8/2023 | (1,000) | $3.0950 |
| Sale | Common Stock | 8/8/2023 | (1,000) | $3.0944 |
| Sale | Common Stock | 8/9/2023 | (500) | $3.3200 |
| Sale | Common Stock | 8/9/2023 | (1,000) | $3.3129 |
| Sale | Common Stock | 8/9/2023 | (1,000) | $3.3019 |
| Sale | Common Stock | 8/9/2023 | (1,000) | $3.3027 |
| Sale | Common Stock | 8/9/2023 | (1,000) | $3.3100 |
| Sale | Common Stock | 8/9/2023 | (1,000) | $3.3150 |
| Sale | Common Stock | 8/9/2023 | (1,000) | $3.3320 |
| Sale | Common Stock | 8/9/2023 | (1,000) | $3.3308 |
| Sale | Common Stock | 8/9/2023 | (1,000) | $3.3223 |
| Sale | Common Stock | 8/11/2023 | (1,000) | $3.2150 |
| Sale | Common Stock | 8/11/2023 | (1,000) | $3.2200 |
| Sale | Common Stock | 8/11/2023 | (1,000) | $3.2125 |
| Sale | Common Stock | 8/11/2023 | (1,000) | $3.2910 |
| Sale | Common Stock | 8/11/2023 | (2,000) | $3.2108 |
| Sale | Common Stock | 8/15/2023 | (1,000) | $3.2610 |
| Sale | Common Stock | 8/15/2023 | (1,000) | $3.2910 |
| Sale | Common Stock | 8/15/2023 | (1,000) | $3.2920 |
| Sale | Common Stock | 8/15/2023 | (1,000) | $3.2710 |
| Sale | Common Stock | 8/15/2023 | (1,000) | $3.2722 |
| Sale | Common Stock | 8/15/2023 | (1,000) | $3.2730 |
| Sale | Common Stock | 8/30/2023 | (2,000) | $3.2512 |
| Sale | Common Stock | 8/30/2023 | (2,000) | $3.2520 |
| Sale | Common Stock | 9/11/2023 | (1,000) | $3.0712 |
| Sale | Common Stock | 9/11/2023 | (1,000) | $3.0550 |
| Sale | Common Stock | 9/11/2023 | (1,000) | $3.0514 |
| Sale | Common Stock | 9/11/2023 | (1,000) | $3.0450 |
| Sale | Common Stock | 9/11/2023 | (1,000) | $3.0310 |
| Sale | Common Stock | 9/11/2023 | (1,000) | $3.0650 |
| Sale | Common Stock | 9/11/2023 | (1,000) | $3.0612 |
| Sale | Common Stock | 9/11/2023 | (1,000) | $3.0750 |
| Sale | Common Stock | 9/11/2023 | (1,000) | $3.0800 |
| Sale | Common Stock | 9/12/2023 | (1,000) | $3.0112 |
| Sale | Common Stock | 9/12/2023 | (2,000) | $3.0141 |
| Sale | Common Stock | 9/12/2023 | (2,000) | $3.0125 |
| Sale | Common Stock | 9/12/2023 | (2,000) | $2.9700 |
| Sale | Common Stock | 9/12/2023 | (3,000) | $2.9808 |
| Sale | Common Stock | 9/12/2023 | (3,000) | $2.9719 |
| Sale | Common Stock | 9/14/2023 | (1,000) | $2.6710 |
| Sale | Common Stock | 9/14/2023 | (1,000) | $2.6426 |
| Sale | Common Stock | 9/14/2023 | (1,000) | $2.6427 |
| Sale | Common Stock | 9/14/2023 | (2,000) | $2.6400 |
| Sale | Common Stock | 9/14/2023 | (3,000) | $2.7520 |
| Sale | Common Stock | 9/14/2023 | (3,000) | $2.7222 |
| Sale | Common Stock | 9/14/2023 | (3,000) | $2.7100 |
| Sale | Common Stock | 9/14/2023 | (3,000) | $2.7112 |
| Sale | Common Stock | 9/18/2023 | (1,000) | $2.6912 |
| Sale | Common Stock | 9/18/2023 | (1,000) | $2.6950 |
| Sale | Common Stock | 9/18/2023 | (1,000) | $2.6720 |

**Assertio Holdings, Inc. (ASRT)**                                                          **Tihomir Atanasov**

### List of Purchases and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Sale | Common Stock | 9/18/2023 | (1,000) | $2.6712 |
| Sale | Common Stock | 9/19/2023 | (2,000) | $2.6350 |
| Sale | Common Stock | 9/19/2023 | (2,000) | $2.6200 |
| Sale | Common Stock | 9/19/2023 | (2,000) | $2.6050 |
| Sale | Common Stock | 9/19/2023 | (2,000) | $2.6220 |
| Sale | Common Stock | 9/20/2023 | (2,000) | $2.6512 |
| Sale | Common Stock | 9/21/2023 | (2,000) | $2.5550 |
| Sale | Common Stock | 10/2/2023 | (797) | $2.5405 |
| Sale | Common Stock | 10/2/2023 | (1,000) | $2.4720 |
| Sale | Common Stock | 10/2/2023 | (1,000) | $2.4700 |
| Sale | Common Stock | 10/2/2023 | (1,000) | $2.4520 |
| Sale | Common Stock | 10/2/2023 | (1,203) | $2.5350 |
| Sale | Common Stock | 10/3/2023 | (1,000) | $2.4430 |
| Sale | Common Stock | 10/4/2023 | (1,000) | $2.4750 |
| Sale | Common Stock | 10/4/2023 | (1,000) | $2.4730 |
| Sale | Common Stock | 10/4/2023 | (1,000) | $2.5244 |
| Sale | Common Stock | 10/4/2023 | (1,000) | $2.4900 |
| Sale | Common Stock | 10/4/2023 | (1,000) | $2.5035 |
| Sale | Common Stock | 10/4/2023 | (2,000) | $2.4650 |
| Sale | Common Stock | 10/4/2023 | (2,000) | $2.4631 |
| Sale | Common Stock | 10/9/2023 | (2,000) | $2.5446 |
| Sale | Common Stock | 10/11/2023 | (300) | $2.4300 |
| Sale | Common Stock | 10/11/2023 | (700) | $2.4220 |
| Sale | Common Stock | 10/11/2023 | (2,000) | $2.4130 |
| Sale | Common Stock | 10/11/2023 | (3,000) | $2.5050 |
| Sale | Common Stock | 10/11/2023 | (3,000) | $2.5003 |
| Sale | Common Stock | 10/11/2023 | (3,000) | $2.5000 |
| Sale | Common Stock | 10/12/2023 | (2,000) | $2.4100 |
| Sale | Common Stock | 10/12/2023 | (3,000) | $2.4250 |
| Sale | Common Stock | 10/17/2023 | (1,000) | $2.4648 |
| Sale | Common Stock | 10/17/2023 | (1,000) | $2.4820 |
| Sale | Common Stock | 10/17/2023 | (1,000) | $2.4820 |
| Sale | Common Stock | 10/17/2023 | (1,000) | $2.4800 |
| Sale | Common Stock | 10/17/2023 | (1,000) | $2.5000 |
| Sale | Common Stock | 10/17/2023 | (1,000) | $2.5146 |
| Sale | Common Stock | 10/17/2023 | (2,000) | $2.4650 |
| Sale | Common Stock | 10/18/2023 | (1,000) | $2.3750 |
| Sale | Common Stock | 10/19/2023 | (2,000) | $2.3234 |
| Sale | Common Stock | 10/20/2023 | (1,000) | $2.3100 |
| Sale | Common Stock | 10/20/2023 | (1,000) | $2.3130 |
| Sale | Common Stock | 10/20/2023 | (1,000) | $2.2610 |
| Sale | Common Stock | 10/20/2023 | (1,000) | $2.2615 |
| Sale | Common Stock | 10/20/2023 | (2,000) | $2.3104 |
| Sale | Common Stock | 10/20/2023 | (2,000) | $2.3001 |
| Sale | Common Stock | 10/20/2023 | (2,000) | $2.2902 |
| Sale | Common Stock | 10/20/2023 | (3,000) | $2.3100 |
| Sale | Common Stock | 10/20/2023 | (3,000) | $2.3126 |
| Sale | Common Stock | 10/23/2023 | (2,000) | $2.2304 |
| Sale | Common Stock | 10/23/2023 | (3,000) | $2.2312 |
| Sale | Common Stock | 10/23/2023 | (5,000) | $2.2316 |
| Sale | Common Stock | 10/24/2023 | (1,000) | $2.2804 |
| Sale | Common Stock | 10/24/2023 | (1,000) | $2.2850 |
| Sale | Common Stock | 10/24/2023 | (1,000) | $2.2827 |
| Sale | Common Stock | 10/24/2023 | (1,000) | $2.2604 |
| Sale | Common Stock | 10/24/2023 | (1,000) | $2.2600 |
| Sale | Common Stock | 10/24/2023 | (1,000) | $2.2550 |
| Sale | Common Stock | 10/24/2023 | (1,000) | $2.2547 |
| Sale | Common Stock | 10/24/2023 | (1,000) | $2.2547 |
| Sale | Common Stock | 10/24/2023 | (1,000) | $2.2536 |
| Sale | Common Stock | 10/24/2023 | (2,000) | $2.2821 |

**Assertio Holdings, Inc. (ASRT)**                                    **Tihomir Atanasov**

**List of Purchases and Sales**

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Sale | Common Stock | 10/24/2023 | (2,000) | $2.2710 |
| Sale | Common Stock | 10/25/2023 | (2,801) | $2.2024 |
| Sale | Common Stock | 10/25/2023 | (3,000) | $2.2101 |
| Sale | Common Stock | 10/31/2023 | (1,000) | $2.1626 |
| Sale | Common Stock | 10/31/2023 | (1,000) | $2.1620 |
| Sale | Common Stock | 10/31/2023 | (1,000) | $2.1620 |
| Sale | Common Stock | 10/31/2023 | (1,000) | $2.1632 |
| Sale | Common Stock | 10/31/2023 | (1,000) | $2.1600 |
| Sale | Common Stock | 10/31/2023 | (1,000) | $2.1700 |
| Sale | Common Stock | 11/2/2023 | (2,000) | $2.1333 |
| Sale | Common Stock | 11/3/2023 | (900) | $2.3250 |
| Sale | Common Stock | 11/3/2023 | (1,000) | $2.2810 |
| Sale | Common Stock | 11/3/2023 | (1,000) | $2.2720 |
| Sale | Common Stock | 11/3/2023 | (1,000) | $2.2700 |
| Sale | Common Stock | 11/3/2023 | (1,000) | $2.2911 |
| Sale | Common Stock | 11/3/2023 | (1,000) | $2.3006 |
| Sale | Common Stock | 11/3/2023 | (1,000) | $2.3000 |
| Sale | Common Stock | 11/3/2023 | (1,000) | $2.3050 |
| Sale | Common Stock | 11/3/2023 | (1,000) | $2.3008 |
| Sale | Common Stock | 11/3/2023 | (1,000) | $2.3100 |
| Sale | Common Stock | 11/3/2023 | (1,000) | $2.3129 |
| Sale | Common Stock | 11/3/2023 | (1,000) | $2.3000 |
| Sale | Common Stock | 11/3/2023 | (1,000) | $2.2810 |
| Sale | Common Stock | 11/3/2023 | (1,000) | $2.3026 |
| Sale | Common Stock | 11/3/2023 | (3,000) | $2.3220 |
| Sale | Common Stock | 11/6/2023 | (3,000) | $2.2712 |
| Sale | Common Stock | 11/8/2023 | (1,000) | $1.3127 |
| Sale | Common Stock | 11/8/2023 | (2,000) | $1.3001 |
| Sale | Common Stock | 11/8/2023 | (2,330) | $1.4030 |
| Sale | Common Stock | 11/8/2023 | (5,000) | $1.2945 |
| Sale | Common Stock | 11/9/2023 | (3,000) | $1.1015 |
| Sale | Common Stock | 11/9/2023 | (3,000) | $1.1509 |
| Sale | Common Stock | 11/9/2023 | (3,000) | $1.1401 |
| Sale | Common Stock | 11/9/2023 | (3,000) | $1.1400 |
| Sale | Common Stock | 11/9/2023 | (3,000) | $1.1500 |
| Sale | Common Stock | 11/9/2023 | (3,000) | $1.1300 |
| Sale | Common Stock | 11/9/2023 | (3,000) | $1.1650 |
| Sale | Common Stock | 11/9/2023 | (2,000) | $1.1200 |
| Sale | Common Stock | 11/9/2023 | (2,000) | $1.1513 |
| Sale | Common Stock | 11/9/2023 | (2,000) | $1.1324 |
| Sale | Common Stock | 11/9/2023 | (2,000) | $1.1414 |
| Sale | Common Stock | 11/9/2023 | (2,000) | $1.1347 |
| Sale | Common Stock | 11/9/2023 | (2,000) | $1.1303 |
| Sale | Common Stock | 11/9/2023 | (2,000) | $1.1550 |
| Sale | Common Stock | 11/9/2023 | (1,000) | $1.1200 |
| Sale | Common Stock | 11/9/2023 | (1,000) | $1.1035 |
| Sale | Common Stock | 11/9/2023 | (1,000) | $1.1513 |
| Sale | Common Stock | 11/9/2023 | (1,000) | $1.1411 |
| Sale | Common Stock | 11/9/2023 | (1,000) | $1.1500 |
| Sale | Common Stock | 11/9/2023 | (1,000) | $1.1500 |
| Sale | Common Stock | 11/9/2023 | (1,000) | $1.1750 |
| Sale | Common Stock | 11/9/2023 | (1,000) | $1.1800 |
| Sale | Common Stock | 11/9/2023 | (700) | $1.1750 |
| Sale | Common Stock | 11/13/2023 | (3,000) | $1.0423 |
| Sale | Common Stock | 11/13/2023 | (2,000) | $1.0450 |
| Sale | Common Stock | 11/20/2023 | (3,000) | $1.2100 |
| Sale | Common Stock | 11/20/2023 | (3,000) | $1.2109 |
| Sale | Common Stock | 11/20/2023 | (2,000) | $1.2100 |
| Sale | Common Stock | 11/20/2023 | (1,000) | $1.2150 |
| Sale | Common Stock | 11/20/2023 | (1,000) | $1.2150 |

**Assertio Holdings, Inc. (ASRT)**                                                                **Tihomir Atanasov**

### List of Purchases and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Sale | Common Stock | 12/1/2023 | (5,000) | $1.1336 |
| Sale | Common Stock | 12/1/2023 | (5,000) | $1.1300 |
| Sale | Common Stock | 12/4/2023 | (5,000) | $1.1741 |
| Sale | Common Stock | 12/4/2023 | (5,000) | $1.1712 |
| Sale | Common Stock | 12/4/2023 | (5,000) | $1.1729 |
| Sale | Common Stock | 12/4/2023 | (5,000) | $1.1700 |
| Sale | Common Stock | 12/11/2023 | (10,000) | $1.0720 |
| Sale | Common Stock | 12/13/2023 | (3,000) | $1.1020 |
| Sale | Common Stock | 12/13/2023 | (2,000) | $1.1101 |
| Sale | Common Stock | 12/14/2023 | (8,000) | $1.1220 |
| Sale | Common Stock | 12/14/2023 | (5,000) | $1.1234 |
| Sale | Common Stock | 12/14/2023 | (5,000) | $1.1227 |
| Sale | Common Stock | 12/14/2023 | (5,000) | $1.1133 |
| Sale | Common Stock | 12/14/2023 | (5,000) | $1.1120 |
| Sale | Common Stock | 12/21/2023 | (5,000) | $1.0900 |
| Sale | Common Stock | 12/21/2023 | (3,000) | $1.0920 |
| Sale | Common Stock | 12/21/2023 | (2,000) | $1.0950 |
| Sale | Common Stock | 12/21/2023 | (2,000) | $1.0819 |
| Sale | Common Stock | 12/22/2023 | (2,000) | $1.0923 |
| Sale | Common Stock | 12/22/2023 | (1,000) | $1.0920 |
| Sale | Common Stock | 12/26/2023 | (5,000) | $1.1202 |
| Sale | Common Stock | 12/26/2023 | (60) | $1.1210 |