**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| PERRY SHAPIRO, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:24-cv-00169 <br> Honorable Franklin U. Valderrama |
| Plaintiff, | |
| v. | |
| ASSERTIO HOLDINGS, INC., DAN PEISERT, PAUL SCHWICHTENBERG, AJAY PATEL, SPECTRUM PHARMACEUTICALS, INC., THOMAS RIGA, and NORA BRENNAN, | Oral Argument Requested |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION**
**TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

i

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.    Assertio's Flawed Acquisition of Spectrum ............................................... 4

    B.    Rolvedon Underperformed Because of "High Levels of Inventory in the Channel" ................................................................................................... 4

    C.    Spectrum's Inflated Expectations Were Based on Unsustainable Sales Practices ................................................................................................... 5

    D.    Defendants Profited Enormously From Their Fraud and Caused Substantial Losses .................................................................................... 6

ARGUMENT ....................................................................................................... 7

    I.    Plaintiffs State a Claim as to the Assertio Defendants' Indocin Statements .......... 8

    A.    Misrepresentations Related to the Risk of Generic Competition to Indocin ................................................................................................... 8

    B.    The Assertio Defendants' Scienter as to the Indocin Misrepresentations 11

    C.    Loss Causation as to the Indocin Misrepresentations is Adequately Alleged ................................................................................................. 13

    II.    Plaintiffs State a Claim as to the Assertio Defendants' Rolvedon Statements ..... 14

    A.    The Assertio Defendants' False and Misleading Statements About Rolvedon ................................................................................................ 14

        1.    Misstatements Promoting Rolvedon's Past Sales ........................ 15

            a)    The Complaint Adequately Alleges Channel Stuffing .......... 15

            b)    The Confidential Witness Allegations Should be Credited .... 18

        2.    Assertio's October 10, 2023 Form 8-K ....................................... 21

        3.    Misstated Rolvedon Projections and Fairness Statements ............ 22

        4.    Misstatements Promoting Rolvedon ........................................... 28

    B.    Plaintiffs State a Claim Under Section 14(a) Against the Assertio Defendants ............................................................................................. 30

    C.    The Assertio Defendants' Scienter as to the Rolvedon Statements .......... 31

        1.    Defendants' Timing Arguments Fail ........................................... 32

        2.    The Assertio Defendants' Motive to Commit Fraud .................... 33

        3.    Confidential Witnesses Support Scienter ..................................... 34

        4.    Executive Departures Support Scienter ....................................... 36

        5.    Additional Evidence of the Assertio Defendants' Scienter ......... 36

6.    Assertio's Core Operations Support Scienter ............................... 37

7.    Assertio's Corporate Scienter ........................................................ 39

8.    The Assertio Defendants' Scienter is Alleged on a Holistic Basis ..................................................................................... 40

III.    The Spectrum Defendants' Liability Under Section 14(a) and Rule 10b-5(b)..... 40

    A.    Plaintiffs Have Standing as to the Spectrum Defendants ......................... 41

    B.    The Spectrum Defendants' Scienter as to Rolvedon Sales ...................... 43

IV.    Plaintiffs State a Claim Under Rule 10b-5(a) and (c) ........................................... 44

V.    Plaintiffs State a Claim Under Section 20(a) ....................................................... 45

CONCLUSION ................................................................................................................ 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison v. Oak St. Health*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ....................................................38, 39

*Asher v. Baxter Int'l*,
2005 WL 331572 (N.D. Ill. Feb. 3, 2005) ...............................................23, 26, 35

*Asher v. Baxter Int'l*,
377 F.3d 727 (7th Cir. 2004) ...........................................................................21, 25

*Azar v. Grubhub*,
2021 WL 4077327 (N.D. Ill. Sept. 7, 2021) ...............................................13, 37, 43

*Baum v. Harman Int'l Indus.*,
408 F. Supp. 3d 70 (D. Conn. 2019)........................................................................27

*Beck v. Dobrowski*,
559 F.3d 680 (7th Cir. 2009) ...................................................................................30

*Blanchard v. EdgeMark Fin. Corp.*,
1999 WL 59994 (N.D. Ill. Feb. 3, 1999) .................................................................43

*Blau v. Harrison*,
2006 WL 850959 (N.D. Ill. Mar. 24, 2006).............................................................30

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975)..................................................................................................42

*Brasher v. Broadwind Energy*,
2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) ...........................................................40

*Brown v. Papa Murphy's Holds.*,
2021 WL 1574446 (W.D. Wash. Apr. 22, 2021)......................................................27

*Busic v. Orphazyme A/S*,
2022 WL 3299843 (N.D. Ill. Aug. 11, 2022) ..............................................19, 32, 37

*Carps. Health & Welfare Fund v. Coca-Cola Co.*,
321 F. Supp. 2d 1342 (N.D. Ga. 2004) ....................................................................15

*Carps. Pen. Tr. Fund for N. Cal. v. Allstate Corp.*,
2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) .......................................10, 33, 37, 40

*City of Lakeland Emps. Pension Plan v. Baxter Int'l*,
  2012 WL 607578 (N.D. Ill. Jan. 23, 2012) ..................................................................7

*City of Livonia Emps. Ret. Sys. v. Boeing Co.*,
  711 F.3d 754 (7th Cir. 2013) ..............................................................................11, 12

*City of St. Clair Shores Gen. Emps. Ret. Sys. v. Inland W. Retail Real Est. Tr.*,
  635 F. Supp. 2d 783 (N.D. Ill. 2009) ......................................................................30

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
  8 F.4th 592 (7th Cir. 2021) ......................................................................................29

*Coll. Ret. Equities Fund v. Boeing Co.*,
  2023 WL 6065260 (N.D. Ill. Sept. 18, 2023) ..............................................10, 22, 32

*Desai v. Gen. Growth Props.*,
  654 F. Supp. 2d 836 (N.D. Ill. 2009) ......................................................................39

*Flentye v. Kathrein*,
  485 F. Supp. 2d 903 (N.D. Ill. 2007) ......................................................................20

*Friedman v. Rayovac Corp.*,
  291 F. Supp. 2d 845 (W.D. Wis. 2003) ...................................................................15

*Friedman v. Rayovac Corp.*,
  295 F. Supp. 2d 957 (W.D. Wis. 2003) ..............................................................15, 29

*Fryman v. Atlas Fin. Holds.*,
  2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ..............................................13, 27, 28

*George v. Kraft Foods Global*,
  674 F. Supp. 2d 1031 (N.D. Ill. 2009) ......................................................................3

*Gosselin v. First Tr. Advisors L.P.*,
  2009 WL 5064295 (N.D. Ill. Dec. 17, 2009).........................................12, 32, 36, 43

*Hedick v. Kraft Heinz Co.*,
  2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ..........................................14, 29, 35, 39

*Higginbotham v. Baxter Int'l*,
  495 F.3d 753 (7th Cir. 2007) ..............................................................................19, 34

*In re Akorn, Inc. Sec. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) ........................................................8, 9, 29, 36

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ......................................................................................45

*In re AOL Time Warner*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004)......................................................................................41

*In re Boeing Co. Aircraft Sec. Litig.*,
  2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ....................................................................14, 25

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002)....................................................................................................16

*In re Connetics Corp. Sec. Litig.*,
  2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) .......................................................................16

*In re GoHealth, Inc. Sec. Litig.*,
  2022 WL 1016389 (N.D. Ill. Apr. 5, 2022) ...........................................................................25

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
  20 F.4th 131 (2d Cir. 2021) ...................................................................................................17

*In re Hot Topic, Inc. Sec. Litig.*,
  2014 WL 7499375 (C.D. Cal. May 2, 2014) ..........................................................................23

*In re Inotiv, Inc. Sec. Litig.*,
  2024 WL 1344784 (N.D. Ind. Mar. 29, 2024)..................................................................36, 40

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..................................................................................41

*In re Mindbody, Inc. Sec. Litig.*,
  489 F. Supp. 3d 188 (S.D.N.Y. 2020).....................................................................................23

*In re Northfield Lab'ys, Inc. Sec. Litig.*,
  2008 WL 4372743 (N.D. Ill. Sept. 23, 2008) ........................................................................22

*In re Plantronics, Inc. Sec. Litig.*,
  2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) .......................................................................17

*In re Regeneron Pharms., Inc. Sec. Litig.*,
  2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)..............................................................................22

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
  239 F. Supp. 2d 1351 (N.D. Ga. 2002), *aff'd*, 374 F.3d 1015 (11th Cir. 2004) ......................23

*In re Sears, Roebuck & Co. Sec. Litig.*,
  291 F. Supp. 2d 722 (N.D. Ill. 2003) .....................................................................................38

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018).........................................................................37

*In re Spiegel, Inc. Sec. Litig.*,
  382 F. Supp. 2d 989 (N.D. Ill. 2004) ...................................................................8

*In re Ulta Salon, Cosms. & Frag., Inc. Sec. Litig.*,
  604 F. Supp. 2d 1188 (N.D. Ill. 2009) ...................................................10, 22, 35

*In re Vocera Commc'ns Sec. Litig.*,
  2015 WL 603208 (N.D. Cal. Feb. 11, 2015) .......................................................15

*Jones v. Corus Bankshares, Inc.*,
  701 F. Supp. 2d 1014 (N.D. Ill. 2010) ...............................................................29

*Kuebler v. Vectren Corp.*,
  13 F.4th 631 (7th Cir. 2021) .........................................................................30, 31

*Lickteig v. Cerberus Cap. Mgmt.*,
  2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020)......................................................23

*Loc. 472 & 172 Pen. & Annuity Funds v. Fifth Third Bancorp*,
  2022 WL 1642221 (N.D. Ill. May 24, 2022) ............................................... *passim*

*Lorenzo v. SEC*,
  587 U.S. 71 (2019).............................................................................................45

*Lowry v. RTI Surgical Holds.*,
  532 F. Supp. 3d 652 (N.D. Ill. 2021) .......................................................18, 37, 39

*Lucid Motors Sec. Litig.*,
  110 F.4th 1181 (9th Cir. 2024) ...........................................................................42

*Macovski v. Groupon*,
  553 F. Supp. 3d 460 (N.D. Ill. 2021) ..............................................................8, 23

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ................................................................... *passim*

*Marks v. CDW Comp. Ctrs., Inc.*,
  122 F.3d 363 (7th Cir. 1997) ..............................................................................28

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)..............................................................................................12

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
  54 F.4th 82 (2d Cir. 2022) ..................................................................................42

*MissPERS v. Mohawk Indus.*,
  564 F. Supp. 3d 1272 (N.D. Ga. 2021) ...............................................................16

*Mkt. St. Sec. v. Racing Champions Corp.*,
   2000 WL 1727788 (N.D. Ill. Nov. 21, 2000) ..........................................................34

*N.J. Carps. Health Fund v. Royal Bank of Scot. Grp., PLC*,
   709 F.3d 109 (2d Cir. 2013).................................................................................10

*ODS Cap. LLC v. JA Solar Holds.*,
   2020 WL 7028639 (S.D.N.Y. Nov. 30, 2020)..........................................................28

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015).............................................................................................27

*Padilla v. Cmty. Health Sys.*,
   2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022) .....................................................20

*Pampena v. Musk*,
   705 F. Supp. 3d 1018 (N.D. Cal. 2023) .................................................................38

*Pen. Fund v. SIRVA*,
   2006 WL 2787520 (N.D. Ill. Sept. 22, 2006) ........................................................24

*Phoenix Ins. Co. v. ATI Phys. Therapy*,
   690 F. Supp. 3d 862 (N.D. Ill. 2023) ............................................................. *passim*

*Pierrelouis v. Gogo*,
   2021 WL 1608342 (N.D. Ill. Apr. 26, 2021) ....................................................32, 39

*Powell v. Am. Bank & Tr. Co.*,
   640 F. Supp. 1568 (N.D. Ind. 1986) .....................................................................10

*Puddu v. 6D Glob. Techs.*,
   2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ........................................................45

*Ray v. Citigroup Glob. Markets*,
   482 F.3d 991 (7th Cir. 2007) ...............................................................................13

*Rehm v. Eagle Fin. Corp.*,
   954 F. Supp. 1246 (N.D. Ill. 1997) .......................................................................39

*Ret. Sys. of Miss. v. TreeHouse Foods*,
   2018 WL 844420 (N.D. Ill. Feb. 12, 2018) .........................................................7, 30

*Ret. Sys. v. Anixter Int'l*,
   2011 WL 1303387 (N.D. Ill. Mar. 31, 2011)..........................................................45

*Ret. Sys. v. Walgreen Co.*,
   2016 WL 5720375 (N.D. Ill. Sept. 30, 2016) ........................................................10

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)......................................................12, 19, 35, 36

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)..............................................................................................32

*Schaps v. McCoy*,
2002 WL 126523 (N.D. Ill. Jan. 31, 2002) .....................................................................43

*Schleicher v. Wendt*,
529 F. Supp. 2d 959 (S.D. Ind. 2007) .......................................................................14, 20

*SEC v. Kameli*,
2020 WL 2542154 (N.D. Ill. May 19, 2020) ..................................................................45

*SEC v. Ustian*,
2019 WL 7486835 (N.D. Ill. Dec. 13, 2019) ....................................................................8

*SEC v. Ustian*,
229 F. Supp. 3d 739 (N.D. Ill. 2017) .......................................................................27, 29

*Selbst v. McDonald's Corp.*,
2005 WL 2319936 (N.D. Ill. Sept. 21, 2005) .......................................................23, 27, 29, 35

*Sgariglia v. Am. Int'l Reloc. Servs.*,
2021 WL 4206788 (N.D. Ill. Sept. 16, 2021) .................................................................10

*Shah v. Zimmer Biomet Holdings, Inc.*,
348 F. Supp. 3d 821 (N.D. Ind. 2018) ............................................................................19

*Silverman v. Motorola*,
2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) .................................................................19

*Stavros v. Exelon Corp.*,
266 F. Supp. 2d 833 (N.D. Ill. 2003) ..............................................................................26

*Stransky v. Cummins Engine Co.*,
51 F.3d 1329 (7th Cir. 1995) .............................................................................................9

*Stuve v. Kraft Heinz Co.*,
2023 WL 184235 (N.D. Ill. Jan. 12, 2023) .......................................................................3

*Sw. Carps. Pen. Tr. v. Merge Techs.*,
2008 WL 11381377 (E.D. Wis. Mar. 31, 2008) ..............................................................29

*Takara Tr. v. Molex*,
429 F. Supp. 2d 960 (N.D. Ill. 2006) .........................................................................34, 39

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..................................................................................................12

*United UURWAW Loc. Union No. 8 v. Great Lakes Dredge & Dock Corp.*,
    2014 WL 12780549 (N.D. Ill. Oct. 21, 2014)..........................................................37

*Vargas v. Citrix Sys.*,
    2024 WL 413454 (S.D. Fla. Feb. 3, 2024) .......................................................10, 18

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands*,
    495 F. Supp. 3d 622 (N.D. Ill. 2020) .............................................................15, 16, 38

*White v. United Airlines*,
    987 F.3d 616 (7th Cir. 2021) ......................................................................................7

*Willett v. Procopio*,
    2019 WL 4266545 (S.D. Cal. Feb. 4, 2019) .............................................................42

*Zoghlin v. Renaissance Worldwide, Inc.*,
    1999 WL 1004624 (N.D. Ill. Nov. 4, 1999) ..............................................................26

*Zyla Life Scis., LLC v. Wells Pharma*,
    No. 4:22-CV-04400, 2023 WL 6301651 (S.D. Tex. Sept. 27, 2023)........................11

## Statutes

15 U.S.C. 78(a) ..................................................................................................... *passim*

15 U.S.C. §78j(b) ................................................................................................... *passim*

15 U.S.C. § 78u–4(a)    .............................................................................................2

PSLRA ..................................................................................................................7, 30, 31

## Rules

Fed. R. Civ. P. 8(a)(2)................................................................................................13

Fed. R. Civ. P. 9(b) ..............................................................................................7, 13

## Other Authorities

17 C.F.R. § 240.10b-5............................................................................................ *passim*

Lead Plaintiff Continental General Insurance Company and additional plaintiffs Perry Shapiro, David Cox, and Tihomir Atanasov (collectively, "Plaintiffs"), submit this Memorandum in opposition to the Defendants' Motion to Dismiss the Amended Class Action Complaint.[1]

## INTRODUCTION

Assertio is a commercial pharmaceutical company. Indocin, its primary drug at the start of the Class Period on March 9, 2023, faced imminent competition. To compensate for that challenge, Assertio proceeded to overpay for Spectrum based on sales figures for Rolvedon—Spectrum's only commercial product—that were inflated by improper and unsustainable channel stuffing.

At the start of the Class Period, Assertio and its executives mispresented the risk of generic competition to Indocin. They, along with the Spectrum Defendants, then mispresented the strength of Rolvedon sales through the end of the Class Period on January 3, 2024. The Complaint sets forth abundant specific allegations of Defendants' liability for these misstatements.

Assertio knew the risk of generic competition to Indocin was imminent because it was involved in efforts to thwart that competition, including through a lawsuit against a competitor that Defendant Peisert (Assertio's CEO) was personally involved in and opposing another competitor's FDA suitability petition. ¶¶ 48-51, 55-59. Yet, Assertio disclosed only potential competition, while omitting the full extent of that competition or the futility of Assertio's efforts to oppose it.

To make up for the loss of business from Indocin, Assertio bought Spectrum, whose sole commercial product was Rolvedon, an oncology drug on the market for only two quarters when the Merger was announced on April 25, 2023. ¶ 6. Confidential witnesses explain that Spectrum inflated Rolvedon's sales through unsustainable practices known as channel stuffing. ¶¶ 107,

---

[1] ¶ _ references herein are to the Amended Class Action Complaint ("Complaint," ECF No. 73). Capitalized terms have the same meaning as in the Complaint. Defendants' Corrected Memo of Law in Support of their Motion to Dismiss (ECF No. 83) is referenced as "Mem." Citations, quotation marks, and brackets are omitted, and emphases are added, unless noted otherwise.

133-34. One of these witnesses was on Assertio's executive team and stated that its executives—including Peisert and Schwichtenberg—discussed weekly sales reports showing that Rolvedon sales were far below expectations, and that Assertio concealed the problems with Rolvedon sales from the public. ¶¶ 104-08. This witness and others also explained that the projections disclosed in the Merger, based on past sales inflated by channel stuffing, were completely unrealistic.

Assertio was forced to disclose this weakness when it announced its "disappointing" results for the third quarter of 2023, conceding "that certain aspects of the acquisition may not be everything we initially expected." ¶ 97. Assertio admitted that the reason for these poor sales was the "high levels of inventory in the channel at the end of second quarter." ¶ 98. Throughout the Class Period, however, Defendants misrepresented Rolvedon's past sales, projections, the fairness of the Merger, and the strength that Spectrum would purportedly add to Assertio's business.

Peisert and other executives were fired as a result of their role in these events. ¶¶ 135-38. All of the Individual Defendants profited enormously from their misrepresentations, including through suspiciously timed stock sales just before Assertio was required to disclose Rolvedon's poor results and the Spectrum Defendants receiving millions of dollars in profits by selling Spectrum to Assertio. ¶¶ 139-52. The Class suffered enormous losses when Defendants revealed on August 3, 2023, the FDA's approval of a competitor to Indocin; the disappointing Rolvedon results announced on November 8, 2023; and Peisert's termination on January 3, 2024. ¶¶ 259-88.

Plaintiffs bring claims on behalf of Assertio shareholders against all Defendants under Section 14(a) of the Securities Exchange Act of 1934 for their misstatements in the Proxy materials for the Merger, Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder for Defendants' misstatements throughout the Class Period, and Rules 10b-5(a) and (c) for their deceptive conduct. In response, Defendants point to Assertio's risk disclosure related to potential

Indocin competition, but fail to acknowledge that this obscured the actual extent of that risk. (Mem. at 1). Defendants' response regarding Rolvedon sales is also perplexing. They mischaracterize Plaintiffs' allegations as "impermissible hindsight" (Mem. at 2) while ignoring the ample evidence that those sales were inflated by unsustainable channel stuffing, Defendants knew Rolvedon's sales did not live up to expectations, and that they profited enormously from deceiving shareholders.

These allegations adequately plead Plaintiffs' claims under Section 10(b). In addition, Defendants concede, as they must, that Section 14(a) "does not require that Plaintiffs plead scienter" and do not challenge this claim on any basis other than the element of falsity. (Mem. at 2). The many false and misleading statements that Defendants made in the Proxy materials for the Merger about Rolvedon adequately allege a claim under Section 14(a) against all Defendants.

Defendants' argument that Plaintiffs lack standing as to the Spectrum Defendants fails because it does not apply to Section 14(a) and these Defendants' statements were *about* Assertio.

The Court should deny the Motion so Plaintiffs can seek redress for losses arising out of Defendants' misstatements and deceptive conduct about basic weaknesses in Assertio's business.

## BACKGROUND[2]

At the start of the Class Period, Assertio's primary product was Indocin, a nonsteroidal anti-inflammatory drug. Indocin accounted for 70% of Assertio's revenue in the first half of 2023. ¶¶ 2, 43. Assertio, however, faced the risk that a generic competitor to Indocin would enter the market and deplete the Company's revenue source. ¶¶ 3, 45-46. The Company took steps to block multiple Indocin competitors from being able to sell their products. ¶¶ 48-60. Assertio, however,

---

[2] Defendants request that the Court consider 15 SEC filings and Peisert's declaration from the Wells Pharma litigation. (Mem. at 2 n.2). The Court, however, may not "not assume the truth of the facts" in these documents. *Stuve v. Kraft Heinz Co.*, 2023 WL 184235, at *5 (N.D. Ill. Jan. 12, 2023); *George v. Kraft Foods Global*, 674 F. Supp. 2d 1031, 1044 (N.D. Ill. 2009) (same). Moreover, nothing in these documents negates the well-pled allegations in the Complaint.

did not disclose the full extent of this risk, including its omission that Assertio had opposed suitability petitions to the FDA for a 100 mg indomethacin suppository and that Assertio's attempt to block Wells Pharma was clearly preempted by federal law. ¶¶ 58-59.

**A.    Assertio's Flawed Acquisition of Spectrum**

Assertio's highest priority was to acquire a patented product to offset the decline that competition would cause to Indocin sales. Defendants announced on April 25, 2023, that Assertio agreed to acquire Spectrum for $248-to-$291 million, as a way to diversify the Company's revenue and "reduc[e] Indocin Revenue Concentration." ¶¶ 6, 62-64, 73, 77, 79, 103.

Spectrum's sole commercial product was Rolvedon, a patented oncology drug that launched in Q4 2022. ¶ 74. The $248 million that Assertio valued Spectrum at was an enormous 65% premium to Spectrum's trading price. ¶ 77. That lofty valuation was justified by Rolvedon's purported "exceptional launch trajectory" to date and its projected sales based on those past figures. ¶¶ 75-76, 89-96. Assertio projected Rolvedon to have $46 million in net sales the second half of 2023, $130 million in 2024, and $157 million in 2025, even before accounting for synergies from the Merger. ¶¶ 91, 95. The Merger also included contingent value rights for Spectrum's shareholders worth an additional $43 million if Rolvedon achieved $175 million in net sales in 2024 and $225 million in 2025. ¶ 77. Peisert expressly affirmed those CVR milestones. ¶ 96.

The Merger closed on July 31, 2023. ¶ 81. Assertio kept Spectrum's "commercial infrastructure" after the Merger, including Defendant Riga, who "remain[ed] on in a consulting capacity"), another key executive, and Assertio's salesforce. ¶¶ 32, 82-87, 112-16, 128, 138.

**B.    Rolvedon Underperformed Because of "High Levels of Inventory in the Channel"**

This risk of generic competition to Indocin came about when, immediately after the Merger closed, Assertio announced on August 3, 2023, that Zydus received FDA approval for 50 mg indomethacin suppositories. Assertio's stock price fell 45.6% on this news. ¶¶ 7, 65-66.

Peisert tried to reassure investors that the Merger fulfilled Assertio's "strategic need to diversify." ¶ 7. The assumptions that formed the basis for the Merger, however, were quickly dashed when Rolvedon did not come close to meeting projections. On November 8, 2023, Assertio announced its Q3 2023 results, the first quarter following the Merger. Peisert stated that the Q3 "results were disappointing" because of "the loss of Indocin exclusivity and Rolvedon results below expectations," with Assertio "learning that certain aspects of the acquisition may not be everything we initially expected." ¶ 97. Rolvedon's net sales were just $7.1 million for the two months following the Merger. This put sales far off pace from the $46 million that Assertio projected for the second half of the year and the $97 million that Spectrum projected for the full year. ¶ 98. Assertio admitted that these disappointing sales resulted from the fact that "there were high levels of inventory in the channel at the end of second quarter." ¶ 98.

Defendants misleadingly argue that Rolvedon "returned to a growth trajectory" in Q4 2023. (Mem. at 4). But these figures were still very disappointing and far off from what was projected in the Merger. ¶¶ 100-01, 119. Even in Q1 2024, sales were just $14.5 million, below Q1 2023 sales and just 11.2% of the $130 million that Assertio projected for 2024. ¶¶ 90-91, 95-96.

**C.      Spectrum's Inflated Expectations Were Based on Unsustainable Sales Practices**

Confidential witnesses explain that the "high levels of inventory" that Assertio admitted Rolvedon had "in the channel" resulted from Spectrum's unsustainable sales practices that made the projections for Rolvedon sales that were disclosed in the Merger completely unfounded.

CW 1 was a member of Assertio's executive team, reported directly to Peisert, and was heavily involved in the Merger. ¶ 102. CW 1 explained that Assertio's executive team, including Peisert and Schwichtenberg, saw a weekly report of Rolvedon sales that they reviewed at a weekly meeting. ¶ 105. They started receiving these sales figures by July 2023, before the Merger closed. *Id.* By the end of August, they were getting "really anxious" about Rolvedon's sales weakness.

¶ 106. There were "alarm bells" in September and panic by the end of that month. ¶ 106.

Further, CW 1 explained that the reason for these disappointing sales was that Rolvedon's pre-Merger sales were inflated by "channel stuffing and it was all the lies around" the product. ¶ 107. This channel stuffing involved customers "that would buy extra at a discount." *Id.* Large orders that were expected did not arrive because orders from prior quarters were under "buy and hold" arrangements and "customers weren't ordering because they were sitting on so much." *Id.*

While Spectrum's senior executives, including Riga, misrepresented Spectrum's finances during the Merger process, Assertio discovered these lies soon after the acquisition but concealed them from the public. ¶ 108. As a result, Assertio fired Peisert, demoted Schwichtenberg, and fired a Spectrum executive that oversaw its channel stuffing. ¶¶ 111, 113, 116, 125-26, 135-38.

Similarly, CW 4, a Strategic Business Leader, explained that Spectrum allowed its customers to buy large amounts of Rolvedon when prices were lower at the end of the quarter (end-of-quarter "spiffs"), which meant that the customer would "pull from the inventory" during the following quarter without Spectrum booking any additional sales. ¶ 133. Spectrum's "large customers in Q1 and Q2 bought what they needed for all of Q2 and Q3" of 2023. ¶ 134.

CW 2, a Spectrum salesperson that stayed on at Assertio, stated that the projections for Rolvedon sales were "ridiculous." ¶ 118. CW 3, Spectrum's Executive Director for Sales, described Spectrum's projections as "impossible," stating that Assertio "didn't do their due diligence" on the projections that drove "the value of the acquisition." ¶¶ 122, 124, 126, 129-31.

**D.      Defendants Profited Enormously From Their Fraud and Caused Substantial Losses**

The Assertio Individual Defendants engaged in highly suspicious stock sales in September 2023, unloading a substantial portion of their shares on the same day in September 2023, shortly before Assertio was forced to disclose Rolvedon's disappointing sales. ¶¶ 140-47. On the Spectrum side, Riga and Brennan received millions of dollars from the Merger. ¶¶ 109, 148-52.

6

Defendants misrepresented fundamental aspects of Assertio's business throughout the Class Period, resulting in substantial losses to Assertio's shareholders when the generic competitor to Indocin was announced, when it was revealed that Rolvedon sales significantly underperformed as a result of Spectrum's unsustainable sales practices, and when Peisert was fired as a result of these events. ¶¶ 261, 273-76, 286-87. In total, Assertio's share price fell from $5.35 per share before Assertio withdrew its 2023 outlook on August 3, 2023 because of the approval of an Indocin competitor, to just $0.90 per share on January 4, 2024, following Peisert's termination. *Id.*

## ARGUMENT

On a motion to dismiss, the court "accept[s] all well-pleaded facts as true and draw[s] all reasonable inferences in the plaintiff's favor." *White v. United Airlines*, 987 F.3d 616, 620 (7th Cir. 2021). Under Rule 9(b) of the Federal Rules of Civil Procedure, allegations of "fraud or mistake must state with particularity the circumstances constituting fraud or mistake, but [m]alice, intent, knowledge, and other" states of mind "may be alleged generally." *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods*, 2018 WL 844420, at *1 (N.D. Ill. Feb. 12, 2018). The PSLRA requires specifying "each statement alleged to" be misleading and the reason(s) "why the statement is misleading," and to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* Although "the PSLRA imposes a heightened standard, it requires no proof as opposed to plausible allegations." *Id.* at 3. A statement is adequately alleged to be false or misleading if the allegations "support a reasonable belief as to the misleading nature of the statements or omissions." *Id.*[3]

---

[3] Defendants contend that Plaintiffs engage in "puzzle pleading" because they do not explain "which statements" they "are challenging" and why they are false and misleading. (Mem. at 10 n.4). The Complaint, however, sets out its allegations clearly and Section V specifies each statement alleged to be actionable, which Defendants made each statement, and why each set of statements are alleged to be false and misleading. *See City of Lakeland Emps. Pension Plan v. Baxter Int'l*, 2012 WL 607578, at *5 (N.D. Ill. Jan. 23, 2012) (rejecting puzzle pleading argument);

I.      **Plaintiffs State a Claim as to the Assertio Defendants' Indocin Statements**

A.      **Misrepresentations Related to the Risk of Generic Competition to Indocin**

The Assertio Defendants misrepresented the risk of generic competition to Indocin. They stated that the actions of other drug companies "could indicate the development of one or more INDOCIN product generics," that Indocin "may" or "could face generic competition at any time," and that a "company could introduce a generic for these drugs at any time." ¶¶ 154-56, 183. They also described a competitor as acting illegally in "violation" of the Food, Drug and Cosmetic Act and as "an unlawful compounder." ¶¶ 155-56, 183. These statements misleadingly downplayed the risk of competition, including by omitting information related to pending suitability petitions and the weakness of Assertio's claims against Wells Pharma. ¶¶ 157, 181, 184, 191.

These statements are actionable because although the Assertio Defendants warned of the possibility of generic competition to Indocin, they mischaracterized the "*magnitude*" of that risk. *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 816 (N.D. Ill. 2017) (explaining that "corrective information must be conveyed" with "a degree of intensity and credibility sufficient to counter-balance" misleading information); *Macovski v. Groupon*, 553 F. Supp. 3d 460, 483 (N.D. Ill. 2021) (sustaining allegation that "defendants did not disclose the *severity* of Goods' troubles" even if they "were open about" those troubles); *SEC v. Ustian*, 2019 WL 7486835, at *33 (N.D. Ill. Dec. 13, 2019) (holding "although the risk of failure may not have become a reality" yet, "a question still exists as to whether Navistar's disclosures, even in light of the identified risk factors, mischaracterized that risk"). Furthermore, "cautionary statements" are actionable when they "are contradicted by the Plaintiffs' detailed allegations." *Phoenix Ins. Co. v. ATI Phys. Therapy*, 690 F.

---

*In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1012 (N.D. Ill. 2004) (same). Moreover, the Complaint makes clear that the alleged misstatements contain bolded and italicized language only where that is needed to highlight a specific portion of the statement at issue. ¶ 153 n.15.

8

Supp. 3d 862, 882 (N.D. Ill. 2023). The omitted information here rendered Defendants' statements actionable because they failed to disclose that multiple competitors had already applied for FDA approval of a generic version of Indocin, ¶¶ 47-51, 58, and that Assertio had no reasonable basis to conclude it would be able to prevent the compounder from continuing to operate, ¶¶ 53-55, 59.

Defendants cite *Heavy & Gen. Labors.' Loc. 472 & 172 Pen. & Annuity Funds v. Fifth Third Bancorp*, 2022 WL 1642221, at *16 (N.D. Ill. May 24, 2022) (Mem. at 13-14), but that case dealt with the different situation of general statements about business practices and risk management that apply to all companies, not statements about the biggest risk to the company's particular business model. Defendants also argue that the risk of generic competition to Indocin was disclosed. (Mem. at 11-14). But their statements were misleading because they mischaracterized the *magnitude* of that risk.

Moreover, Assertio's cautionary language cannot insulate from liability their misstatements of current or historical fact. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (*Tellabs III*) (holding "a mixed present/future statement is not entitled to the safe harbor" for "the part of the statement that refers to the present"); *Akorn*, 240 F. Supp. 3d at 815-17 (part of statements about "integration efforts being 'on track'" were not forward-looking). The Assertio Defendants misrepresented present facts by attributing current net product sales performing above expectations to being "driven by continued growth of Indocin" and reassuring investors that "growth in INDOCIN" sales "made up for" the loss of patent protection for other drugs. ¶¶ 180, 190. These statements misled investors by downplaying the risk of generic competition to Indocin in light of the information that Defendants omitted.

These statements of present fact are also actionable because once a defendant chooses to speak about a topic, "he must speak the whole truth." *Stransky v. Cummins Engine Co.*, 51 F.3d

9

1329, 1331 (7th Cir. 1995); *see also Coll. Ret. Equities Fund v. Boeing Co.*, 2023 WL 6065260, at *14 (N.D. Ill. Sept. 18, 2023) (*Boeing*) ("Once Boeing chose to rely on" flight manual "to reassure investors, it had a duty to tell the whole truth."). "A half-truth" is "misleading because it omits important information." *Sgariglia v. Am. Int'l Reloc. Servs.*, 2021 WL 4206788, at *5 (N.D. Ill. Sept. 16, 2021). Defendants thus may not state that part of their business was "good and favorable" while failing to disclose the negative details associated with that information. *Carps. Pen. Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at *4 (N.D. Ill. Feb. 27, 2018); *In re Ulta Salon, Cosms. & Frag., Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1196 (N.D. Ill. 2009) (statements suggest "trends were expected to continue" even though expenses and inventory "had risen dramatically"). The statements here attributed Assertio's positive performance to Indocin while misleadingly omitting the substantial risks that it faced. Once Defendants put Indocin's role in Assertio's performance at issue, they were required to do so in a way that was not misleading.

The Assertio Defendants also argue that their statements are not actionable because information about competing suitability petitions and Assertio's "dispute with Wells Pharma" were "already in the public domain." (Mem. at 12-13). But this information was in an obscure corner of the FDA's website and isolated court dockets that investors would not have been aware of. *See Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2016 WL 5720375, at *6 (N.D. Ill. Sept. 30, 2016) (rejecting "defendants' assertion that generic drug price inflation was a well-known and universally recognized market trend"); *Vargas v. Citrix Sys.*, 2024 WL 413454, at *9 n.7 (S.D. Fla. Feb. 3, 2024) ("the fact that omitted information is publicly available does not defeat materiality"); *N.J. Carps. Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013) (there is no "sweeping proposition that" issuers are "never required to disclose publicly available information"); *Powell v. Am. Bank & Tr. Co.*, 640 F. Supp. 1568, 1579-80 (N.D. Ind.

10

1986) ("solitary instances of publication" would not "have made the Powells aware of the Compromise"). Defendants' cases, in contrast, dealt with information that was far more public and allegations that did not suffice for other reasons. (Mem. at 12 (citing *Higginbotham v. Baxter Int'l*, 495 F.3d 753, 759 (7th Cir. 2007) (Brazilian government's accusation did not support the claim) and *Goucher v. Iterum Theraps. plc*, 648 F. Supp. 3d 962, 976 (N.D. Ill. 2022) (allegations contradicted by "Plaintiffs' own description" and clinical trial that plaintiffs referenced))).

Next, the Assertio Defendants argue that the "suitability petition for a 100 mg" Indocin competitor is not relevant. (Mem. at 13). But one of these petitions was from Zydus, which is the same company whose approval of a 50 mg suppository formulation was announced on August 3, 2023, causing Assertio's stock price to plummet. ¶¶ 48, 65, 259-61. Defendants' failure to sufficiently disclose the nature of this competition was misleading. In addition, the Assertio Defendants did not adequately disclose the dispute with Wells Pharma because they portrayed this as a legitimate dispute rather than disclosing that Assertio's position in the litigation was unequivocally preempted by federal law. ¶ 59.[4]

## B.     The Assertio Defendants' Scienter as to the Indocin Misrepresentations

Scienter may be adequately alleged based on the allegations that Defendants "either knew the statement was false or w[ere] reckless in disregarding a substantial risk of its being false." *City of Livonia Emps. Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 756 (7th Cir. 2013). Plaintiffs may plead a "strong inference" of scienter by "plead[ing] 'facts rendering an inference of scienter at least as

---

[4] Defendants note that "Assertio has appealed" this ruling against the Company. (Mem. at 14 n.7). But the district court specifically explained why the cases that Assertio cites here as the basis for its appeal (*Spano*, *Bass*, and *Hughes*) do not apply, including that it seeks to "add[] to the federal requirements under the FDCA," "depend[s] on speculation that the FDA would have" acted, and "fails to plead any facts to support" its claim. *Zyla Life Scis., LLC v. Wells Pharma*, No. 4:22-CV-04400, 2023 WL 6301651, at *4 (S.D. Tex. Sept. 27, 2023) (decision cited by ¶ 59). The mere fact that Assertio chose to appeal this clear ruling does not make its position credible.

11

likely as any plausible opposing inference.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007) (*Tellabs*)). In making this determination, the Court must consider "all the allegations holistically." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). The inference of scienter need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre,' or even 'the most plausible of competing inferences'"; instead, the inquiry is simply: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 324, 326. Defendants acted with scienter if they spoke in disregard of a risk of falsity that was "so obvious [they] must have been aware of it." *Tellabs III*, 513 F.3d at 704. They "cannot ignore the facts and plead ignorance." *Id.*

The Assertio Defendants' scienter as to their statements about Indocin is supported by multiple sources. ***First***, their highly suspicious stock sales show their scienter. *See infra* at 33-34. These sales are discussed in response to Defendants' arguments related to Rolvedon sales and are equally applicable to competition for Indocin because the whole reason that Assertio so grossly overpaid for Spectrum was because of the risk of impending competition to Indocin. *Supra* at 4.

***Second***, Defendant Peisert's scienter is supported by his awareness of Assertio's dispute with Wells Pharma, which Defendants concede. ¶ 293; (Mem. at 16). He therefore also knew, or was reckless if he was not informed by Assertio's counsel, that the Company's position did not have legal support. *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *9 (N.D. Ill. Oct. 30, 2012).

***Third***, CW 2 noted the unusual timing by which Assertio ensured that the Merger closed before the approval of a competitor to Indocin was announced. ¶¶ 120, 296. Defendants misread CW 2's statements as limited to the quotation attributed to this witness (Mem. at 15) when CW 2 provided all of the information that the Complaint attributes to the witness. And even if approval of another drug was up to the FDA, it was Assertio's decision to rush the Merger to completion

just days before that approval could happen. This suspicious timing supports scienter. *See infra* at 40. Defendants' timing disclosures so the Merger could be completed without investors knowing the extent of this risk also displays the motive to "inflate [Assertio's] stock" so that it "could more cheaply acquire" Spectrum. *Azar v. Grubhub*, 2021 WL 4077327, at *5 (N.D. Ill. Sept. 7, 2021).

*Fourth*, the Assertio Defendants' scienter is supported by the departure and demotion of Peisert and Schwichtenberg soon after the acquisition of Spectrum failed to fix the debacle that resulted from the approval of an Indocin competitor. ¶ 302; *see infra* at 36.

*Fifth*, the Assertio Defendants making detailed statements about Indocin supports their scienter. ¶ 303; *see* ¶¶ 154-57, 180-84, 190-91; *see infra* at 37.

*Sixth*, the Assertio Defendants' scienter can be inferred because Indocin was Assertio's core operation prior to the introduction of competition for the drug, accounting for 70% of the Company's revenue before the Merger. ¶ 304. *See infra* at 37-39.

*Seventh*, Assertio's scienter is adequately pled based on the scienter of the Assertio Defendants and because someone sufficiently senior at Assertio would have known about the true risk of competition to Indocin. *See ATI Phys. Therapy*, 690 F. Supp. 3d at 895–96; *infra* at 39-40.

## C.      Loss Causation as to the Indocin Misrepresentations is Adequately Alleged

"Plaintiffs are not required to plead facts showing economic loss or causation; they must merely 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Fryman v. Atlas Fin. Holds.*, 2022 WL 1136577, at *32 (N.D. Ill. Apr. 18, 2022) (Valderrama, J.) (quoting *Dura Pharms. v. Broudo*, 544 U.S. 336, 347 (2005)); *see also Ray v. Citigroup Glob. Markets*, 482 F.3d 991, 994-95 (7th Cir. 2007). Pleading loss causation "is not subject to the heightened Rule 9(b)" standard. *Fryman*, 2022 WL 1136577 at *32. Rather, it is subject to "Rule 8(a)(2), which requires only 'a short and plain statement.'" *Id.*

Moreover, "corrective disclosures need not . . . be a 'mirror image' of previous

13

misstatements." *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *28 (N.D. Ill. Aug. 23, 2022) (*In re Boeing*). A "disclosure is sufficiently 'corrective' if it" has "something to do with the circumstances that prior false statements concealed or misrepresented." *Id.* at *28-29; *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *15 (N.D. Ill. Aug. 11, 2021) (plaintiffs are not required to identify "a corresponding, mirror-image" representation). Plaintiffs may also plead loss causation under "the 'materialization of the risk' approach," where defendants "exposed [them] to an undisclosed risk that subsequently materialized and . . . the materialization of this risk resulted in the complained of loss." *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 966-67 (S.D. Ind. 2007).

The Complaint adequately pleads loss causation by alleging the Assertio Defendants misrepresented the risk of generic competition to Indocin and Assertio's stock price fell dramatically when that risk came about through the FDA's approval of Zydus's competing generic version of Indocin. ¶¶ 259-64. Defendants argue that "[t]here is no allegation of any decline following any news about [the] pending suitability petitions" for a 100 mg generic competitor or Assertio's dispute with Wells Pharma. (Mem. at 17). This misconstrues the pleading standard, which does not require a "mirror image" of prior misstatements, but rather, only that a corrective disclosure has "something to do with the circumstances that prior" misstatements concealed or misrepresented. *In re Boeing*, 2022 WL 3595058, at *29. Plaintiffs' loss was also the materialization of "an undisclosed risk." *Schleicher*, 529 F. Supp. 2d at 966.

## II. Plaintiffs State a Claim as to the Assertio Defendants' Rolvedon Statements

### A. The Assertio Defendants' False and Misleading Statements About Rolvedon

The Assertio Defendants made many misstatements misrepresenting the strength of Rolvedon sales. Their statements in the Proxy materials are actionable under Section 14(a) and all of their statements are actionable under Section 10(b). This Section explains why these statements were false and misleading, followed by a discussion of liability for each cause of action.

14

### 1. Misstatements Promoting Rolvedon's Past Sales

The Assertio Defendants repeatedly promoted Rolvedon's past sales as supporting Spectrum's value. *See* ¶ 208 (historical sales figures), ¶ 219-20 (confirming accuracy of Spectrum's financial reports), ¶ 229 (describing Rolvedon as "transformative" because of its "exceptional launch trajectory as second quarter sales increased to $21.0 million, from $15.6 million"). These statements were misleading because those figures were a result of channel stuffing, as described by CWs 1 and 4, and as Assertio admitted that there were "high levels of inventory in the channel at the end of second quarter" and the acquisition of Spectrum "may not be everything we initially expected." *See supra* at 5-6; ¶¶ 97-98, 100, 270-71.

### a) The Complaint Adequately Alleges Channel Stuffing

Promoting sales figures that are the product of channel stuffing is actionable. *See Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 986–87 (W.D. Wis. 2003) (holding channel stuffing adequately alleged based on CW allegations that "various techniques were continually used to get customers to purchase quantities greatly in excess of their needs")[5]; *Carps. Health & Welfare Fund v. Coca-Cola Co.*, 321 F. Supp. 2d 1342, 1351–52 (N.D. Ga. 2004) (concluding "that Plaintiffs are entitled to pursue discovery to further develop their channel stuffing claim"); *In re Vocera Commc'ns Sec. Litig.*, 2015 WL 603208, at *1 (N.D. Cal. Feb. 11, 2015) (allegations sufficient based on CW attributing revenue to shipping products early to make up for shortfall).

Defendants rely principally on *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands*, 495 F. Supp. 3d 622 (N.D. Ill. 2020), to argue that the Complaint does not adequately

---

[5] Although the court in *Friedman* subsequently dismissed the complaint because the plaintiffs did not "identify *when* the alleged channel stuffing occurred," *Friedman v. Rayovac Corp.*, 291 F. Supp. 2d 845, 851 (W.D. Wis. 2003), that is not an issue here because CWs 1 and 4, as well as the limited timeframe during which Rolvedon was on the market, make clear that the channel stuffing occurred in the quarters leading up to the Merger, including in Q1 and Q2 2023. ¶¶ 74, 107, 134.

15

allege improper channel stuffing. (Mem. at 17-19; *see also id.* at 20-23). The Complaint, however, alleges details that did not exist in *Conagra*, showing why Defendants' sales practices for Rolvedon led to misleadingly inflated sales figures. Unlike in *Conagra*, the Complaint alleges that Defendants "provid[ed] excess supply to distributors in order to create a misleading impression in the market of the company's financial health," including "the products involved in the contingent transactions" (Rolvedon), the timing of these transactions (in Q1 and Q2 2023 (¶ 134)), "that [the Company's] customers experienced an excess of inventory" (¶¶ 107, 133-34, 270), and that Riga and others misrepresented these practices "to boost the sales numbers for their valuation of Spectrum" in the Merger (¶¶ 107-09, 130-31). *Conagra*, 495 F. Supp. 3d at 640-41. The allegations here more than suffice under the channel stuffing cases cited above. *See supra* at 15; *see also In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *10 (N.D. Cal. Aug. 14, 2008) (holding it was adequately alleged that defendants "knew the distribution channels had excessive inventory" despite the "lack of specific allegations regarding the nuts and bolts of defendants' alleged channel stuffing"); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 32–33 (1st Cir. 2002) (channel stuffing allegations suffice even "when some questions remained unanswered, provided the complaint as a whole is sufficiently particular"); *MissPERS v. Mohawk Indus.*, 564 F. Supp. 3d 1272, 1298-99 (N.D. Ga. 2021) (detailed allegations of "means by which" revenue was improperly recognized suffice even if complaint "does not describe in detail each single specific transaction").

Furthermore, Defendants' sales practices here were even worse than in cases where channel stuffing was adequately alleged because Spectrum booked Rolvedon sales before shipping the product to customers. CW 4 described how Rolvedon was sold through end-of-quarter discounts even though customers did not "actually take the order" at the time of the sale, explaining that "the product is not in the office so you pull from the inventory throughout the quarter." ¶¶ 133-34; *see*

16

*Tellabs III*, 513 F.3d at 710 (explaining revenue could not be recorded "before actually transferring title to 6500 systems to Sprint"). Even on Defendants' own terms, their sales practices were improper because customers did not "actually take the order" (¶ 133), so Spectrum did not "book revenues on the basis of goods shipped," as in the cases that Defendants cite. (Mem. at 20-21).

The channel stuffing allegations here also suffice for the *additional reason* that these sales practices made the Assertio Defendants' descriptions of Rolvedon sales unsustainable. It "does not depend on whether the alleged channel stuffing practices themselves were fraudulent or otherwise illegal," where defendants attributed "high sales volume to strong consumer demand" while omitting that the "high sales volume was achieved in significant part by the offer of unsustainable channel stuffing incentives." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021). Plaintiffs are "not required to identify specific pull in transactions" when a company promotes its revenue growth as the result of "sustainable organic growth based on demand for [its] products without simultaneously disclosing that" it was "pulling in sales to pursue its quarterly goals." *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *10 (N.D. Cal. Aug. 17, 2022).

That is precisely what happened here with Rolvedon's unsustainable sales in its first few quarters, which Defendants used to promote the strength of Spectrum's business and the projections in the Merger. *See supra* at 14-15 (discussing misstatements). Defendants' argument that "having high channel inventory is not inherently fraudulent" or "improper" (Mem. at 19-22) is beside the point because their sales practices made the past Rolvedon sales that Defendants promoted, and other promotions of Rolvedon on that basis, completely unsustainable. It also was misleading to make these statements without disclosing that the past Rolvedon sales that formed the basis for them were the product of these unsustainable practices because once they chose "to reassure investors" with these statements, they "had a duty to tell the whole truth." *Supra* at 9-10.

17

Defendants also try to argue that they did not make any misstatements because they disclosed the unremarkable fact that customers could purchase "Rolvedon for future use" and "return unused product." (Mem. at 20). But that does not justify their failing to disclose the *separate issue* that customers were incentivized by Spectrum's end-of-quarter discounts to the point that Rolvedon would post anemic sales in subsequent quarters. The "net sales" metric that Defendants discuss (Mem. at 20) also does not help them because that figure—which is what the Complaint alleges was false and misleading (¶¶ 167, 197, 202, 206, 208, 215, 233)—already accounted for expected returns and therefore would not need to be lowered if they took place.

In addition, Defendants mischaracterize the disclosures they point to as being contained in the Proxy when they were actually contained in the fine print of Spectrum SEC filings not referenced in the Complaint, which Defendants acknowledge in a footnote were merely "incorporated by reference in [the] Proxy" materials. (Mem. at 20 nn.13-14). The Court therefore should not consider those SEC filings and investors "should not be called upon to piece together buried information from distinct parts of financial statements," much less to "look beyond a given document." *Vargas*, 2024 WL 413454, at *9 n.7 (rejecting argument that Proxy disclosed data "by incorporating Citrix's Form 10-K").

### b) The Confidential Witness Allegations Should be Credited

The allegations of the CWs here should be credited because the Seventh Circuit has held that "it is appropriate for courts to rely on statements from 'confidential sources' who 'consist of persons who from the description of their jobs are in a position to know at first hand the facts to which they are prepared to testify.'" *Lowry v. RTI Surgical Holds.*, 532 F. Supp. 3d 652, 663 (N.D. Ill. 2021) (quoting *Tellabs III*, 513 F.3d at 712). Contrary to Defendants' argument (Mem. at 8-9), "a presumption to disregard [CW] allegations was squarely rejected by the Seventh Circuit in *Tellabs III*, and district courts . . . have credited [CWs] when sufficient detail as to the basis for

18

their knowledge is alleged." *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 844-45 (N.D. Ind. 2018). *Tellabs III* specifically distinguished *Higginbotham*, on which Defendants heavily rely (Mem. at 8, 9, 19, 21-22, 25), from cases such as this one, where CWs meet the criteria set out above. *Tellabs III*, 513 F.3d at 712.

As in *Shah*, Plaintiffs "offer the job titles, dates of employment and responsibilities of [CWs] and sufficient facts which show that these [CWs] have first hand knowledge of the facts ascribed to them." *Id.* Their statements should not be "discounted" because their descriptions make clear that they were in positions to know the information they discuss—including CW 1's role on Assertio's executive team, through which CW1 saw weekly sales reports, participated in executive meetings, and reported to Peisert (¶¶ 102, 105), and the roles of the other CWs at Spectrum and Assertio (¶¶ 114, 121, 124, 126-27). *See Ross*, 2012 WL 5363431, at *4-5 (discounting applies "only when the complaint lacks enough detail" to determine whether the CWs "were in a position to know" the facts firsthand). Defendants' attempt to impugn CW 1's credibility by hypothesizing about the witness's "potential biases" (Mem. at 22) thus goes against this Circuit's clear authority.

In addition, even when CW allegations are discounted, which they should not be here, they are still considered in the context of other allegations and credited where they "corroborate or disambiguate evidence from disclosed sources." *Busic v. Orphazyme A/S*, 2022 WL 3299843, at *19 (N.D. Ill. Aug. 11, 2022); *Silverman v. Motorola*, 2008 WL 4360648, at *14 (N.D. Ill. Sept. 23, 2008) (CWs credible where "corroborated by multiple sources"). That is the case here, where the CWs' allegations corroborate each other and the additional allegations of channel stuffing, including Assertio's admission that sales were disappointing because of "high levels of inventory in the channel" (¶ 98) and the other suspicious circumstances discussed below. *See infra* at 33-39.

Defendants try to characterize the end-of-quarter discounts, or "spiffs," that CW 4

19

described as "typical in the pharmaceutical industry." (Mem. at 19-20).[6] But that is a factual issue far outside the Complaint that cannot be addressed on a motion to dismiss. *See Flentye v. Kathrein*, 485 F. Supp. 2d 903, 917 (N.D. Ill. 2007) (holding statements on a website "are not referred to in the Complaint and cannot be considered on a motion to dismiss"); *see also supra* at 3 n.2.

Next, Defendants' critique of CW 1 (Mem. at 21-23) falls flat because CW 1 was on Assertio's executive team, saw weekly Rolvedon sales reports starting in July 2023 along with Assertio's other executives, was involved in the due diligence process for the Merger, and is corroborated by other sources. *See* ¶¶ 102-13.

Contrary to Defendants' argument (Mem. at 19, 21-22), CWs 2 and 3 support Plaintiffs' claims. CWs 2 and 3 are clear that Spectrum's projections for Rolvedon sales were "ridiculous" and "impossible" to meet, and that Assertio's executives were at least reckless in ignoring that information. ¶¶ 118-19, 122-25. These witnesses did not approve of past Rolvedon sales. CW 3, the more senior of them, agreed that customers may have bought large amounts at the end of Q2 2023, Spectrum's executive got fired for those practices, and this executive "knew something." ¶ 126. While CWs 2 and 3 were focused on the untenable nature of the projections, they in no way detract from the specific channel stuffing allegations that CWs 1 and 4 provided.

Defendants also denigrate instances where the Complaint paraphrases rather than quotes CWs. (Mem. at 15, 22, 23, 26). This misstates the standard for CWs, who are credited "where the complaint quotes or *summarizes* information from unidentified witnesses who have personal knowledge of facts that show scienter." *Schleicher*, 529 F. Supp. 2d at 972; *Padilla v. Cmty. Health Sys.*, 2022 WL 3452318, at *34 n.43 (M.D. Tenn. Aug. 17, 2022) (crediting allegation that "either

---

[6] Regardless of whether the practice that CW 4 described is termed "buy and bill" or "buy and hold" (Mem. at 19 n.12)—as CW 1 stated—both of these CWs explained how "customers weren't ordering because they were sitting on so much" Rolvedon from prior quarters. ¶¶ 107, 133-34.

paraphrases" or "otherwise makes clear" what a CW stated).

Lastly, Defendants' attempt to justify the disappointing Rolvedon sales (Mem. at 22) is belied by how they dramatically underperformed expectations. *See supra* at 5. "Nor has the time arrived to evaluate [Defendants'] contention that its projections panned out." *Asher v. Baxter Int'l*, 377 F.3d 727, 734 (7th Cir. 2004) (*Asher I*).

### 2. Assertio's October 10, 2023 Form 8-K

The Assertio Defendants also misrepresented past Rolvedon sales in **Assertio's Amended Form 8-K** that it filed on October 10, 2023. ¶ 244. This disclosure, stating that Spectrum's "financial statements and pro forma financial information are not required to be filed pursuant to Item 9.01 of Form 8-K," was false and misleading because the Assertio Defendants did not decline to disclose Spectrum's financial statements and information for the reason provided, but rather, to avoid making any disclosures about Spectrum's financial information for as long as possible given its improper sales practices and disappointing results for Q3 2023 that was already over and that, by this point in time, the Assertio Defendants were already panicked about. ¶¶ 106, 244-48.

Defendants argue that Assertio was not required to make such a disclosure. That is wrong because the Spectrum financial information that Defendants reference as already having been filed was through only the first quarter of 2023. (Mem. at 31-32); *see also* ¶ 208. But the Merger closed on July 31, 2023—and was not even voted upon by shareholders until July 27, 2023 (¶ 80)—when the second quarter was already complete for a month and was therefore a period "prior to the merger," just as Q3 2021 was prior to the Otrexup "acquisition that occurred in December 2021." (Mem. at 32). When Assertio separately disclosed results for the second quarter, it gave only cursory figures for Spectrum, far from the level of detailed required by Item 9.01. ¶¶ 228-29. Indeed, Defendants do not even contend that these Q2 2023 disclosures satisfied Item 9.01. (Mem. at 32 n.24). The Assertio Defendants failed to file the requisite information in the amended Form

21

8-K not because it was not required, but rather because those figures were inflated by channel stuffing and undercut by the disappointing results for the third quarter that was already complete.

Moreover, even if Item 9.01 did not require further disclosure (which it did, for the reasons explained above), it was still misleading to discuss Spectrum's "financial statements and pro forma financial information" in the amended Form 8-K while failing to disclose that those purportedly positive results were misstated as a result of channel stuffing. According to Defendants, this Form 8-K effectively incorporated Spectrum's financial results that Defendants contend were filed previously. "Once [Defendants] chose to rely on the" previously filed information, they "had a duty to tell the whole truth." *Boeing*, 2023 WL 6065260, at *14; *see also supra* at 9-10.

It was also misleading for Defendants to state that the only reason for failing to publish the results was because they were "not required to be filed pursuant to Item 9.01," when Defendants did not want to publish them because they were misleading and, by this point in time, the extremely disappointing third quarter was already complete. *See In re Northfield Lab'ys, Inc. Sec. Litig.*, 2008 WL 4372743, at *4 (N.D. Ill. Sept. 23, 2008) (misrepresentations adequately alleged regarding defendant's "*reason* for closing" a clinical trial); *In re Regeneron Pharms., Inc. Sec. Litig.*, 2005 WL 225288, at *9 (S.D.N.Y. Feb. 1, 2005) (same as to "reasons for pursuing" drug development).

### 3. Misstated Rolvedon Projections and Fairness Statements

The Assertio Defendants disclosed unfounded projections for Rolvedon sales that were unrealistic because they were based on past sales that were the result of channel stuffing. *See* ¶ 163 (projecting Rolvedon "generating greater than $100 million in revenues"), ¶ 171 (Peisert stating that "as long as things go as planned, we should be able to achieve those targets" of sales of $175 in 2024 million and $225 million in 2025), ¶ 202 (Assertio Adjusted Spectrum Projections).

Financial projections are actionable where they are "made without a reasonable basis or disclosed other than in good faith." *In re Ulta Salon*, 604 F. Supp. 2d at 1196 (complaint adequately

alleged defendants knew "inventory levels as of the date of the IPO were contrary to the trends reported in the Prospectus, because they had the actual data available to them at the time"); *see also Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *9–10 (N.D. Ill. Sept. 21, 2005) (complaint adequately alleged "Defendants ignored facts that seriously undermined the accuracy of the Projections"); *Macovski*, 553 F. Supp. 3d at 483 (holding that if Groupon "omitted a known fact that would make the guidance misleading, the defendants are liable"); *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 207-10 (S.D.N.Y. 2020) (holding "duty at issue is not an ongoing duty to update . . . but a new duty not to omit material information" when discussing company's value because undisclosed preliminary quarterly results undermined that value).

Moreover, channel stuffing is improper when it gives investors the false impression about the company's projected future sales. *See In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1362–63 (N.D. Ga. 2002) (holding "a company is obligated to reveal channel stuffing once sales, earnings, and growth projections were disclosed"), *aff'd*, 374 F.3d 1015 (11th Cir. 2004); *Asher v. Baxter Int'l*, 2005 WL 331572, at *6 (N.D. Ill. Feb. 3, 2005) (*Asher II*) (holding "plaintiffs have sufficiently alleged actual knowledge" based on "allegations that defendants were high level managers, who had access to frequent reports which would lead a reasonable person to believe that the predictions . . . are not accurate and/or missing relevant information"). Specifically in the merger context, projections are regularly held to be actionable where they are unfounded or based on "flawed and inaccurate assumptions." *In re Hot Topic, Inc. Sec. Litig.*, 2014 WL 7499375, at *2, *6 (C.D. Cal. May 2, 2014); *see also Lickteig v. Cerberus Cap. Mgmt.*, 2020 WL 1989424, at *4, *10-11 (S.D.N.Y. Apr. 26, 2020) (valuation multiple can support a claim where undisclosed information shows it was "grossly understated").

Defendants' arguments about projections are dependent on their contention that Plaintiffs

23

have not adequately alleged channel stuffing (Mem. at 24-25), and thus fail for the reasons explained above. These claims are based on more than just hindsight because the projections were inflated by Defendants' unsustainable sales practices.

In addition, Defendants try to differentiate between Spectrum's and Assertio's projections. (Mem. at 25-26). But Assertio's projections were based on Spectrum's projections, were also based on inflated past Rolvedon sales that were the result of channel stuffing, and misleadingly presented Assertio's figures as set to increase because they did not account for the synergies from the Merger. ¶¶ 202-03. Indeed, when Assertio announced its "disappointing" third quarter results because of "high levels of inventory in the channel," those figures were disappointing because they failed to meet *Assertio's* projections. ¶¶ 91-101. Moreover, in addition to being responsible for the Assertio projections, the Assertio Defendants promoted a higher set of projections because Peisert specifically affirmed the higher projections that were the basis for the CVRs. ¶¶ 96, 171.

Defendants also argue that CWs 2, 3, and 4 do not adequately allege the falsity of the projections. (Mem. at 25-27). But the Assertio Defendants' projections were misleading because they were based on Rolvedon's past sales while omitting that those figures were inflated by channel stuffing. The separate CW allegations about the projections themselves corroborate the unsupported nature of these figures that were premised on unsustainable sales practices.

Next, Defendants argue that the Rolvedon projections are protected as forward-looking statements. (Mem. at 27-28). Safe harbor protection, however, does not apply because the cautionary language that Defendants cite was too general and did not warn about Spectrum's sales practices. *See Cent. Labors.' Pen. Fund v. SIRVA*, 2006 WL 2787520, at *23 (N.D. Ill. Sept. 22, 2006) (holding given "allegation that the missing information pertained to the 'principal or important' risks at the time the projections were made, we cannot say, as a matter of law, that the

24

cautionary language was meaningful"); *In re GoHealth, Inc. Sec. Litig.*, 2022 WL 1016389, at *5 (N.D. Ill. Apr. 5, 2022); *In re Boeing*, 2022 WL 3595058, at *24-25. Indeed, all of the risk language that Defendants cite dealt with other topics and none of them disclosed the risk that Rolvedon sales practices were unsustainable. (*See* Mem. at 27-28).

Defendants cite *Asher I* (Mem. at 25), but the Court there ruled that cautionary language did not suffice because "the major risks Baxter objectively faced when it made its forecasts were exactly those that, according to the complaint, came to pass, yet the cautionary statement mentioned none of them." 377 F.3d at 734. The other cases that Defendants cite, unlike here, addressed language that was tailored to the specific risk at issue. (*See* Mem. at 28).

The safe harbor also does not apply because the Assertio Defendants knew that the projected Rolvedon sales were not supported. That knowledge is based on the CW allegations concerning channel stuffing and projections; Peisert's admission that the Merger was not "everything we initially expected" because of "high levels of inventory in the channel"; and the other scienter allegations described. *See supra* at 5-6, 18-20 and *infra* at 33-39. Defendants' projections cases actually held that projections were actionable or did not deal with quantitative projections that were undercut by the company's practices at the time. (Mem. at 25 (citing *Sequel Cap. v. Rothman*, 2003 WL 22757758, at *11 (N.D. Ill. Nov. 20, 2003) (holding projections actionable as to defendants who "by virtue of [their] respective positions, could be said to have had knowledge of Kenny's financial and operational problems" that made projections that "lack[] any reasonable basis") and *St. Lucie Cnty. Fire Dist. Firefighters' Pen. Tr. Fund v. Motorola*, 2011 WL 814932, at *6 (N.D. Ill. Feb. 28, 2011) ("statements that merely predicted that sales figures would increase" were accurate and not undercut by weak holiday sales that did not happen yet))).

Defendants argue that the standard for "actual knowledge" is greater than for scienter.

25

(Mem. at 28). But *Tellabs III*, which Defendants cite, explained that the safe harbor does not apply to a part of "a mixed present/future statement . . . that refers to the present," and proceeded to analyze the "critical question" of how likely it was that the company acted with scienter. 513 F.3d at 705, 709. Another case that Defendants cite held that actual knowledge can be pled based on "circumstantial evidence that a defendant received a contemporaneous report that contradicted an alleged misrepresentation," "allegations of insider trading," or that "key officers knew of facts critical to a business's core operations or to an important transaction that would affect a company's performance." *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 849–50 (N.D. Ill. 2003). The allegations in *Stavros* did not suffice because they dealt with "Exelon's smallest segment that was projected to contribute less than 2% of earnings," *id.*, but all of the bases for actual knowledge that that the court endorsed apply here, as explained in the scienter section below. *Infra* at 33-39; *Asher II*, 2005 WL 331572, at *8 (actual knowledge supported because defendants "financially benefitted from the false information by selling" substantial portions of their stock).[7] The Complaint also alleges actual knowledge because the allegations here are at least as strong as in the many cases cited above where projections were held to be actionable. *See supra* at 22-23.

In addition to not providing adequate cautionary language, the Assertio Defendants' risk factors about the Merger were themselves misleading because they provided a long list of risks that omitted the most important risk that Rolvedon would underperform as a result of Spectrum's sales practices. *See* ¶¶ 185, 242, 252; *see ATI Phys. Therapy*, 690 F. Supp. 3d at 882.

The Assertio Defendants' promotion of the Merger as "fair" and favorable to Assertio

---

[7] Similarly, in *Zoghlin v. Renaissance Worldwide, Inc.*, 1999 WL 1004624, at *8 (N.D. Ill. Nov. 4, 1999), which Defendants cite, the complaint "allege[d] nothing more than a change in the stated condition of the firm," not the type of underlying conduct or defendants' knowledge alleged here.

shareholders was also misleading. *See* ¶ 210, 212, 214-15, 217. The Merger was not fair or beneficial to Assertio shareholders because the valuation of Spectrum in the Merger was based entirely on the projected Rolvedon sales that were not supported for the reasons explained above.

Opinion statements are "actionable as misleading in three ways: (1) the speaker did not hold the belief professed; (2) the opinion statement contained supporting facts which were untrue; or (3) the statement omits material facts about the company's inquiry into or knowledge regarding a statement of opinion when 'those facts conflict with what a reasonable investor would take from the statement itself.'" *Fryman*, 2022 WL 1136577, at *14 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015)). These statements that the Merger was fair are actionable under each of these prongs because Defendants could not possibly have believed the Merger was fair, several of these statements incorporated supporting facts related to Rolvedon sales that were untrue (¶¶ 214-15, 217), and all of these statements omitted the truth about Rolvedon sales that conflicted with the projections that formed the basis for these statements. *See Fryman*, 2022 WL 1136577, at *14 (holding opinion statements misleading under *Omnicare*); *SEC v. Ustian*, 229 F. Supp. 3d 739, 771 (N.D. Ill. 2017) (rejecting "argument that the annual report was just asserting opinions"); *McDonald's*, 2005 WL 2319936, at *16 (rejecting argument that statements were merely "optimism and opinion" after "examining the statements collectively" and in context). Specifically in the merger context, statements that a transaction is "fair" are actionable where, as here, they are contradicted by undisclosed information showing the company was significantly misvalued in the transaction. *See Baum v. Harman Int'l Indus.*, 408 F. Supp. 3d 70, 87-88 (D. Conn. 2019) (holding management's opinions did not reflect their "honestly held beliefs, but rather [used unfounded projections] to convince shareholders that the merger was a fair deal"); *Brown v. Papa Murphy's Holds.*, 2021 WL 1574446, at *2 (W.D. Wash. Apr. 22, 2021)

27

(statements "endorsing" unreasonably prepared projections and "fairness of the Merger" were actionable); *ODS Cap. LLC v. JA Solar Holds.*, 2020 WL 7028639, at *11 (S.D.N.Y. Nov. 30, 2020) (fairness statements were actionable because of "understated and misrepresented" figures).

### 4. Misstatements Promoting Rolvedon

The Assertio Defendants also made many misstatements promoting Rolvedon's purportedly strong performance as crucial to Assertio's business. *See* ¶ 159 ("blockbuster market" and ability to continue growth), ¶ 171 (Rolvedon has had "a very successful launch to that to date"), ¶ 187 (having "completed" acquisition of "key asset Rolvedon" achieved strategic goals), ¶ 188 ("successful launch of Rolvedon"), ¶ 226 ("successful early results in the ROLVEDON® . . . launch"); *see also* ¶¶ 164, 174, 178, 200, 225, 229, 232, 239. Even after announcing disappointing results for the third quarter of 2023, the Assertio Defendants continued to mischaracterize Rolvedon. *See* ¶ 249 ("we did not buy Spectrum just for the third quarter" and "have taken immediate steps to improve the business" and build "Rolvedon's long-term sustainable growth"), ¶ 254 (describing benefits of Rolvedon).

These statements were misleading because Rolvedon did not have a "very successful launch" or the other benefits that Defendants promoted. It was also misleading to discuss Rolvedon in such positive terms while omitting that its sales figures were inflated by channel stuffing. *See supra* at 9-10 (discussing half-truths).

Defendants argue that certain of these statements are inactionable puffery or opinions. (Mem. at 24, 25, 29-31).[8] Whether a statement is puffery is not well-suited to be decided on a motion to dismiss because the assessment of materiality is generally for the trier of fact. *Marks v. CDW Comp. Ctrs., Inc.*, 122 F.3d 363, 370 (7th Cir. 1997); *see also Fryman*, 2022 WL 1136577,

---

[8] Defendants' misstatements discussed in prior sections, related to past Rolvedon sales, projections, or the fairness of the Merger, are also not puffery for the reasons explained above.

at *20 (holding that while "phraseology isolated by Defendants certainly contains ephemeral language," when viewed "in context of [the] full statement, it is clear that [defendant's] comments were not" puffery); *Akorn*, 240 F. Supp. 3d at 815-16 (holding "statements about Akorn's integration efforts being 'on track'" were actionable). Defendants' statements promoting Rolvedon are also not puffery because they make "concrete assertions" concerning the drug's performance, such as by discussing its "successful launch" and "successful early results" that refer to its historical sales figures. *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595-96 (7th Cir. 2021). These statements are objectively false because Rolvedon's launch, as reflected in those figures, was inflated by unsustainable sales practices.

Moreover, "even where a statement is not actionable when considered individually, it can be actionable" when considered in context, such as "if it reinforce[s] factual misstatements and therefore contributes to ongoing deception" *or* "if the speaker is aware that the statement is deceptive." *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1027–28 (N.D. Ill. 2010); *see also Ustian*, 229 F. Supp. 3d at 772 (holding "context can add concreteness to otherwise vague, inactionable statements"); *Hedick*, 2021 WL 3566602, at *10 (same, holding "[c]ontext matters"). Similarly, when a statement does "more than just offer optimistic projections," but also "base[s] those projections on [defendant's] current 'positive financial performance,' even though its strong performance was later reported to be substantially overstated," those statements are actionable. *Sw. Carps. Pen. Tr. v. Merge Techs.*, 2008 WL 11381377, at *6 (E.D. Wis. Mar. 31, 2008).

This analysis also applies to statements that Defendants mischaracterize as mere opinions. *See McDonald's*, 2005 WL 2319936, at *16 (statements not puffery or opinions because they must be examined "collectively in the [their] context"); *Friedman*, 295 F. Supp. 2d at 990-91 (rejecting puffery and opinion arguments); *see also supra* at 27 (discussing opinion statements).

29

For example, statements describing a "prior 'success'"—exactly how the Assertio's Defendants described Rolvedon's launch—contain "substantive information about the health of the company" such "that a reasonable investor could have believed there was a factual basis for such statements." *TreeHouse Foods*, 2018 WL 844420, at *3. In contrast, the statements in the cases that Defendants cite were not concrete in the way that the Assertio Defendants' statements were here and those cases also held that other statements were not puffery. (Mem. at 29-30 (citing *ATI Phys. Therapy*, 690 F. Supp. 3d at 884, 888 (holding certain statements were not contradicted by facts forming the basis of the opinions but statements about "low turnover" and "strong retention" were not puffery); *Conagra*, 495 F. Supp. 3d at 653 (addressing "generalized statements about" likely financial benefits); and *Motorola*, 2011 WL 814932, at *8 (same regarding "operational discipline and execution")).

## B. Plaintiffs State a Claim Under Section 14(a) Against the Assertio Defendants

To state a claim under Section 14(a), a plaintiff must allege: (i) that the proxy statement contained a material misstatement or omission that (ii) caused the plaintiff's injury, and (iii) that the proxy solicitation was an essential link in accomplishing the transaction. *Kuebler v. Vectren Corp.*, 13 F.4th 631, 637 (7th Cir. 2021). "There is no required state of mind for a violation of section 14(a)." *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009). The PSLRA therefore does not impose heightened pleading standards for Section 14(a) claims. *Kuebler*, 13 F.4th at 637. "A proxy solicitation that contains a misleading misrepresentation or omission violates the section even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials." *City of St. Clair Shores Gen. Emps. Ret. Sys. v. Inland W. Retail Real Est. Tr.*, 635 F. Supp. 2d 783, 790–91 (N.D. Ill. 2009). Section 14(a) claims are also "not required to meet the PSLRA particularity requirements because [they] are based on averments of negligence." *Blau v.*

30

*Harrison*, 2006 WL 850959, at \*6 (N.D. Ill. Mar. 24, 2006). Rather, the PSLRA requires only that Plaintiffs "identify each statement alleged to have been misleading, the reason why each statement was misleading, and all relevant facts supporting that conclusion." *Kuebler*, 13 F.4th at 638.

Plaintiffs' Section 14(a) claim is brought on behalf of Assertio shareholders that were entitled to vote on the Merger. ¶¶ 342-43, 348. Defendants' only challenge to this claim is that their Proxy statements are not adequately alleged to be false and misleading. (Mem. at 45). The statements that the Assertio Defendants made in the Proxy materials are false and misleading for the reasons discussed above and include statements of Rolvedon's historical sales figures (¶¶ 208, 219-20; *supra* at 14-21), projections (¶ 202; *supra* at 22-26), fairness statements and other statements in support of the Merger (¶¶ 210, 212, 214-15, 217; *supra* at 26-28), and statements describing Rolvedon's performance (¶ 200; *supra* at 28-30). Defendants also repeated these statements in subsequent versions of the Proxy. ¶¶ 222-24. Plaintiffs have pled their Section 14(a) claim against the Assertio Defendants because these statements are adequately alleged to be false and misleading for the reasons explained above, Defendants do not challenge this claim on any other basis, and Plaintiffs adequately allege all elements of this claim. *See* ¶¶ 342-60.

**C.      The Assertio Defendants' Scienter as to the Rolvedon Statements**

All of the Assertio Defendants' statements related to Rolvedon are adequately alleged to be false and misleading under Rule 10(b)-5(b) for the reasons explained above. The only other element of this claim that the Assertio Defendants challenge concerning the Rolvedon statements is scienter. The standard for alleging scienter is described above. *See supra* at 11-12.

The Assertio Defendants argue that the alleged fraud is irrational. (Mem. at 34). The Complaint, however, sets forth a cogent theory that they were willing to overpay for Spectrum because Assertio needed to acquire a new product since Indocin was on the verge of facing

31

competition and the Assertio Defendants were motivated by their highly suspicious stock sales. *See supra* at 4, 6. Defendants' argument to the contrary is "not an issue to be resolved at the pleadings stage." *Gosselin v. First Tr. Advisors L.P.*, 2009 WL 5064295, at *6 (N.D. Ill. Dec. 17, 2009); *see also Busic*, 2022 WL 3299843, at *24 (explaining defendants "could still have hoped to benefit" if a "resubmitted NDA were ultimately approved"). Defendants also might have hoped to buy time for an unforeseen circumstance, which they had no basis to rely on, to salvage the Company's position. Defendants' argument "confuses expected with realized benefits" because "[t]he fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Tellabs III*, 513 F.3d at 710; *Boeing*, 2023 WL 6065260, at *22 (same).

### 1. Defendants' Timing Arguments Fail

The Assertio Defendants try to differentiate between scienter for their pre-Merger versus post-Merger statements. (Mem. at 34-36). This argument fails because the Complaint need not "fix the exact date and time that [defendants] became aware" of information that rendered their accounting practices misleading. *Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000); *see also Pierrelouis v. Gogo*, 2021 WL 1608342, at *7 (N.D. Ill. Apr. 26, 2021) (holding scienter supported by allegations that "at least by that time, still several months before the full truth came out, [defendants] were aware of the problem to a greater extent than they had revealed in public"). CW 1 described the timeline during which Assertio's executives reviewed weekly Rolvedon sales reports no later than July 2023—before the Merger closed—and were panicked by the end of September. ¶¶ 105-06. Yet the Assertio Defendants continued making misstatements through November 8, 2023. ¶¶ 249-55. CW 1 also explained that Assertio learned about the channel stuffing soon after the Merger, but concealed these facts from the public. ¶¶ 107-08. The Complaint

32

thus adequately alleges a strong inference that they had scienter during the Class Period. The Court need not "fix the exact date and time" at this stage.

Furthermore, the allegations supporting scienter cast suspicion on the Assertio Defendants for the entire Class Period. For example, suspicious stock sales, executive departures, and admissions, by their nature, support scienter when they occur toward the end of the class period because they show that the fraud was coming to a head. These factors cast suspicion over a defendant's state of mind earlier in the class period. *See infra* at 33-34, 36-37.

As for the pre-Merger statements, the Assertio Defendants argue that they could have used the flaws in Spectrum's sales "to negotiate a lower merger price." (Mem. at 36). But that does not account for their recklessness or that by April 25, 2023, they already agreed to buy Spectrum and would have been loath at that point to admit their error and reverse course. ¶ 67.

Defendants also argue that even after the Merger, there was no need to have "announced these Q3 sales numbers earlier than the regularly scheduled" announcement in November. (Mem. at 36-37). But this ignores that channel stuffing and declining Rolvedon sales rendered their recitations of past sales, projections, and promotions of Rolvedon's strength false and misleading, and that they made these statements throughout the Class Period. *See supra* Section II.A.

### 2. The Assertio Defendants' Motive to Commit Fraud

All three of the Assertio Individual Defendants sold substantial portions of their stock— between 33% and 62%—for approximately $1 million on ***the same day*** in September 2023, precisely when CW 1 explains they were raising "alarm bells" about Rolvedon's poor performance and less than two months before they would disclose Rolvedon's terrible third quarter results. ¶¶ 106, 141-47, 269-73, 289. *See Allstate*, 2018 WL 1071442, at *5 ("two substantial stock sales . . . two months and just over eight months before Allstate's negative disclosures" support scienter);

33

*Mkt. St. Sec. v. Racing Champions Corp.*, 2000 WL 1727788, at \*4 (N.D. Ill. Nov. 21, 2000) (defendant having "sold over half of his stock" supports scienter). The Assertio Defendants' stock sales thus by themselves support a strong inference of their scienter.

The Assertio Defendants argue that their stock sales do not support scienter because they were not "unusual or suspicious." (Mem. at 37). But this bare assertion ignores the proportion of their shares that they sold, on the same day, in such close proximity to the corrective disclosures. Moreover, Defendants' contention that "through the date of those" sales, they are not alleged to have "had any post-merger Rolvedon sales data" (Mem. at 38) ignores CW 1's description of their review of weekly Rolvedon sales reports since July 2023, with their sales coinciding exactly with the Assertio Defendants' heightened level of anxiety over Rolvedon's flagging sales. ¶¶ 105-06.

In *Higginbotham* (Mem. at 37), in contrast, defendants sold stock before the "news reached Baxter's headquarters" and there was nothing else suspicious about the sales. 495 F.3d at 759. At the very least, the stock sales here support scienter when "examining all of the allegations in the complaint." *Takara Tr. v. Molex*, 429 F. Supp. 2d 960, 981 (N.D. Ill. 2006) (holding, unlike here, that even sales that are a small fraction of defendant's holdings contribute to scienter).

### 3. Confidential Witnesses Support Scienter

The Assertio Defendants' scienter is supported by CWs that described these Defendants' knowledge of, or recklessness as to, Rolvedon's weak sales. The allegations of these CWs should be credited for the reasons explained above, which also apply to the scienter analysis. *See supra* at 18-21. Additionally, the CWs support a strong inference of scienter for the following reasons.

CW 1 explains that Assertio's executive team, including Defendants Peisert and Schwichtenberg, saw weekly sales reports showing Rolvedon's sales and discussed them at a weekly meeting, starting in July 2023. ¶ 105. By the end of August they "were probably getting really anxious" and there were "alarm bells" in September and panic by the end of that month.

¶ 106. The type of report that CW 1 identified is precisely the type of information that gives rise to a strong inference of scienter. *See Asher II*, 2005 WL 331572, at *8–9 (holding defendants having "routinely accessed weekly (and even daily) revenue and financial reports" supported scienter); *Hedick*, 2021 WL 3566602, at *12 ("Executive Defendants regularly attended meetings where they were informed about . . . KHC's inability to achieve its cost-cutting targets").

Assertio's executives also knew the drop-off in sales was a serious problem because, as CW 1 explained, it was contrary to what Spectrum told them to expect and big accounts were not placing orders because they were "sitting on a lot of the product." ¶¶ 107-08. CW 4 corroborated CW 1's description of the channel stuffing, whereby customers purchased a lot of discounted product and then did not need to purchase more in subsequent quarters. ¶¶ 133-34.

The Assertio Defendants also had access to information—through due diligence before the Merger and owning Spectrum after—concerning Spectrum's sales practices. While the Assertio Defendants reviewed Rolvedon's weekly sales reports by July 2023 (¶ 105), from the perspective of certain Spectrum insiders, the only possible explanation for Merger was that Assertio "didn't do their due diligence" or "homework" before they agreed to the deal. ¶¶ 123-25, 129-32.

The Assertio Defendants thus "either knew or intentionally avoided knowing" about the channel stuffing. *In re Ulta Salon*, 604 F. Supp. 2d at 1196-97; *Ross*, 2012 WL 5363431, at *9 (holding that although "knowledge that students were taking short term jobs does not necessarily indicate awareness that those jobs were being reported improperly, . . . [defendant] cannot ignore the facts and plead ignorance of the risk"); *McDonald's*, 2005 WL 2319936, at *9-10 ("Defendants ignored facts that seriously undermined the accuracy of the Projections."); *Asher II*, 2005 WL 331572, at *6 ("actual knowledge" sufficiently alleged based on "allegations that defendants were high level managers, who had access to frequent reports" that undermined predictions).

### 4. Executive Departures Support Scienter

The Assertio Defendants' scienter is further supported by executive departures coinciding with the announcement of disappointing Rolvedon sales. ¶ 302. Where a termination or resignation occurs immediately around the disclosure of misstatements, "the timing . . . lends weight to a finding of scienter." *Ross*, 2012 WL 5363431, at *10; *see also In re Inotiv, Inc. Sec. Litig.*, 2024 WL 1344784, at *28 (N.D. Ind. Mar. 29, 2024) (scienter supported by "departure of a key executive involved in matters that form the basis of alleged fraud"); *Akorn*, 240 F. Supp. 3d at 820.

Here, Peisert was fired through an "Involuntary Termination" just two months after Assertio announced its disappointing results for Q3 2023. ¶ 137. CWs and analysts stated that Peisert was fired as a result of these events. ¶¶ 111, 125, 284-85. The disappointing Rolvedon sales then continued the following two quarters. ¶¶ 100-01. In addition, Schwichtenberg was demoted and Spectrum's executive responsible for Rolvedon sales was fired as a result of these events. ¶¶ 113, 116, 126, 136, 138, 272. These terminations alongside the announcement of the disappointing Rolvedon sales further support the Assertio Defendants' scienter.

### 5. Additional Evidence of the Assertio Defendants' Scienter

The Complaint also alleges other evidence that supports a strong inference of the Assertio Defendants' scienter. *First*, Assertio and Peisert's admission, when announcing the "disappointing" Rolvedon sales for the third quarter of 2023, that "there were high levels of inventory in the channel at the end of second quarter" and that "certain aspects of the acquisition may not be everything we initially expected," shows that he was aware of the reason for these poor sales—*i.e.*, the channel stuffing that put a high level of inventory in the channel. ¶¶ 270-71, 301.[9] Although Peisert did not make these statements until November 8, 2023, they support the inference

---

[9] Citing a press release quoting Peisert and attached to an 8-K that he signed. ¶ 249.

of his scienter earlier in the Class Period because even "post-class-period data and pre-class data could be used to confirm what a defendant should have known during the class period." *United UURWAW Loc. Union No. 8 v. Great Lakes Dredge & Dock Corp.*, 2014 WL 12780549, at *2 (N.D. Ill. Oct. 21, 2014); *Allstate*, 2018 WL 1071442, at *6 (holding "post-class statement" suggests defendant's statements "were incorrect when made").

The Assertio Defendants' scienter is also supported by their speaking repeatedly about the strength of Rolvedon sales and Spectrum's strategy for the product, their signing SEC filings for the Company, and Peisert and Schwichtenberg signing SOX certifications. ¶¶ 292, 303. Investors are entitled to assume that the Assertio Defendants were informed about the subjects on which they spoke publicly. *See Lowry*, 532 F. Supp. 3d at 663 (holding "the nature and extent of" misrepresentations supported scienter, including because "each individual defendant signed his name on SEC filings . . . containing misleading [revenue] information"). For example, when asked by an analyst about the Rolvedon sales milestones in the Merger, Peisert affirmed that Assertio would "continue with the strategy that the Spectrum team has launched this product with. . . . And as long as things go as planned, we should be able to achieve those targets." ¶ 171. *See also Busic*, 2022 WL 3299843, at *22-23 (holding responses to analyst questions support scienter); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018) (same).

All of these allegations support a strong inference of scienter because they show that the Assertio Defendants, the Company's most senior executives, "had access to proprietary company information, were directly involved in [Assertio's] expansion, and made numerous statements regarding" Rolvedon sales and the acquisition of Spectrum. *Grubhub*, 2021 WL 4077327, at *5.

### 6. Assertio's Core Operations Support Scienter

The core operations doctrine further supports a strong inference of the Assertio

Defendants' scienter. This doctrine holds that officers "can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance." *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003). The "core operations inference applies where the practices 'are a significant part of a company's financial picture.'" *Allison v. Oak St. Health*, 2023 WL 1928119, at *10 (N.D. Ill. Feb. 10, 2023).

The Assertio Defendants were the Company's three highest ranking executives and acquiring Spectrum (whose sole commercial drug was Rolvedon) was how they pursued the Company's core strategy of diversifying its portfolio because of competition to Indocin. ¶ 304; *see supra* at 4. Indeed, Rolvedon sales were projected to exceed Assertio's net sales in 2024 for all of its other products combined. ¶ 304. This case thus presents a paradigmatic example of where high-ranking executive defendants are assumed to have known of facts "critical to a business's core operations" that would affect Assertio's performance. *Sears*, 291 F. Supp. 2d at 727.

Defendants argue that the core operations doctrine does not apply where "where the 'core operations' at issue were those of another company prior to the merger." (Mem. at 38). This argument is contradicted by *Pampena v. Musk*, 705 F. Supp. 3d 1018, 1048 (N.D. Cal. 2023), where the core operations doctrine was applied to hold that Elon Musk's scienter was adequately alleged related to his purchase of Twitter. Defendants cite *Conagra*, which addressed facts very different than the Merger because it dealt with "an enormous $10.9 billion" merger of two "food companies with large portfolios." *Conagra*, 495 F. Supp. 3d at 632, 661. Here, in contrast, Assertio's market capitalization was under $600 million and Rolvedon was core to Assertio's strategy, was its most important product, and was Spectrum's only commercial product. ¶ 304. The Complaint also includes misstatements from when Assertio owned Rolvedon after the Merger closed. It "is almost inconceivable" that the Assertio Defendants "would be unaware of the matters

38

at issue." *Desai v. Gen. Growth Props.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009).

Moreover, even where the core operations doctrine does not support the inference of scienter by itself—which Rolvedon *does* support here—the allegations may still contribute "one relevant part of" that inference. *Allison*, 2023 WL 1928119, at *10. At the very least, the importance of Rolvedon to Assertio's strategy combined with all of the other allegations described above make it "exceedingly unlikely" that the Assertio Defendants' "misleading statements were the result of merely careless mistakes at the management level rather than of an intent to deceive or a reckless indifference to whether the statements were misleading." *Pierrelouis*, 2021 WL 1608342, at *7; *Lowry*, 532 F. Supp. 3d at 663 (holding scienter supported by each defendant's "leadership position that made him privy to RTI's operations . . . , especially with regard to its most important" segment); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) (holding the "more serious the error, the less believable are defendants protests that they were completely unaware of Eagle's true financial status").

### 7.    Assertio's Corporate Scienter

Assertio's scienter is adequately alleged based on the scienter of the Assertio Individual Defendants. *See ATI Phys. Therapy*, 690 F. Supp. 3d at 895-96. Assertio's scienter is also adequately pled based on the scienter of Defendant Riga, who "remain[ed] in a consulting capacity for" Peisert and Assertio following the Merger (¶ 86), as well as Spectrum's other executives and sales team that stayed on at Assertio. *See Takara*, 429 F. Supp. 2d at 980 (corporate scienter alleged based on scienter of corporate agent "acting within the scope of his position").

Even if the Court were to conclude that the Complaint did not allege scienter for any specific individual, the allegations still support Assertio's scienter. "[I]it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Tellabs III*, 513 F.3d at 710; *Hedick*, 2021 WL 3566602, at *14.

39

Given the significance of the misstatements concerning Rolvedon, the suggestion that these misstatements were just the result of "innocent mistakes, or acts of subordinate employees . . . are far less likely than the hypothesis of scienter at the corporate level." *Tellabs III*, 513 F.3d at 711; *see also Brasher v. Broadwind Energy*, 2012 WL 1357699, at \*24 (N.D. Ill. Apr. 19, 2012).

### 8. The Assertio Defendants' Scienter is Alleged on a Holistic Basis

Overall, the allegations here, "considered collectively," support a strong inference of the Assertio Defendants' scienter. *Allstate*, 2018 WL 1071442, at \*5. The "complaint read in its entirety gives rise to a strong inference of scienter, that is . . . at least as compelling as any opposing inference" that Assertio's top executives agreed to purchase Spectrum as part of the Company's central strategy to diversify away from Indocin, and that they had all of the information for Rolvedon described above, yet were not aware or did not recklessly disregard during the entire Class Period that Rolvedon sales were unsustainable because of channel stuffing. *Id.*; *In re Inotiv*, 2024 WL 1344784, at \*28 ("[d]eliberately ignoring 'red flags'" supports scienter); *ATI Phys. Therapy*, 690 F. Supp. 3d at 895 (allegations of "knowledge of worsening attrition," "suspicious departures," and "the core nature of" the issue to ATI's business collectively support scienter).

## III. The Spectrum Defendants' Liability Under Section 14(a) and Rule 10b-5(b)

The Spectrum Defendants (Riga, Brennan, and Spectrum) made similar statements as the Assertio Defendants concerning Rolvedon. These statements that were made in the Proxy materials (¶¶ 204-06, 208, 219-20, 222-24, 343) are subject to both Plaintiffs' Section 14(a) and Rule 10b-5(b) claims and the remainder are subject just to Plaintiffs' Rule 10b-5(b) claim.

These statements—including concerning Rolvedon's historical sales figures (¶¶ 167, 176, 192, 197, 208, 219-20, 222, 233, 235),[10] projections (¶¶ 173, 196, 204-06, 222), and statements

---

[10] When describing why statements are false and misleading, ¶ 198 inadvertently references only ¶¶ 195-96, though it is clear from context that ¶ 198 is also intended to cover ¶ 197.

promoting Rolvedon (¶¶ 160, 166, 172, 176, 193, 234)—are false and misleading for the same reasons as the same or similar statements by the Assertio Defendants. *See supra* Sections II.A.1, II.A.3-4. Moreover, the Spectrum projections, which were represented as a matter of current fact to have been prepared "on a reasonable basis, reflecting the best available estimates and judgments at the time" (¶¶ 204-06), were even higher than the Assertio projections (¶ 202), and thus had even less basis in Spectrum's sales practices.

The Spectrum Defendants also made additional misstatements that Rolvedon "is not a biosimilar." ¶¶ 169, 237. These are actionable because Rolvedon was a biosimilar, as explained by CWs 1 and 2 (¶¶ 110, 118), and thus faced more competition than they indicated. ¶¶ 170, 238, 301. In response, Defendants try to reinterpret the plain meaning of what CWs 1 and 2 said. (Mem. at 32-33). Defendants also improperly rely on a Spectrum SEC filing that may not be considered for its truth because it is not referenced in the Complaint. *See supra* at 3 n.2, 20. This vague document also cannot outweigh the well-pled CW allegations because even Defendants do not rely on its plain language, instead reinterpreting it "[i]n other words." (Mem. at 33).

## A.    Plaintiffs Have Standing as to the Spectrum Defendants

Defendants argue that Plaintiffs, as Assertio shareholders, lack standing under Section 10(b) to bring claims against the Spectrum Defendants. (Mem. at 38-39). Defendants limit this argument to claims "under Section 10(b)," conceding that Plaintiffs have standing as to the Spectrum Defendants for their statements subject to Section 14(a).

The law is clear that shareholders of an acquiring company can bring a §14(a) claim against the target. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1266 (N.D. Cal. 2000) (holding those who make a proxy solicitation should "expect to be held liable for false statements to *all* affected shareholders"); *In re AOL Time Warner*, 381 F. Supp. 2d 192, 232 (S.D.N.Y. 2004)

41

(same where the companies issued a joint proxy). Even the case that Defendants cite, *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022), is limited to §10(b) and does not mention §14(a). This limitation makes sense because if §14(a) did not apply to both the acquired and target companies, it would have little purpose since the statute is intended to protect investors from false statements made by all parties that sign a proxy statement. ¶¶ 72, 199, 222. On the other hand, the "purchaser-seller rule" that formed the basis of *Menora*'s decision is limited to § 10(b). *See Willett v. Procopio*, 2019 WL 4266545, at *2 (S.D. Cal. Feb. 4, 2019).

Furthermore, *Menora* does not apply to any of the Spectrum Defendants' statements, even those outside of the proxy context, because those statements were about how Spectrum would benefit Assertio through the Merger. *Menora*, 54 F.4th at 88-89; ¶¶ 69-72, 160, 166-67, 172-73, 176, 192-93, 195-97. In addition, Defendants' standing argument cannot possibly apply to the Spectrum Defendants' statements after the Merger closed. ¶¶ 233-35.

Lastly, Plaintiffs are not aware of any cases in this Circuit addressing this issue. Even if any of the statements here fit into the scenario addressed by *Menora*, this Court should rule that Plaintiffs have standing because, as the *Menora* opinion concurring in the judgment explains, the majority's "holding is an example of judicial policymaking" that did not follow from precedent. *Menora*, 54 F.4th at 94 (Perez, J., concurring in the judgment).[11] Rather, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975), on which *Menora* is based, held merely that the plaintiff "must be either a purchaser or seller of securities" as opposed to not having traded at all.[12]

---

[11] Plaintiffs satisfy the "direct relationship" test set out in the *Menora* opinion concurring in the judgment because the Merger was essential to Assertio and Spectrum. *See supra* at 4; ¶ 114.

[12] *In re CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181 (9th Cir. 2024), which Defendants did not cite, also does not apply because it is based on *Menora* and dealt with statements made "before the merger was announced." *Id.* at 1183. Here, all of the Spectrum Defendants' statements were made after the Merger was announced and were therefore "about" Assertio.

**B.** **The Spectrum Defendants' Scienter as to Rolvedon Sales**

The Spectrum Defendants' scienter is supported by many of the same factors discussed above as to the Assertio Defendants. *First*, Riga and Brennan reaped millions of dollars in profit from having their Spectrum securities overvalued in the Merger, as well as from other financial "arrangement[s]" upon "consummation of the Merger." ¶¶ 109, 149-52. This supports scienter because they "had motive to inflate [Spectrum's] stock" to "increase [the] payout to Defendants upon an acquisition." *Grubhub*, 2021 WL 4077327, at *5; *see also Schaps v. McCoy*, 2002 WL 126523, at *3 (N.D. Ill. Jan. 31, 2002) (holding scienter supported by motive to inflate stock price "to profit through the sale of inflated shares and to obtain executive compensation incentives"); *Blanchard v. EdgeMark Fin. Corp.*, 1999 WL 59994, at *13–14 (N.D. Ill. Feb. 3, 1999) (scienter adequately alleged in the merger context based on motive to allow insiders "to profit from the concealed information"). The Spectrum Defendants also had the further motive that "Riga was looking" to sell Spectrum because "[m]oney was tight." ¶ 114. These motives to profit from the sale of a troubled company are far more specific than the "generalized motive common to all" executives that Defendants cite. (Mem. at 43).

*Second*, multiple CWs pointed specifically to Riga's awareness of the fraud. ¶ 108 (CW 1 stating the misconduct went up to Riga), ¶¶ 124, 126 (CW 3 stating that Riga was told sales goals were impossible and implicating a Spectrum executive that reported to Riga). *See supra* at 34-45.

*Third*, the executive departures described above—including the termination of Spectrum's SVP of Sales and Marketing—highlight the fraudulent nature of how Defendants misrepresented Rolvedon's sales. ¶¶ 113, 121, 126, 128; *see supra* at 36.

*Fourth*, Riga spoke extensively about the purported strength of Rolvedon sales, including in response to analyst questions, (¶¶ 160, 166-67, 169, 172-73, 176, 193, 233-35, 237) and he and Brennan signed SEC filings for Spectrum (¶¶ 158, 176, 192, 195, 199, 219, 222). *See supra* at 37.

43

*Fifth*, the core operations doctrine applies to Riga and Brennan (Spectrum's CEO and CFO) because Rolvedon was Spectrum's sole commercial product. ¶¶ 32-33, 197; *supra* at 37-39.

*Fifth*, "a strong inference of corporate scienter" is supported even without "nam[ing] the individuals who concocted and disseminated the fraud," given the significance of Spectrum's misstatements concerning its only commercial product. *See supra* at 39-40.

Defendants' cases concerning the Spectrum Defendants' scienter did not contain these types of allegations and held scienter was supported for other claims. (Mem. at 42-43 (citing *Boeing*, 2023 WL 6065260, at \*14, \*17, \*22 (holding it "exceedingly unlikely" defendants "did not at least recklessly disregard" falsity); *City of New Orleans Emps.' Ret. Sys. v. PrivateBankcorp*, 2011 WL 5374095, at \*4-5, \*8 (N.D. Ill. Nov. 3, 2011) (lacking defendant-specific allegations, "any personal, concrete benefit," or core operations allegations); *Higginbotham*, 495 F.3d at 758 (defendants in the U.S. had no reason to know information from Brazilian subsidiary was false); *Cornielsen v. Infinium Cap. Mgmt.*, 916 F.3d 589, 602 (7th Cir. 2019) (plaintiff did not identify defendant-specific statements or the information that made them false))).

For all of these reasons, Plaintiffs adequately allege a strong inference of scienter as to Riga, Brennan, and Spectrum on a holistic basis. *See supra* at 11-12, 40. These Defendants do not even offer a competing inference, arguing only that their "own Assertio holdings also decreased." (Mem. at 44). That "argument confuses expected with realized benefits" (*supra* at 32), overlooks the fact that Riga and Brennan may have sold stock when they were no longer required to disclose their sales after they left the Company, and ignores their other significant Merger compensation.

## IV. Plaintiffs State a Claim Under Rule 10b-5(a) and (c)

All Defendants are also liable, independently, under Rules 10b-5(a) and (c), because they engaged in a fraudulent scheme by conducting the Merger based on Rolvedon sales figures that were inflated by channel stuffing, in order to compensate for Assertio's decline in revenue from

44

competition to Indocin. ¶ 331. This constitutes a fraudulent scheme because Rules 10b–5(a) and (c) are "expansive" and "capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019).

Defendants argue these claims may not be based on the same allegations as Plaintiffs' misrepresentation claim. (Mem. at 44). But Defendants notably do not cite any recent cases from this Court, which hold that "*Lorenzo* effectively abrogated the line of cases on which defendants rely and permits liability under Rule 10b-5(a) and (c) for both making and disseminating misleading statements." *SEC v. Kameli*, 2020 WL 2542154, at \*14 (N.D. Ill. May 19, 2020); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (same); *Puddu v. 6D Glob. Techs.*, 2021 WL 1198566, at \*11 (S.D.N.Y. Mar. 30, 2021) (same). The Complaint also adequately alleges Defendants' scheme and state of mind with particularity, as explained above.

Furthermore, even according to Defendants' outdated standard, the Complaint alleges that all Defendants engaged in deceptive conduct separate from their misstatements, based on their orchestration and oversight of the channel stuffing scheme and conducting the Merger at an inflated value for Spectrum, in order to compensate for generic competition to Indocin and profit from the sale of a cash-strapped Spectrum. *See supra* at 3-6; ¶ 114.

## V.   Plaintiffs State a Claim Under Section 20(a)

Defendants' Section 20(a) argument is based solely on their arguments as to Plaintiffs' other claims (Mem. at 45), and fails because those predicate claims are adequately alleged.

### CONCLUSION

Defendants' motion should be denied in full for the reasons explained above. Alternatively, if the Court grants any part of the motion, Plaintiffs respectfully request leave to amend because this is "the first time" that the Court is ruling on the substance of Plaintiffs' claims. *Garden City Emps.' Ret. Sys. v. Anixter Int'l*, 2011 WL 1303387, at \*31 n.33 (N.D. Ill. Mar. 31, 2011).

Dated: October 10, 2024

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Michael Grunfeld* _____
Jeremy A. Lieberman
Michael Grunfeld (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mgrunfeld@pomlaw.com

*Lead Counsel for Plaintiffs*

**DJS LAW GROUP LLP**
David J. Schwartz
274 White Plains Road, Suite 1
Eastchester, New York 10709
Telephone: (914) 206-9742
david@djslawllp.com

*Counsel for Lead Plaintiff Continental
General Insurance Company*

46