**IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PERRY SHAPIRO, et al.,

        Plaintiffs,

v.

ASSERTIO HOLDINGS INC., et al.,

        Defendants.

No. 24-cv-00169

Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

Assertio Holdings Inc. (Assertio) is a pharmaceutical company whose non-patented product, Indocin, used to treat various forms of arthritis, was a key component of Assertio's product portfolio. Seeking to diversify its portfolio, Assertio acquired Spectrum Pharmaceuticals, Inc. (Spectrum), a pharmaceutical company whose only product was a patented oncology drug. The acquisition, however, did not achieve its desired results and Assertio's stock price dropped. Plaintiffs, various shareholders in Assertio bring this putative class action for securities fraud under Section 10(b), Section 14(a), and Section 20(a) of the Securities Exchange Act, against Assertio and Spectrum, as well as several of the companies' officers. (collectively Defendants). R.73.

Before the Court is Defendants' motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). R. 82, Mot. Dismiss.[1] The Court

---

[1] Citations to the docket are indicated by "R." followed by the docket number or filing name, and, where necessary, a page or paragraph citation.

grants the motion.

## Background[2]

Assertio is a pharmaceutical company whose primary pharmaceutical product is Indocin. Am. Compl. ¶ 2. Indocin is "a nonsteroidal anti-inflammatory drug marketed in an oral and suppository formulation used to treat rheumatoid arthritis, inflammation, and other painful conditions." *Id.* Indocin represented 64–70% of Assertio's revenue from 2022 through the first half of 2023. *Id.* Despite having a "*de facto* monopoly" over the suppository form of Indocin, Indocin was not patented. *Id.* ¶ 3. Consequently, Assertio faced a risk of competition from generic competitors. *Id.* This risk of competition was heightened both by Assertio's decision to implement price increases for Indocin, and a Food and Drug Administrative (FDA) process by which companies could get expedited approval for drugs with inadequate competition, also known as "Competitive Generic Therapies." *Id.* ¶¶ 45–47.

Defendants Peisert, Schwichtenberg, and Patel all served in various positions at Assertio (collectively the Assertio Individual Defendants). Defendant Peisert served as Assertio's President, CEO, and a Director from December 14, 2020, until his departure on January 2, 2024. *Id.* ¶ 28. Defendant Schwichtenberg served as Assertio's Senior Vice President and CFO from March 2021 until November 2023, and then as Assertio's Senior Vice President, Commercial Pricing, Analytics and Distribution until February 2024, when he moved to Assertio's Senior Vice President

---

[2]The Court takes the factual background from the well-pled allegations in the Amended Complaint (R. 275) and assumes the allegations to be true for the purposes of the instant motion. *See, e.g., Anicich v. Home Depot U.S.A., Inc.*, 852 F.3d 643, 648 (7th Cir. 2017).

and Chief Commercial Officer. *Id.* ¶ 29. Defendant Patel was Assertio's Senior Vice President and Chief Accounting Officer from March 2021 until November 2023, when he became Assertio's Senior Vice President and CFO. *Id.* ¶ 30.

Defendants Riga and Brennan both served in positions at Spectrum (collectively the Spectrum Individual Defendants). Defendant Riga served as Spectrum's President, CEO, and Director from December 2021 until Assertio's acquisition of Spectrum, after which he was retained in a consulting capacity, and Defendant Brennan served as Spectrum's CFO from May 2022 until Assertio's acquisition of Spectrum. *Id.* ¶¶ 32–33.

## I. Assertio's reliance on Indocin and Increasing Competition

On August 3, 2023, Zydus, another pharmaceutical company, successfully obtained the Competitive Generic Therapy designation for a 50 mg suppository formulation of indomethacin. *Id.* ¶ 48. Well before that date, in March of 2021, Zydus had applied for a "suitability petition" with the FDA, "requesting that the FDA declare a 100 mg indomethacin suppository formulation would be suitable for submission in an Abbreviated New Drug Application ("ANDA")." *Id.* ¶ 48. It withdrew this petition after receiving the August 2023 final approval of the Competitive Generic Therapy designation for the 50 mg suppository formulation. *Id.* ¶ 48. Before the petition was withdrawn, however, in September 2021, ProPharma Group ("ProPharma"), a pharmaceutical research consulting organization, submitted comments to the FDA "on behalf of a client" requesting that Zydus's petition be denied. *Id.* ¶ 49. Plaintiffs, based upon Assertio's *de facto* monopoly over Indocin at

the time, posit that this undisclosed client was Assertio. *Id.* ¶ 50. Suitability petitions like Zydus's are also public. *Id.* ¶ 48, n.5. Thus, Plaintiffs allege that Assertio was aware of Zydus's efforts to produce a generic competitor of Indocin prior to the September 2023 approval. Further, in March of 2023, Hopewell Pharma Ventures (Hopewell Pharma) similarly submitted a suitability petition to the FDA for approval of a 100 mg suppository formulation of indomethacin. *Id.* ¶ 51.

Wells Pharma of Houston LLC (Wells Pharma) also began marketing an indomethacin suppository formulation. *Id.* ¶ 54. On September 16, 2022, Assertio sent Wells Pharma a cease-and-desist letter, which prompted litigation between the two competitors in which Assertio alleged it had lost sales, customers, and market share to Wells Pharma. *Id.* ¶¶ 54–55.

In Assertio's March 8, 2023 annual report (March 8, 2023 Form 10-k) and its August 9, 2023 quarterly report (August 9, 2023 Form 10-Q) filed with the Securities and Exchange Commission (SEC), Assertio made various statements about the competition Indocin was facing, including that Assertio:

> face[s] competition and potential competition from several sources, including pharmaceutical and biotechnology companies, generic drug companies, and medical devices and drug delivery companies. There are no patents covering the INDOCIN products, which means that a generic drug company could file for and obtain approval of, and launch, a generic form of these drugs at any time. We are aware of other drug companies that have had interactions with regulatory agencies including the U.S. Food and Drug Administration ('FDA') relating to indomethacin, which could indicate the development of one or more INDOCIN product generics or other formulations of indomethacin.

*Id.* ¶¶ 56–57, 154. It also stated that Assertio "currently faces competition for INDOCIN suppositories from what we believe is an unlawful compounder and could

face generic competition at any time for the INDOCIN products," and that "the entry and sales of generics of our products (including the INDOCIN products which are not patent protected and may face generic competition at any time) and/or other products competitive with any of our products (including compounded indomethacin suppositories that a 503B compounder recently began selling in what we believe to be violation of certain provisions of the FDCA and which compete with our INDOCIN suppositories)" as a factor that affects the Company's operating results and that could adversely affect its stock price. *Id.* ¶ 156. Assertio did not disclose that the instances of competition were Zydus's suitability petition, nor Assertio's litigation with Wells Pharma.

On August 3, 2023, Assertio issued a press release with the news that Zydus had received FDA approval for its 50 mg indomethacin suppositories, and that Assertio was withdrawing its 2023 financial outlook to assess that news. *Id.* ¶ 66. Assertio's stock price dropped 45.6% that day. *Id.*

## II.    Spectrum Acquisition

Around 2022, Assertio began taking additional steps to offset the risk posed by the possibility of a generic competitor entering the market. *Id.* ¶¶ 4–5. Specifically, Assertio began looking for patented products it could acquire. *Id.* It disclosed this plan to investors in presentations in 2022 and 2023. *Id.* ¶¶ 61–64. On April 25, 2023, Assertio announced that it agreed to acquire Spectrum, a pharmaceutical company whose sole commercial product was Rolvedon, a patented oncology drug. *Id.* ¶ 6.

In an April 25, 2023 call discussing the acquisition, Defendant Peisert stated that the "transaction accelerates our strategy to diversify and extend the duration of our portfolio" and "is expected to accelerate and diversify Assertio's growing revenues . . . . In summary, we expect this transaction to enable us to exceed our near-term business development objectives. The addition of ROLVEDON to our portfolio will immediately diversify and accelerate the revenue growth trajectory of Assertio." *Id.* ¶ 73. Defendant Peisert also stated that Assertio "intend[s] to retain the majority of Spectrum's commercial infrastructure," which Defendant Riga also echoed in his comments. *Id.* ¶¶ 82–84.

Defendant Riga also stated at this conference that "ROLVEDON was the first novel product to enter the long acting G-CSF space in over 20 years that is not a biosimilar." *Id.* ¶ 76. A "biosimilar" medication is a biologic medication that "is highly similar to a biologic medication already approved by FDA – the original biologic (also called the reference product)." *Id.* ¶ 76, n.12. In other words, a "biosimilar" product has no clinically meaningful differences from the reference product, and it has the same safety and effectiveness as the reference product. *Id.* At this same call, Defendant Riga reaffirmed in response to an analyst question that "[Rolvedon] is not a biosimilar." *Id.* ¶ 169.

The transaction was also described as an example of "Assertio's attractiveness as an acquirer of new, accretive assets across diverse therapeutic categories, and ability to continue their growth and achieve profitable contributions faster and more efficiently than could be achieved on a standalone basis," ¶ 159, and as "synergistic,"

"expected to accelerate and diversify," and "a pathway to more than doubling our existing revenue based with near-term potential to have two products generating greater than $100 million." ¶ 163. Defendant Riga described it as "continu[ing] to commercialize Rolvedon while extracting operational strategies," which Spectrum shareholders will "capitalize" on. *Id.* ¶ 166. He stated that Assertio as being "in good hands with the team with a proven track record of success in oncology," and that they will "create long-term shareholder value." *Id.* ¶ 145. He expressed "confiden[ce] in our ability to execute on those numbers." *Id.* ¶ 172.

Assertio continued to promote the acquisition as one that would diversify Assertio's revenue base through statements in its July 31, 2023 press release announcing the closure of the acquisition, as well as in its August 3, 2023 press release announcing its quarterly results, and the corresponding conference call. *Id.* ¶¶ 78–79. These included statements that Assertio aimed to "protect Indocin," "create internal opportunities for growth," and that the merger was a tactic "completed in the aim of achieving that strategy." *Id.* ¶ 187. Peisert stated that Spectrum was "clearly doing a tremendous job with the launch of Rolvedon," and that "combined, we're stronger." *Id.* ¶ 188. Riga stated that the merger would "set the brand up for long-term success and accelerate the profitability." *Id.* ¶ 193.

The Proxy Materials described the acquisition as "enhancing Assertio's leadership position," "expanding" Assertio's portfolio, and providing asset and revenue "diversification," and that historical information, financial conditions, results, and other factors "weigh in favor of the Merger." *Id.* ¶¶ 200, 217. Various

statements by the Defendants described the merger as "transformative," as creating a "diverse revenue base," a sustainable near-term growth driver," and "long-term growth strategy," and that "employees should take great pride in the excellent Rolvedon performance to date. *Id.* ¶¶ 229, 232, 235.

A substantial portion of Spectrum's team stayed with Assertio following the acquisition, and Assertio reiterated that it intended to maintain Spectrum's team. *Id.* ¶¶ 85–88.

### III. Defendants' Valuation of Spectrum

Plaintiffs allege that throughout the acquisition process, Defendants relied on Rolvedon sales data that had been improperly inflated, which eventually came to light after the acquisition closed. On August 3, 2023, immediately after the acquisition, Assertio announced in its second quarter results for 2023 that "ROLVEDON continues its exceptional launch trajectory as second quarter sales increased to $21.0 million, from $15.6 million in the first quarter." *Id.* ¶ 89. Previously, on June 2, 2023 in the Registration Statement, Prospectus, and Joint Proxy Statement for the Spectrum acquisition, it was reported that Rolvedon generated $10.1 million in sales in the fourth quarter of 2022 (the first quarter that it was launched) and $15.6 million in the first quarter of 2023. *Id.* ¶ 90. Assertio's management projected that Rolvedon would generate $46 million in net sales for the second half of 2023, $130 million in 2024, and $157 million in 2025. *Id.* ¶ 91. These numbers were based off of an unaudited prospective financial analysis that Spectrum conducted. *Id.* ¶ 92. The numbers that Assertio actually disclosed in the Registration

Statement, however, were lowered from the estimates that Spectrum management had reached in their analysis. *Id.* ¶¶ 93–94. Plaintiffs allege that this adjustment shows that Assertio's management was aware of certain flaws in Spectrum's projections. *Id.* ¶ 94.

But the numbers turned out much lower than even Assertio had projected in the Registration Statement. Assertio announced its third-quarter results on November 8, 2023—the first quarter-close post-acquisition—which showed that Rolvedon's net sales were $7.1 million for the two months following the acquisition, resulting in sales far off-pace from the $46 million that Assertio projected for the second half of the year and the $97 million that Spectrum projected for the full year. *Id.* ¶¶ 97–98. Assertio stated that "[w]hile the early phase of the launch benefited from favorable reimbursement, expectations for an incremental demand increase from a permanent J-code, effective April 1, have not been achieved, and there were high levels of inventory in the channel at the end of second quarter." *Id.* ¶ 98. Yet Assertio still stated that "the rationale for the merger and our commitment to diversification are evidence," and that Rolvden brings "enhanced competencies," "support" for a "broader strategic vision for the future," and that it is "still very attractive." *Id.* ¶ 254.

Rolvedon sales continued to decrease into the first quarter of 2024. In the fourth quarter of 2023, the first full quarter post-acquisition, Assertio reported $11 million in net product sales for Rolvedon, while stating that Assertio had "successfully addressed high levels of inventory in the channel and implemented an updated commercial strategy expected to drive sales growth throughout 2024 while

maintaining pricing discipline." *Id.* ¶ 100. In the first quarter of 2024, Assertio reported net product sales of Rolvedon to be $14.5 million, which was still far off earlier projections related to the acquisition. *Id.* ¶ 101.

### a. Confidential witnesses report Spectrum's revenues were improperly inflated

Four confidential witnesses explained how Spectrum's revenues had been improperly inflated by Spectrum in the acquisition process. First, Confidential Witness 1 (CW 1) was a member of Assertio's executive team and who reported directly to Defendant Peisert from Spring 2021 through March 2024. *Id.* ¶ 102. CW 1 explained that shortly after Assertio's acquisition of Spectrum, Assertio learned that Spectrum's sales were less than what was previously represented. *Id.* ¶ 104. During this time, CW 1 attended weekly meetings wherein Defendant Peisert, Defendant Schichtenberg, and other executives reviewed Rolvedon sales figures. *Id.* ¶ 105. Assertio received Rolvedon sales figures in July 2023, and despite the team's growing alarm throughout August and September 2023 at the low sales figures, Spectrum had assured Assertio that sales would pick up. *Id.* ¶¶ 105–106.

CW 1 explained that Spectrum had inflated its Rolvedon sales figures through "channel stuffing," which involved selling products at a discounted price to partners months in advance, thus inflating sales in the near-term. *Id.* ¶ 107. In other words, Spectrum executives had misrepresented Rolvedon's finances and potential, including Defendant Riga. *Id.* ¶ 108. Assertio executives became aware of the misrepresentations shortly after the acquisition yet did not disclose the discovery. *Id.* ¶ 108. CW 1 also stated that while Rolvedon was patented, there "are biosimilars in

10

that competitive market." *Id.* ¶ 110. CW1 stated that Defendant Peisert was terminated by Assertio because Assertio's board "blamed him for the failure on the Spectrum acquisition," and that Spectrum's SVP of Sales and Marketing was going to be on Assertio's Executive Committee, but was dismissed in the third quarter of 2023 because of the inflated sales figures. *Id.* ¶¶ 111, 113.

CW 2 had worked in sales at Spectrum and Assertio from November 2022 to April 2024. *Id.* ¶ 114. CW 2 stated that they questioned Spectrum's projections pre-acquisitions as too high and opined that Spectrum was "saying that because they wanted to get bought." *Id.* ¶ 117. In their experience, it was a "crowded market with six or seven biosimilar players that insurance plans preferred because they were cheaper." *Id.* ¶ 118. CW 2 also questioned if Assertio had quashed the news of the generic version of Indocin to encourage the Spectrum acquisition. *Id.* ¶ 120.

CW 3 worked for Spectrum from 2014 to June 2023, most recently as Executive Director for Sales. *Id.* ¶ 121. CW 3 stated that Spectrum's projection of $200 million in annual Rolvedon sales and corresponding quarterly projections were "impossible" to reach. *Id.* ¶ 122. In CW 3's opinion, this reality should have been clear to Assertio based on Spectrum's past sales figures, and that Assertio "should have done their homework." *Id.* ¶¶ 122–124.

CW 4 was a Strategic Business Leader for Spectrum and Assertio from mid-2020 to April 2024. *Id.* ¶ 127. CW 4 also stated that Assertio "didn't do their due diligence," and that Spectrum's projections for Rolvedon were a "complete joke." *Id.* ¶¶ 129–132. CW 4 explained that Spectrum sold "buy and bill" drugs, where

customers purchase products for a deal, and that sale goes on the books, but the actual distribution of the product is delayed throughout the quarter. *Id.* ¶¶ 133–134. As a result, Spectrum's customers in Q1 and Q2 had already bought everything they needed for Q2 and Q3 of 2023. *Id.* ¶ 134.

### b. Assertio's Executive Departures

After these events, Assertio fired Defendant Peisert and the Senior Vice President of Sales and Marketing. *Id.* ¶¶ 135, 137. On November 8, 2023, Assertio announced that Paul Schwichtenberg, Assertio's Senior Vice President and Chief Financial Officer (CFO), would be transitioned to a role as Senior Vice President, and that Ajay Patel would now be CFO in addition to his role as Chief Accounting Officer (CAO), "effective immediately after the filing of the Company's Quarterly Report on Form 10-Q for the three months ended September 30, 2023 with the SEC." *Id.* ¶ 136.

### c. Executive Stock Sales and Windfalls

On September 11 and 12, 2023, Defendant Peisert sold approximately 33% of his Assertio securities in a series of sales for total proceeds of $479,341. *Id.* ¶ 141. On September 11, 2023, Defendant Schwichtenberg sold approximately 62% of his Assertio securities for total proceeds of $322,593. *Id.* ¶ 142. Also on September 11, 2023, Defendant Patel sold approximately 41% of his Assertio securities, for total proceeds of $195,769. *Id.* ¶ 143. Each of these sales were the only open-market transactions of Assertio shares made by each respective Defendant during the Class Period, and they were conducted directly rather than through a Rule 10(b)(5)(1) trading plan. *Id.* ¶¶ 144–145.

12

Further, according to Plaintiffs, the Spectrum Individual Defendants received large windfalls as a result of their ownership of Spectrum securities, as their respective option and equity-based rewards were valued based "a fixed dollar amount that will be paid in the form of Assertio common stock," and Spectrum was over-valued in the transaction. *Id.* ¶¶ 148–152.

## IV. Defendants' Statements During the Class Period

Plaintiffs allege a long list of materially false and misleading statements made by Defendants during the Class Period, which spans from March 9, 2023 to January 3, 2024. *Id.* ¶ 153. The two main categories of false statements include: (1) those that "downplayed the risk of generic competition to Indocin," specifically by omitting "information related to pending suitability petitions to the FDA for an ANDA for a 100 mg indomethacin suppository and Assertio's lawsuits with Wells Pharma"; and (2) those that were misleading "because Rolvedon's past sales were inflated by Spectrum's improper sales practices and the drug did not provide the benefit to Assertio that these statements represented." A small subset of statements are alleged to be false and misleading because they represented that Rolvedon was not a biosimilar, when in fact it was, making it less competitive than suggested. *Id.* ¶ 170.

Those statements can be broken up into those made at seven different points in time: (1) those made prior to the announcement of the Spectrum acquisition in Assertio's 2022 Form 10-K; (2) those made announcing the Spectrum acquisition in Assertio's April 25, 2025 Form 8-K and investor call, and Spectrum's April 26, 2023 Schedule 14A; (3) those made announcing the first quarter 2023 financial results in

Assertio's May 9, 2023 Form 8-K, Form 10-Q, and investor call, and Spectrum's May 9, 2023 Form 8-K and Form 10-Q; (4) those made in the proxy materials for the merger in Assertio's Form S-4, which included which included the Joint Proxy Statement and Prospectus for the Spectrum acquisition (collectively, the "Registration Statement"); (5) those made in announcing the completion of the Spectrum acquisition and second quarter 2023 financial results in Assertio's August 1, 2023 Form 10-K, August 3, 2023 Form 8-K and investor call, and August 9, 2023 Form 10-Q; (6) those made amending the financial disclosures related to the merger in Assertio's October 10, 2023 Form 8-K/A; and (7) those made announcing third quarter 2023 financial results in Assertio's November 8, 2023 Form 8-K, Form 10-Q, and earnings call.

## V.     Resulting Investor Losses

Plaintiffs allege that Assertio's statements downplaying the risk of generic competitors to Indocin directly caused the stock price drop on August 3, 2023, which was the day Zydus received FDA approval for the Indocin competitor, and the day Assertio withdrew its financial outlook to assess that news. *Id.* ¶¶ 259–262.

Various analysts also lowered revenue assumptions for Assertio in the days after that announcement. *Id.* ¶¶ 263–264. These reports, however, still highlighted Assertio's acquisition of Rolvedon and its promising expectations as a reason to be optimistic. *Id.* ¶¶ 265–268. Consequently, Plaintiffs allege, Defendants' failure to disclose the inflated sales projections resulted in the large stock price drop beginning

14

on November 9, 2023, after Assertio issued its disappointing third quarter 2023 results and changes to senior leadership. *Id.* ¶¶ 269–277.

According to Plaintiffs, even after those third quarter results were issued, Defendants still failed to disclose the inflated sales projections and the reasons for senior leadership terminations, so analysts continued highlighting Rolvedon as a reason to be optimistic. *Id.* ¶¶ 278–282. These continued misrepresentations, Plaintiffs allege, caused the next stock price drop after Assertio announced Defendant Peisert's departure from the company on January 3, 2026. *Id.* ¶¶ 283–288.

Plaintiffs, a group of investors in Assertio sued Defendants for false and misleading statements under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)) and Rule 14a 9, as well as claims under Section 20(a) for controlling person liability. R. 73, Am. Compl. Plaintiffs allege two main instances of fraud (1) that Defendants failed to disclose two specific instances of competition from generic versions of Assertio's main product, a drug called Indocin; and (2) in Assertio's acquisition of Spectrum, Defendants improperly inflated certain sales data for Spectrum's primary product, a drug called Rolvedon. Before the Court is Defendants fully briefed motion to dismiss pursuant to Federal Rule 12(b)(6).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. FED. R. CIV. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts

as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). The Court need not, however, accept conclusory allegations, or allegations that contain only legal conclusions. *See, e.g., Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 513 (7th Cir. 2020) (citations omitted). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Seventh Circuit has held that a motion to dismiss under Rule 12(b)(6) "doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis in original).

## Analysis

Defendants seek dismissal of the Amended Complaint, asserting that it fails to state a claim for securities fraud. Defendants advance several arguments in support of their motion, including that (1) Plaintiffs fail to plead falsity and scienter with respect to all statements made by Assertio; (2) Plaintiffs fail to allege scienter with respect to all statements made relating to Indocin's competition; (3) Plaintiffs

16

fail to plead loss causation with respect to all statements relating to Indocin's competition; (4) Plaintiffs fail to plead any misrepresentation with respect to Spectrum's alleged improper sales practices; and (5) Plaintiffs failed to plead any particularized allegation that any other general statement concerning the merger was false or misleading. R. 83, Memo. Mot. Dismiss. The Court addresses each argument in turn below.

## I.     Legal Standards for Securities Fraud Claims under the PLSRA

Plaintiffs bring their Amended Complaint under Section 10(b) and Section 20(a) of the Securities Exchange Act, alleging that Defendants made misrepresentations to the investing public, which artificially inflated Assertio's stock price and caused Plaintiffs and members of the putative class to purchase Assertio's stock at those artificially inflated values. Am. Compl. ¶ 1.

Section 10(b) of the Securities Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security . . ., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements Section 10(b) and makes it unlawful for a company or individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements . . . not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). The Supreme Court has clarified that the purpose of this statute is "not to provide investors with broad insurance against market losses,

17

but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

To state a claim for securities fraud under Section 10(b) and Rule 10b-5(b), a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 951 (7th Cir. 2024) (quoting *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008)). While §10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information, disclosure is required "when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (internal citation omitted). In fact, "[m]ere silence about even material information is not fraudulent absent a duty to speak." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995). However, "[i]f one speaks, he must speak the whole truth." *Id.*

Private actions under Rule 10b-5 are subject to the heightened pleading standards of the Private Securities Litigation Reform Act (PSLRA). 15 U.S.C. §78u-4. Congress enacted the PSLRA "[a]s a check against abusive litigation by private parties[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). One of the control measures of the PSLRA is its "[e]xacting pleading requirements," which require plaintiffs "to state with particularity both the facts constituting the alleged

violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Id.* (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)). Specifically, under section 21D(b)(2) of the PSLRA, a plaintiff must state with particularity facts giving rise to a "strong inference" that the defendant acted with the required state of mind. 15 U.S.C. ¶ 78u-4(b)(2).

Here, Defendants challenge the alleged misrepresentations on grounds that Plaintiffs fail to plead falsity scienter, and loss causation. Defendants argue that because Plaintiffs have not adequately pled these elements as to the alleged misrepresentations made by Defendants, Plaintiffs' Amended Complaint should be dismissed. The Court addresses each element in turn.

The scienter element refers to the defendant's required state of mind. *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 601 (7th Cir. 2019). To sufficiently plead scienter, a plaintiff must plead a "strong inference" that the defendant acted with the required intent to "deceive, manipulate, or defraud[.]" *Tellabs*, 551 U.S. at 313–14. A strong inference demands more than a plausible or reasonable one, it must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* To make this determination, the Court must review "all the allegations holistically." *Matrixx*, 563 U.S. at 48. The PSLRA also contains a safe harbor for "forward-looking" statements, or "predictions or speculations about the future." *Makor*, 513 F.3d at 705. Specifically, the PLSRA requires that a complaint allege "actual knowledge" of falsity for "forward-looking"

19

statements, or "predictions or speculations about the future." *Id.* (citing 15 U.S.C. § 78u-5(c)(1)).

To prevail on a §10(b) claim, a plaintiff must also allege that the defendant made a statement that was "*misleading* as to a *material* fact." *Matrixx*, 563 U.S. at 38 (emphasis in original). The Supreme Court has consistently rejected a bright line rule for materiality but has held that a representation may be material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*

Finally, a plaintiff bringing a securities fraud claim under the PSLRA must "prov[e] that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. §78u–4(b)(4). In other words, the plaintiff has the burden to show "that the loss in value of [plaintiffs'] shares was proximately caused by the defendants' alleged misrepresentation." *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 994 (7th Cir. 2007). The loss causation element "attempts to distinguish cases where the misrepresentation was responsible for the drop in the share's value from those in which market forces are to blame." *Id.* at 995. This is because the broader purpose of the securities statute is not to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

20

## II.     Statements Related to Indocin

The Court now turns to whether Plaintiffs have adequately alleged the elements of a securities fraud claim for the various misrepresentations alleged with respect to Indocin. Defendants argue that Plaintiffs fail to plead (1) a material misrepresentation, (2) scienter, and (3) loss causation for statements involving Indocin. For the reasons stated below, the Court agrees that Plaintiffs have failed to plead a material misrepresentation and dismisses all claims related to statements made about Indocin's competition.

Defendants first contend that they could not have misrepresented anything related to Indocin's risk from generic competitors, because Defendants in fact continuously reiterated that Indocin was at risk from generic competitors. Memo. Mot. Dismiss at 11. Indeed, Plaintiffs' own complaint alleges that Defendants, at multiple points, disclosed that there were no patents covering Indocin, that Indocin was at risk of facing generic competition, and once that competition emerged, Assertio timely disclosed the existence competing generic versions. *See* Memo. Dismiss at 11, n.6. To the extent Plaintiffs allege Defendants still "downplayed" that risk by not disclosing two specific instances of competition—the suitability petitions and the Wells Pharma litigation—Defendants maintain that these disclosures were not material, the information was publicly available, and Plaintiffs have not otherwise pled any loss causation for those omissions.

First, Defendants argue, to the extent Plaintiffs rely on Assertio not disclosing that it opposed Zydus's suitability petition to the FDA for a 100 mg indomethacin

suppository, that Plaintiffs themselves allege that these suitability petitions were public, and therefore available to investors. Memo. Dismiss at 12. Further, Defendants explicitly warned investors in its 2022 Form 10-K that Assertio was "aware of other drug companies that have had interactions with regulatory agencies including the [FDA] relating to indomethacin, which could indicate the development of one or more INDOCIN product generics or other formulations of indomethacin." Memo. Mot. at 12 (citing Compl. ¶¶ 154–155).

Second, to the extent Plaintiffs allege Assertio failed to disclose its litigation with Wells Pharma, Defendants point out that it was in fact explicitly disclosed in its 2022 Form 10-K when Assertio stated that it was "vigorously pursuing remedies" against a competitor who was acting unlawfully. Memo. Mot. at 13 ("a 503B outsourcing facility . . . recently began compounding 100 mg indomethacin suppositories in what we believe to be a violation of certain provisions of the FDCA, including, among others, Section 505 approval requirements for new drugs and labeling requirements related to adequate directions for use.").

Plaintiffs do not dispute that Assertio in fact disclosed that other drug companies had interacted with the FDA, that these interactions could indicate the development of generic competition, and that Assertio disclosed that it was challenging a competitor who was acting unlawfully. Rather, Plaintiffs argue that Defendants "mischaracterized the magnitude of the risk." Resp. at 8. The way Plaintiffs see it, Assertio should have specifically disclosed the existence of the two suitability petitions before the FDA, and, with respect to the Wells Pharma litigation,

22

that Assertio should have disclosed that it "had no reasonable basis to conclude it would be able to prevent the compounder from continuing to operate." Resp. at 9. Further, Plaintiffs state that although this information was publicly available, it was "in an obscure corner of the FDA's website and isolated court dockets that investors would not have been aware of." Resp. at 10.

First, the Court is not convinced that by leaving out those particular details about Indocin's competition, Assertio was misleadingly "downplaying" the risk of competition, such that an investor would have received a false impression about the risk Assertio was facing. As Defendants point out, "[a]n omission renders a statement materially misleading when it creates an 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*, 2022 WL 1642221, at *15 (N.D. Ill. May 24, 2022) (citation omitted). Assertio disclosed the risk of competition on countless occasions (indeed, it was the reason for the Spectrum acquisition in the first place), including the fact that its competitors were interacting with the FDA, which pointed to the development of generic competitors, and that it was pursuing remedies against competitors acting unlawfully. The Court doubts that disclosing that those FDA interactions were specifically suitability petitions (one of which was not approved, and on the other we have no allegations about its success or impact on Assertio) would have materially changed that message. Indeed, as Assertio points out, the Zydus suitability petition which Plaintiffs reference was not ultimately successful. And when Zydus was successful in getting a product approved, Assertio

23

disclosed it the same day. The Court also sees no basis for a company to have to disclose that its position in ongoing litigation is "baseless." Not surprisingly, Plaintiffs cite to no authority creating this duty. In any event, there is no allegation that any Defendant knew the position was "baseless"—this position would in fact be at odds with bringing the litigation in the first place.[3] *See* Memo. Mot. Dismiss at 15–16.

Second, Assertio is correct that all of these details were in the public domain. "Silence is not 'fraud' without a duty to disclose," and "[t]he securities laws do not require firms to 'disclose' information that is already in the public domain." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759–760 (7th Cir. 2007) (antitrust charges were public knowledge, and "[i]f it were enough to demonstrate fraud, then plaintiffs and other investors could have drawn that inference themselves"). Plaintiffs counter that Defendants' cited cases are distinguishable because the information in those cases was much more public, but the Court disagrees.

In *Goucher*, the plaintiffs sued the defendant, a pharmaceutical company and its officers, alleging that that they were injured by defendants' false and misleading statements and omission regarding the development, regulatory approval and commercialization of a new antibiotic drug. The court dismissed plaintiffs' complaint and in doing so, rejected plaintiffs' contention that the defendant failed to disclose that their New Drug Applications (NDAs) did not meet the FDA's guidelines, when

---

[3]The Court notes that Defendants subsequently submitted a Fifth Circuit opinion reinstating their claims against Wells Pharma, reversing the dismissal by the district court. R. 96, Notice Supp. Authority. Plaintiffs still contend that the litigation is baseless. R. 97. The Court finds that the ultimate outcome of this litigation does not change the conclusion that Plaintiffs have not adequately alleged a 10(b) claim based on the withheld details of this lawsuit.

those guidelines were publicly available. *Goucher v. Iterum Therapeutics plc*, 648 F. Supp. 3d 962, 972 (N.D. Ill. 2022) ("Plaintiffs position fails because the information alleged to have rendered Defendants' statements false and misleading was either disclosed by Defendants or otherwise publicly available."). In other words, a reasonable investor could have put together the shortfalls when evaluating the defendant's disclosures and the publicly available information. *Id.* So too here, Defendants disclosed that competitors had interactions with the FDA related to indomethacin, as well as the implications of those interactions. A reasonable investor could have also investigated this claim, seen the suitability petitions, and surmised themselves the risk those suitability petitions posed. Similarly here, when Assertio disclosed that it was pursuing remedies against competitor who "recently began compounding 100 mg indomethacin," any reasonable investor could have looked up that litigation for more details. And there was otherwise no misrepresentation about these details that needed to be corrected.

Plaintiffs cited cases, on the other hand, are distinguishable on this basis. *See Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*, 2016 WL 5720375, at \*6 (N.D. Ill. Sept. 30, 2016) ("Ordinarily, the defendants [sic] are correct that they would not be required to alert investors to the existence of price inflation," but defendants' "misrepresentations created a duty to disclose the existence of generic drug price inflation where none would have otherwise existed"); *Vargas v. Citrix Sys., Inc.*, 716 F. Supp. 3d 1295, 1309 (S.D. Fla. 2024) (finding investors did not need to do their own research to discover whether the misleading statements were true or not); *New Jersey*

*Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013) (rejecting argument that publicly available news reports corrected a material omission, where they were "only 'sporadic news reports,' which do not alone clarify or contextualize the alleged misstatements"); *Powell v. Am. Bank & Tr. Co.*, 640 F. Supp. 1568, 1579 (N.D. Ind. 1986) (finding two Indiana newspaper articles about legislative compromise that were material to stock price were not reasonably available to Michigan individuals, where defendants did not disclose compromise).

Ultimately, the Defendants here disclosed the relevant events. To the extent that publicly available details about those events were not included in those disclosures, the Court finds they are either not material, were publicly available, or that Plaintiffs have not adequately pled scienter with respect to the decision not to include those details. Finally, Defendants are correct that although Plaintiffs insist that Assertio's statement in its first quarter 2023 results that sales were driven by "continued growth of Indocin" misrepresented Indocin's risk of competition, that argument fails because there is no allegation that that statement was false. Memo. Mot. Dismiss at 14.

Again, Plaintiffs cited cases are distinguishable. For example, Plaintiffs cite to *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802 (N.D. Ill. 2017) in support of their argument that Defendants misrepresented the magnitude of the risk of competition. But in *In re Akorn*, the defendant had published "materially false" financial results, where certain numbers were grossly miscalculated (*e.g.*, net income was overstated by 194.7%), did not follow GAAP standards, and ultimately had to be restated. *Id.* at

26

816. The defendants had warned investors that its financial statements "may contain material misstatements," and that the company's controls were not effective, but simultaneously certified the results in SEC filings as "fairly represent[ing] in all material respects our financial condition, results of operations and cash flows at and for the period presented in accordance with U.S. GAAP." *Id.* at 816. Consequently, the previous warnings did not accurately convey how serious the financial misrepresentations were. Here, there were no "misrepresentations" or false impressions that Defendants needed to correct with respect to Indocin's risk of generic competition. Defendants were not holding on to any information that undermined their previous disclosures. *See Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 483 (N.D. Ill. 2021) (sustaining allegation that defendants did not disclose severity of risk where warnings about financial guidance were "boilerplate," and "they had knowledge that seriously undermined the accuracy of that guidance"). Defendants also did not mischaracterize the nature of Indocin's competition. *See United States Sec. & Exch. Comm'n v. Ustian*, 2019 WL 7486835, at \*32 (N.D. Ill. Dec. 13, 2019) (finding dispute of material fact as to whether defendants "mischaracterized the risk of non-certification because, at the time of filing, the risk had become a reality"). Indeed, it promptly disclosed when there were competitors taking steps towards making a generic competing product, and when its competitors were ultimately approved for those products.

For the reasons stated the Court grants the motion to dismiss all claims based on statements related to Indocin's risk of competition from generic products.

### III. Statements Related to Rolvedon Sales

The Court now turns to the second category of allegedly false and misleading statements: those concerning Rolvedon's strength and sales projections. Defendants maintain that, with respect to the Assertio Defendants, the Complaint does not adequately allege a misrepresentation or scienter. With respect to Spectrum, Defendants argue that Plaintiffs (1) lack standing with respect to the Spectrum Defendants; (2) do not plead a misrepresentation; and (3) do not plead scienter. The Court begins with the question of standing below.

### A. Plaintiffs' Standing to Sue Spectrum under Rule 10(b)

Under Supreme Court precedent, "standing to bring a private damage action under SEC rule 10b-5 is limited to actual 'purchasers' or 'sellers' of securities." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975).[4] "The virtue of the [purchaser-seller] rule, simply stated, in this situation, is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." *Id.* at 747. The Plaintiffs in this case are those "that purchased or otherwise acquired Assertio securities between March 9, 2023 and January 3, 2024." Compl. ¶ 1. Plaintiffs do not allege that they ever purchased or sold

---

[4]The Court notes that although this is referred to as an issue of "standing," the Seventh Circuit has noted that this is not standing in the Article III sense, but in the statutory sense. *Eason v. Gen. Motors Acceptance Corp.*, 490 F.2d 654, 657 (7th Cir. 1973) ("The *Birnbaum* rule has been interpreted as a standing requirement in this constitutional and jurisdictional sense. We are satisfied that such an interpretation of *Birnbaum* is unwarranted and we have no doubt that the plaintiffs' interest in the controversy before us is sufficient to satisfy the requirements of Article III.").

Spectrum securities. Defendants point to the Second Circuit's holding that "purchasers of a security of an acquiring company do not have standing under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger between the two companies." Memo. Dismiss at 38–39 (quoting *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 88 (2d Cir. 2022). Plaintiffs do not dispute the Second Circuit's holding, but argue that it (1) is inapplicable here, (2) is limited to claims under Section 10(b), and (3) that Plaintiffs can still sue Spectrum for statements made after the merger closed. Resp. at 41–42. The Court begins by examining *Menora*.

*Menora* involved a merger between two companies, International Flavors & Fragrances and Frutarom Industries Ltd, under which Frutarom became a wholly-owned subsidiary. 54 F.4th at 84–85. Plaintiffs were investors in the wholly-owned subsidiary, who alleged that leading up to the consummation of the merger, Frutarom made materially misleading statements about its compliance with anti-bribery laws and the sources of its business growth. *Id.* at 84. The Second Circuit, citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), held that the plaintiffs lacked standing to sue, because "[u]nder the purchaser-seller rule, standing to bring a claim under Section 10(b) is limited to purchasers or sellers of securities *about which a misstatement was made.*" *Id.* (emphasis added). The Second Circuit stated that "[p]laintiffs here lack statutory standing to sue [Company B] based on alleged misstatements about [Company B] because they bought shares of [Company A], not [Company B]," despite the fact that after those statements were made, Company B

29

became part of Company A, and Company B's previous alleged misstatements lowered the stock price for Company A. *Id.* at 86. "In short, Section 10(b) standing does not depend on the significance or directness of the relationship between two companies. Rather, the question is whether the plaintiff bought or sold the securities about which the misstatements were made." *Id.* at 88. Here, Plaintiffs did not purchase the securities about which misstatements were made, so they did not have standing to sue under Section 10(b) or Rule 10b-5." *Id.* at 89.

The Ninth Circuit has also addressed the issue of standing with respect to statements made in advance of an anticipated merger in *In re: CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181 (9th Cir. 2024), where it adopted the rule in *Menora.* In *Lucid Motors*, the plaintiffs were shareholders in a Company A, who later acquired Company B. In the time leading up to the acquisition, the CEO of Company B made misrepresentations about Company B's ability to meet production targets. *Id.* at 1183. The merger was announced, and the same day, the defendants disclosed that the production targets would not be met, and the stock plunged. *Id.* The Ninth Circuit found that plaintiffs lacked standing under Section 10(b) and Rule 10(b)-5 because they never purchased or sold securities in company B. *Id.* at 1187.

In addition to the Second and Ninth Circuits, at least one district court in the Third Circuit has also followed *Menora, In re Toronto-Dominion Bank / First Horizon Corporation Securities Litigation,*[5] 2025 WL 3302536 (D.N.J., 2025, Nov. 26, 2025) ("the Court agrees with the [defendants] that *Menora* and *Lucid Motors* did not create

---

[5]This case is currently on appeal.

new law, but rather are well-reasoned interpretations of binding Supreme Court precedent"). In *In re Toronto-Dominion Bank*, plaintiffs purchased securities in First Horizon Corporation (but not TD Bank ) after the announcement of a merger between the two companies. In *In re Toronto-Dominion Bank / First Horizon Corporation*, however, the merger never actually occurred, but fell apart due to the misstatements of TD Bank. The court stated that under *Blue Chip*, *Menora*, and *Lucid Motors*, it would "not impute TD Bank's alleged misrepresentations about itself to First Horizon. Thus, Plaintiffs—as purchasers and sellers of First Horizon securities only—do not have standing to sue TD Bank for its misstatements unless those statements were about First Horizon." *Id.* at 15. The court rejected the plaintiffs' contention "that TD Bank's alleged misstatements—about its own regulatory compliance and its own commitment to the merger—were actually about First Horizon because they were made in the context of the pending merger," finding that "this is nothing more than a veiled attempt to relitigate the 'direct relationship' and 'sufficiently connected' tests that were expressly rejected by *Menora* and *Lucid Motors* respectively." *Id.* at 16. Indeed, "[t]he test advocated for by [p]laintiffs 'would begin exactly the "endless case-by-case erosion" of the purchaser-seller rule about which Blue Chip Stamps warned.'" *Id.*

Plaintiffs counter that the Spectrum Defendants' statements were nevertheless *about* Assertio's stock, because, in the face of the pending merger, they referenced how Spectrum would benefit Assertio. Resp. at 42. They also distinguish *Lucid Motors* on the basis that all statements made in *Lucid Motors* were made before the merger

was announced. Here, in contrast, argue Plaintiffs, the statements at issue were made after the merger was announced, and thus were about Assertio. *Id.* at n.12. While this timing occurred in *Lucid Motors*, the facts here are still similar to *Manora*, where the merger was announced, then misstatements were made, and the plaintiffs purchased stock in the acquiring company. Yet the Second Circuit in *Menora* still held that the plaintiffs did not have standing and declined to engage in an inquiry as to how "direct" the relationship was between the companies in the lead-up to the merger.

To state the obvious, the parties agree that there is no authority in the Seventh Circuit on this issue. While *Menora* and *Lucid Motors* are not binding authority on this Court, they are persuasive, and the Court finds that they are factually on point. There is no dispute that Plaintiffs did not purchase securities in Spectrum. They did not allege as such, and they do not argue as such in their response. Further, the statements attributable to Spectrum and the Spectrum Defendants that are *not* part of the proxy statement and solicitation (as those are Section14(a) claims rather than 10(b)) involve statements about Spectrum's financials and strength, not Assertio's. Consequently, Plaintiffs do not have standing to pursue claims against Spectrum for the statements it made about its own securities pre-merger, because under the purchaser-seller rule, they have neither purchased nor sold Spectrum securities. Accordingly, the Court grants the motion to dismiss the Rule 10(b) claims against Spectrum. The Court also grants the motion to dismiss the Rule 10(b) claims against the Spectrum Individual Defendants to the extent the claims are based on statements

32

they made about *Spectrum's* securities pre-merger. These include those claims based on Spectrum's April 26, 2023 Schedule 14A, *see e.g.*, Compl. ¶ 176 ("We delivered strong sales of $10.1 million in the fourth quarter of 2022, and that momentum has continued throughout Q1 of 2023"), and Spectrum's May 11, 2023 10-Q, *see e.g.*, *id.* ¶ 197 ("During the three months ended March 31, 2023, net sales were $15.6 million[.]"). To the extent that the Spectrum Individual Defendants stayed on with Assertio post-merger and made misleading statements on behalf of Assertio, the Court will examine those statements below. Plaintiffs are correct, however, that Defendants do not argue that Plaintiffs' Rule 14(a) claims are due to be dismissed. Thus, the Court declines to dismiss these claims on the basis of standing.

The Court now turns to claims against the Assertio Defendants, as well as the Spectrum Individual Defendants to the extent they stayed on Assertio's team and made statements about Assertio post-merger.

### B. Remaining Statements About Rolvedon

Defendants argue that Plaintiffs fail to state a claim based on the statements about Rolvedon's sales projections because Plaintiffs allege that the projections were misleading due to improper sales practices, and Plaintiffs have not alleged an improper sales practice. Memo. Mot. Dismiss at 17–22. For the reasons stated below, the Court agrees that Plaintiffs have failed to plead an improper sales practice, and because Plaintiffs' 10(b) claims are predicated on Assertio and Spectrum's improper sales practice, the remaining claims are due to be dismissed.

Plaintiffs do not dispute that their Rolvedon claims are founded on the alleged "inflated" sales due to channel stuffing. Channel stuffing can be a form of fraud, and "it refers to shipping to one's distributors more of one's product than one thinks one can sell." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008). "Channel stuffing becomes a form of fraud only when it is used . . . to book revenues on the basis of goods shipped but not really sold because the buyer can return them. They are in effect sales on consignment, and such sales 'cannot be booked as revenue. Neither condition of revenue recognition has been fulfilled—ownership and its attendant risks have not been transferred, and since the goods might not even be sold, there can be no certainty of getting paid.'" *Id.* (noting that "huge number of returns . . . is evidence that the purpose of the stuffing was to conceal the disappointing demand for the product").

Defendants first argue that Plaintiffs have not pled a deceptive sales practice. Memo. Dismiss at 17–18 (citing *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622 (N.D. Ill. 2020), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, 2022 WL 1449184 (7th Cir. May 9, 2022). In that case, the district court dismissed the securities fraud claims which were based on similar allegations about "channel stuffing" in the context of a merger. Memo. Mot. at 18.

The Court finds *Conagra* to be on point. Like the Plaintiffs here, the plaintiffs in *Conagra* "d[id] not allege that any of Defendants' statements about [the company's] historical sales or growth rates were false with respect to recorded sales. Rather,

[p]laintiffs appear to argue that sales recorded pursuant to channel stuffing should have been excluded from the calculations underlying the statements." *Conagra*, 495 F. Supp. 3d at 639. Plaintiffs confirm that this is their theory of fraud in their response, stating that the projections about Rolvedon's strength "were misleading because those figures were a result of channel stuffing." Resp. at 15. The plaintiffs in *Conagra* alleged the defendants "used promotional discounts to shift sales from future periods in order to artificially inflate present period sales figures." *Id.* at 640. In other words, the defendants "accelerated sales so that future sales would decline as customers worked through their excess inventory." *Id.* Again, this is identical to the allegations of the confidential witness here. Compl. ¶ 109 (the "channel stuffing involved 'friends and channel partners that would buy extra at a discount and hold onto it for a few quarters worth . . . trying to boost the sales numbers for their valuation of Spectrum as we're acquiring it,'" then "there were a few big accounts that were expected to 'be ordering at the end of the quarter that didn't and we thought it was because they were sitting on a lot of the product.'").

The court in *Conagra* pointed out that the plaintiffs made no allegations about returns (which would suggest actual fraudulent sales under *Tellabs Inc.* rather than genuine, completed sales), but even if using promotional discounts in the near-term could constitute a fraudulent practice, the plaintiffs had not pled that the discounts were in fact a fraudulent attempt to overstate sales in the instant case. *Conagra*, 495 F. Supp. 3d at 640. The fact that "[the defendant] used promotional pricing to increase sales volume is not enough. . . . Nor, as Plaintiffs recognize, [] is it enough that [the

defendant] attempted to move up the timing of regular sales." *Id.* The court in *Conagra* noted that plaintiffs had not alleged (1) any details about the terms of the promotion; nor (2) an excess of inventory with customers which was caused by the promotions. *Id.* at 641. Post-merger statements that the difference between projected and actual productions were the result of decisions to exit certain promotions, and a decision to "jump-start volume" through "price promotions" that were "not efficient" were found *not* to be admissions to a practice of fraudulent channel stuffing. *Id.*

Plaintiffs counter that they allege more than what was alleged in *Conagra*. Resp. at 15–16. To a certain extent, the Court agrees, but the Court ultimately still finds *Conagra* to be on point here. For example, here there are allegations that there was excess inventory in the channel after the merger (which, to be clear, was disclosed to investors), and allegations (albeit conclusory ones) that the "channel stuffing" was done to make the company look better for the merger. Still, the only specific facts Plaintiffs cite to in support of a fraudulent practice of channel stuffing here are that (1) Assertio admitted that there were "high levels of inventory in the channel at the end of second quarter" and that the acquisition of Spectrum "may not be everything we initially expected," Compl. ¶¶ 97–98, 100, 270–71, and (2) the statement of a confidential witnesses stating that Spectrum was using promotions to increase sales in the short term for pushing the merger through, and that in their opinion, the projections were either "impossible" or difficult to hit.

While Plaintiffs insist that allegations of channel stuffing can constitute fraud, as Defendants point out in their reply, each case cited by Plaintiffs involved alleged

36

facts much more particularized than those here. For example, in *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957 (W.D. Wis. 2003), plaintiffs' allegations of channel stuffing were "barely" able to "scrape by" with descriptions of "endemic" and increasingly aggressive channel scraping, which included specific examples. In *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 321 F. Supp. 2d 1342 (N.D. Ga. 2004), the court had previously granted the motion to dismiss, only allowing the claims through once plaintiffs came back with allegations of "*at least one* specific channel stuffing transaction, including the name of the bottler, the amount of revenue improperly recognized, and when the transaction occurred." *Id.* at 1349 (emphasis in original). This level of detail is required in each case cited by Plaintiffs. *In re Vocera Commc'ns, Inc. Sec. Litig.*, 2015 WL 603208, at *1 (N.D. Cal. Feb. 11, 2015) (allegations of consistent pattern of promotional practices that were actively hurting sales, "including the loss of a $1.5 million sale that [a CW] personally worked on," while company simultaneously represented that sales were strong and consistent with prior years); *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *9 (N.D. Cal. Aug. 14, 2008) ("Recent authority suggests that for an allegation of channel stuffing to be pled with sufficient particularity, it must 'allege "specific transactions, specific shipments, specific customers, specific times, or specific dollar amounts."'"); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 26 (1st Cir. 2002) ("The complaint names five distributors who apparently participated in the practice," and "alleges 'inventory parking' arrangements with certain Cabletron customers, . . . One of the former employee sources named two locations in New Hampshire where inventory was parked"); *Pub.*

*Employees' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1300 (N.D. Ga. 2021) ("builders returned approximately 80% of the LVT Mohawk produced domestically, and retailer customers returned approximately 25–50% of LVT they received"); *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131 (2d Cir. 2021) (alleging that company's largest customers were given undocumented concessions, cash incentives of $500,000, product discounts of up to 20%, extended payment terms, and the "absolute right to return unsold product"); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *8 (N.D. Cal. Aug. 17, 2022) (previously dismissing channel stuffing claims because "[p]laintiffs had failed to aver specific instances of transactions 'indicat[ing] a desire to artificially inflate sales,'" but allowing claims that defendants attributed sales to organic growth rather than harmful promotional practices).

Here, the particularized (as opposed to conclusory) allegations as to channel stuffing consist of the following confidential witness statements:

- CW 2 stated that "money was tight at Spectrum and that's why the CEO, Defendant Riga, knew he had to sell the company." Compl. ¶ 114.

- CW 2 stated CW 2 stated that "Rolvedon is growing but it's not growing to the extent they thought it would. I said, 'If you guys do $100 million, you're lucky.' They were talking $150 million to $200 million potential. I said, 'Sure. Potential.' They were saying that because they wanted to get bought. They needed this drug to be really big." *Id.* ¶ 117.

- CW 2 stated that projecting that Rolvedon sales would be $20 million the first quarter after the Assertio acquisition was a "ridiculous number" because "nobody doubles like that." *Id.* ¶ 118.

- CW 3 stated that Spectrum's projection of Rolvedon bringing in $200 million in sales annually was an "impossible" number to reach. *Id.* ¶ 122.

38

- CW 1 said that part of Spectrum's "story was we would see sales in the first month" following the acquisition (i.e., August). "By early September we [Assertio] were saying, 'When are these sales coming in? You guys keep telling us the end of the quarter.' Then that end of the quarter came and that was very tumultuous because sales didn't come in as expected." The witness stated that there were "alarm bells" in September. *Id.* ¶ 106.

- The witness explained that Spectrum inflated its sales figures for Rolvedon by "channel stuffing and it was all the lies around where this product was and where it was going and when to expect more." This channel stuffing involved "friends and channel partners that would buy extra at a discount and hold onto it for a few quarters worth. A lot of channel customers will hold two to three months of a product and they had people buying a helluva lot more." *Id.* ¶ 107.

- CW 1 stated that Spectrum "basically lied to our executive team at Assertio" about how they "shoved products into channels; and hid product into channels to inflate sales." In particular, there were a few big accounts that were expected to "be ordering at the end of the quarter that didn't and we thought it was because they were sitting on a lot of the product." The Spectrum team told Assertio that large orders would come in September, as they had in the last month of prior quarters, but they did not because those orders from prior quarters were under "buy and hold" arrangements and "these customers weren't ordering because they were sitting on so much." *Id.*

- CW 1 "explained that Assertio then discovered soon after the acquisition that Spectrum had lied to them in the acquisition process, but Assertio concealed these facts from the public. CW 1 stated that people lost their jobs on the Spectrum side once the Assertio team figured out there was a lot of funny stuff happening," and "that this conduct went all the way up to former Spectrum CEO Riga." *Id.* ¶ 108.

- CW 1 said the Spectrum team was "trying to boost the sales numbers for their valuation of Spectrum as we're acquiring it." and Spectrum "was only worth a fraction of" what Assertio paid. *Id.* ¶ 109.

- CW 4 stated that Spectrum sold "buy and bill" drugs whereby "[i]f at the end of the quarter your price is going down and you're running a business and get a deal you might buy" the "inventory for the entire quarter." CW 4 stated that "you purchase it but you don't actually take the order. You bought the product, the company books the sale, but the product is not in

the office so you pull from the inventory throughout the quarter. So there's usage but there's no sales because you already sold it." *Id.* ¶ 133.

- CW 4 specified that Spectrum "offered EOQ [End of Quarter] spiffs," which "goes to the inventory issue and not managing the channel appropriately." The witness stated that Spectrum's "large customers in Q1 and Q2 bought what they needed for all of Q2 and Q3" of 2023. *Id.* ¶ 134.

- CW 1 stated that the Spectrum SVP of Sales and Marketing was going to be on Assertio's Executive Committee, but was dismissed in the third quarter of 2023 because of the inflated sales figures. *Id.* ¶ 113.

In the end, even if the Court credits these confidential witness allegations,[6] they offer very few details about the alleged "channel stuffing." There are no allegations of excessive returns or fraudulently recorded sales, which would constitute fraudulent channel stuffing under *Tellabs*. And even if using promotions to temporarily boost sales could constitute a fraudulent sales practice, not a single one of these statements alleges any detail about a specific transaction, the amount of channel stuffing, the customers involved, personal involvement in the conduct, or the promotions offered. There are also no allegations that Assertio or Spectrum misrepresented the existence of the promotions or the type of promotions.

---

[6]Defendants point out that the Seventh Circuit has held that allegations from "unnamed confidential sources of damaging information require a heavy discount." *City of Livonia Employees' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013). While this is true, they are more convincing from "persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008). The confidential witnesses here worked in sales at Assertio and Spectrum during various time periods, and with varying levels of responsibility. They also offered varying degrees of detail in their accounts. One of them appeared unable to confirm if the promotional scheme was even occurring, stating simply that "*if*" that is what happened, "that's a s*****y thing to do," and "*if* there was channel stuffing . . . Spectrum's SVP of Sales and Marketing . . . would know about it." Compl. ¶ 126 (emphasis added). The Court, however, declines to evaluate the particularities of each confidential witness here, because even crediting all statements, the Court's conclusion still stands.

The confidential witnesses essentially state that although Assertio and Spectrum projected that they would meet sales numbers the next quarter, they ultimately did not, because some large customers already had the inventory they needed for the next quarter. The witnesses then state in a conclusory fashion that Spectrum had lied to Assertio before the merger about the sales expectations because they did not account for these promotions. Under Plaintiffs' own cited cases, these allegations are too vague and conclusory to allege a deceptive sales practice with particularity, or to support the conclusion that Assertio and Spectrum knew that its sales practices were unsustainable, such that they fraudulently hid that fact from investors. Further, if anything, the confidential witnesses allege that *Spectrum* had fraudulently inflated past sales, not Assertio, although the failure to allege a fraudulent practice on behalf of Spectrum dooms any claims against Assertio as well, as Plaintiffs theory of the case is that "Assertio's projections were based on Spectrum's projections."[7] Resp. at 24.

Accordingly, the Court finds that Plaintiffs have failed to plead a false and misleading statement about Rolvedon and grants the motion to dismiss their Rule 10(b) claims.

## IV. Remaining Claims

Plaintiffs do not dispute that their Section 14(a) claims also require a false and misleading statement. *Kuebler v. Vectren Corp.*, 13 F.4th 631, 637 (7th Cir. 2021) ("To

---

[7] CW 1 stated that Assertio discovered after the merger "that Spectrum had lied to them in the acquisition process, but Assertio concealed these facts from the public." Compl. ¶ 108. But again, there are no more details about Spectrum's "lies" apart from the vague allegations that promotions were used to temporarily boost sales.

41

state a claim under Section 14(a), a plaintiff must allege: (i) that the proxy statement contained a material misstatement or omission . . . ."). And while Section 14(a) may not have a state of mind requirement, it still requires that the misleading nature of the statement be pled with particularity. *Id.* at 648 ("the PSLRA imposes heightened pleading requirements on Section 14(a) plaintiffs").

Recall that Plaintiffs' theory of the case is that Defendants' statements were misleading because they were based on sales numbers that were achieved "improperly," not because Defendants did not actually make the sales they reported. As the Court previously found, Plaintiffs have not pled with particularity any "improper" sales practices that would make Defendants' statements misleading. Because the Section 14(a) claims are also based on the allegedly improperly inflated sales numbers, these claims fail for the same reasons as the Rule 10(b) claim. Further, without a Section 10(b) or Section 14(a) claim, Plaintiffs cannot state a claim under Section 20(a). *Id.* at 647, n.6 ("Section 20(a) liability is derivative. Because plaintiffs' predicate Section 14(a) claim fails, their Section 20(a) claim necessarily fails.").

Finally, to the extent Plaintiffs rely on the Spectrum Defendants' statements that Rolvedon "is not a biosimilar," the Court finds that these claims fail not only because they were made by Spectrum Defendants pre-merger, but also because the only allegations about whether or not Rolvedon was actually a biosimilar are CW 1's statement that there "are biosimilars in that competitive market," Compl. ¶ 110, and CW 2's statement that "[t]his was a crowded market with six or seven biosimilar players," Compl. ¶ 118. As Defendants point out, neither of these statements actually

42

say that Rolvedon is not a biosimilar, and Plaintiffs do not otherwise explain how it is not a biosimilar. Reply at 12. Indeed, Plaintiffs appear to rely on these CW statements to emphasize that Rolvedon faced more competition than disclosed. Plaintiffs do not otherwise develop a separate claim based on Rolvedon's status as a biosimilar product. Accordingly, the Court grants the motion to dismiss claims based on Defendants' statements about whether Rolvedon was a biosimilar.

## Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is granted. If Plaintiffs believe they can file a complaint consistent with this opinion, they may do so on or before July 30, 2026.

Date: July 10, 2026

United States District Judge
Franklin U. Valderrama

43